UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 03-852 (MLC) |
| v. | : | |
| | : | **MEMORANDUM OPINION** |
| ATLANTIC STATES CAST IRON | : | **ON MOTION TO DISMISS** |
| PIPE CO., JOHN PRISQUE, | : | **PORTIONS OF INDICTMENT** |
| SCOTT FAUBERT, JEFFREY MAURY, | : | **AS BARRED BY PRIOR SETTLEMENT** |
| DANIEL YADZINSKI, and | : | |
| CRAIG DAVIDSON, | : | |
| | : | |
| Defendants. | : | |
| | : | |

Defendants move to dismiss specified portions of the
Superseding Indictment on the ground that those claims are barred
by res judicata because of a settlement agreement in July, 2002
("the Settlement Agreement") between defendant Atlantic States
and the State of New Jersey that resolved a then-pending state
criminal investigation.  Defendants argue that federal law
enforcement had a "laboring oar" in that state criminal
investigation, so the present federal criminal prosecution is
barred by res judicata as to any claims that were covered by the
Settlement Agreement.  We have previously ruled that the
investigation that resulted in the pending federal indictment was
not a "joint investigation" with local and state authorities, for
discovery purposes.  The present motion will be denied for the
reasons expressed in this opinion.[1]

_____

[1]  We write for the parties, who are fully familiar with the
extensive pretrial record of pleadings, motions and hearings in
this case.  Therefore, we do not provide formal record citations.
Instead, we cite the case record using the abbreviation "dkt." to
refer to the entry number of a document as electronically filed.

I.

The Superseding Indictment in this case contains 34 counts. Count One alleges a multi-object conspiracy under 18 U.S.C. § 371 against all defendants.  A total of 81 Overt Acts are alleged in Count One.  Overt Acts 1, 3, and 6-14 variously allege discharges of petroleum-contaminated water and asphalt-based waste paint during the period from July, 1996 through September, 2002, and efforts to conceal those discharges from federal, state and local law enforcement officials.  Several of those Overt Acts refer specifically to a petroleum discharge incident that occurred on Dec. 4/5, 1999, and a related search warrant execution on or about February 23, 2000.  Counts 3-4 and 24-27 are substantive counts referring to the same subject matter.

Atlantic States was the target of a New Jersey criminal investigation that began in 1999 and resulted in a civil settlement agreement between it and the New Jersey Department of Law and Public Safety, Office of the Attorney General, Division of Criminal Justice ("DCJ") on July 12, 2002.  The Settlement Agreement "covere[d] all criminal liability for acts or omissions resulting from an alleged incident ... on or about December 4/December 5, 1999 and the alleged resultant water pollution...." It provided that the DCJ "will close with prejudice its criminal investigation of the [Dec. 4/5, 1999] incident as it pertains to Atlantic States", its parent company, and related persons.  It

2

contained no admission of responsibility, but did impose certain
obligations on Atlantic States.  Finally, it provided that it was
"fully enforceable as a final order in the Superior Court of New
Jersey upon filing of a summary action for compliance."  (Dkt.
139, Ex. 10.)

A representative of the DCJ has explained to this Court that
the underlying state investigation was exclusively a criminal
investigation, but it did not result in an indictment.  Rather,
it ended with a civil settlement agreement "only because in New
Jersey, we don't have a pretrial intervention program for
corporations."  (Dkt. 145 at 36.)  The Settlement Agreement was
drafted by counsel for Atlantic States, reviewed and perhaps
edited by the responsible Deputy Attorney General (id. at 48),
and signed on behalf of both parties effective July 12, 2002.[2]

Defendants contend in this motion that those Overt Acts and
substantive counts that allege actions of Atlantic States or its
personnel based on discharges from Atlantic States during the

---

[2]   This background information about the genesis of the
Settlement Agreement was provided by the state in responding to a
Rule 17 subpoena issued by this Court at the request of
defendants.  The supervising Deputy Attorney General who
responded as representative of DCJ for that purpose was Phillip
Leahy, Esq.  (Dkt. 145 at 2.)

Mr. Leahy stated that in his experience at DCJ, the fact
that the 1999-2002 state investigation of Atlantic States ended
in a settlement agreement was unusual.  Most DCJ criminal
investigations either go to indictment or are closed without
action.  (Id. at 65.)

period covered by the Settlement Agreement, namely December, 1999
through July, 2002, must be dismissed from the Superseding
Indictment on grounds of res judicata.  The government opposes
the motion on both legal and factual grounds.  The parties
disagree on the law that should govern this motion, so our
discussion will begin there.

II.

Defendants rely on principles of res judicata requiring a
final judgment in one state to be given full faith and credit in
other jurisdictions, and recognizing that a settlement agreement
between parties has the same preclusive effect as a judicial
decree.  (Dkt. 129-1 at 6-9.)  They refer to established
precedent that a party not named in the prior action may be
precluded from bringing a subsequent action if that party is "in
privity" with the party named in the first action, the notion of
"privity" being a flexible concept that asks whether the party in
question had a "laboring oar" in the first action.  (Id. at 9-
11.)  We note that under this body of case law, the "laboring
oar" is generally described in terms suggesting control.  Recent
cases in the civil environmental enforcement context, cited by
defendants, have focused on the regulatory relationship between
federal and state agencies in determining whether such agencies
are "in privity" for res judicata purposes.  (Id. at 11-14.)

The Court has reviewed and carefully analyzed the body of

4

case law cited by defendants, which arises in civil litigation

applying res judicata principles.  We conclude, however, that it

does not supply the applicable jurisprudence where, as here, a

party is facing a criminal indictment and seeks dismissal based

on prior proceedings.  Rather, this issue is governed by aspects

of the Constitutional guarantee against double jeopardy embodied

in the Fifth and Fourteenth Amendments, and related

jurisprudential doctrines, which we will briefly review.

                                III.

    The Double Jeopardy Clause of the Fifth Amendment provides:

"nor shall any person be subject for the same offense to be twice

put in jeopardy of life or limb...."  The Supreme Court,

recognizing the ancient origins of this guarantee and its

fundamental nature, has ruled that it is applicable to the states

through the Fourteenth Amendment.  <u>Benton v. Maryland</u>, 395 U.S.

784, 794 (1969).  The classic statement of its rationale bears

repeating:

> The underlying idea, one that is deeply ingrained in at
> least the Anglo-American system of jurisprudence, is
> that the State with all its resources and power should
> not be allowed to make repeated attempts to convict an
> individual for an alleged offense, thereby subjecting
> him to embarrassment, expense and ordeal and compelling
> him to live in a continuing state of anxiety and
> insecurity, as well as enhancing the possibility that
> even though innocent he may be found guilty.

<u>Green v. United States</u>, 355 U.S. 184, 187-88 (1957).  The Supreme

Court has identified "three separate constitutional protections"

                                  5

afforded by the guarantee against double jeopardy:

> It protects against a second prosecution for the same
> offense after acquittal.  It protects against a second
> prosecution for the same offense after conviction.  And
> it protects against multiple punishments for the same
> offense.

North Carolina v. Pearce, 395 U.S. 711, 717 (1969) (footnotes

omitted).  It has been observed that "[t]he terms of the Double

Jeopardy Clause, however, are not self-defining and the Supreme

Court has never applied them absolutely when a first trial did

not end in an acquittal on the facts."  United States v. Busic,

639 F.2d 940, 945 (3d Cir. 1981).

Our Court of Appeals recognizes that a claim of double

jeopardy "is of constitutional dimension and its very substance

[,] the right to be free from trial twice on the same issue[,]

would be defeated if the [defendant] were required to await

appellate review until after the second trial."  United States v.

Venable, 585 F.2d 71, 74 (3d Cir. 1978).  Therefore, denial of a

motion to dismiss based on double jeopardy is a final and

appealable order under the collateral order doctrine.[3]  Id.; see

_____

[3]  There is a procedural context for the decision on a
pretrial motion to dismiss based on a claim of double jeopardy in
this Circuit, as described in Venable:

> A pretrial double jeopardy hearing must be held at
> which the criminal defendant bears the burden of going
> forward in asserting his double jeopardy claim.  Once a
> non-frivolous claim has been asserted, the government,
> to defeat the claim, assumes the burden of persuasion
> by a preponderance of the evidence.  Here, the district
> judge was not required to conform to this procedural
> format since there appears to have been no disputed

6

also <u>United States v. Berry</u>, 164 F.3d 844 (3d Cir. 1999)

(interlocutory appeal from district court order denying motion to

dismiss indictment on double jeopardy grounds).

We will turn in a moment to a discussion of the "dual

sovereignty doctrine" in double jeopardy analysis, which appears

to be the basis of defendants' motion.[4]  However, strictly

speaking, we do not need to reach that topic.  The dispositive

answer to the present motion, in our view, is that the

constitutional guarantee against double jeopardy is not triggered

unless there has been an adjudication on a criminal charge in the

first proceeding.  Each of the "three separate constitutional

protections" embodied in the Double Jeopardy Clause arise when,

---

issue of fact, but only a ruling of law....

<u>Venable</u>, 585 F.2d at 75, n.5.  <u>See</u> note 7, <u>infra</u>.

This Court has compiled a complete record of the facts and
legal arguments relevant to this motion, as described in this
opinion.  For this purpose, we incorporate by reference all of
the documents and oral arguments submitted on the pending motion
(motion 129), as well as pertinent portions of the prior motions
regarding "joint investigation," (motion 85) and motions to quash
subpoenas by the state Attorney General (motions 111 and 115).
One part of those materials is currently sealed, that being the
portions of the <u>in camera</u> evidentiary hearing, bearing
specifically on the "joint investigation motion," conducted on
Feb. 8, 2005.  We have reviewed that sealed material, and find it
to be consistent with the unsealed factual presentations made in
connection with these related motions.  At an appropriate time,
or as directed by the Court of Appeals, that portion of the
sealed material will be made available as well.

[4]  "[C]ollateral estoppel does not apply in successive
prosecutions by different sovereigns."  <u>United States v. Gricco</u>,
277 F.3d 339, 352 (3d Cir. 2002) (citations omitted).

and only when, a person has been subjected to a criminal charge, whether by trial or by conviction via guilty plea and sentencing. The parties have not cited, nor has our research revealed, any decided case under the Double Jeopardy Clause where a mere criminal investigation, culminating in a <u>civil</u> <u>settlement</u> <u>without</u> <u>any</u> <u>criminal</u> <u>prosecution</u>, could clothe a person with constitutional rights against double jeopardy. For that basic reason alone, this motion must be denied. We will, however, briefly outline the law in the area of prosecutions by dual sovereigns, and the relevant facts in this record.

The Supreme Court has consistently held that "the Constitution does not deny the State and Federal Governments the power to prosecute for the same act." <u>Rinaldi v. United States</u>, 434 U.S. 22, 28 (1977). This rule was first established in <u>United States v. Lanza</u>, 260 U.S. 377 (1922), holding that a prior state conviction, followed by a federal indictment for the same acts, did not violate the Fifth Amendment protection against double jeopardy. It was reinforced in the companion decisions <u>Abbate v. United States</u>, 359 U.S. 187 (1959), and <u>Bartkus v. Illinois</u>, 359 U.S. 121 (1959). <u>Abbate</u>, like <u>Lanza</u>, involved a federal indictment following a state conviction for the same acts. <u>Bartkus</u> involved the reverse situation of a state conviction following an acquittal on federal charges.[5] Over

---

[5] When <u>Bartkus</u> was decided in 1959, a successive state prosecution was subject only to the Due Process Clause of the

vigorous dissents, the Court declined to overrule <u>Lanza</u> and left
intact the dual sovereignty doctrine, which continues in force to
this day.[6]  Our Court of Appeals has applied that doctrine to
uphold successive state/federal prosecutions in an unbroken line
of precedent.  <u>See, e.g.</u>, <u>United States v. Gricco</u>, 277 F.3d 339,
352 (3d Cir. 2002); <u>United States v. Berry</u>, 164 F.3d at 845-47;
<u>United States v. Bell</u>, 113 F.3d 1345, 1351 n.6 (3d Cir. 1997);
<u>United States v. Pungitore</u>, 910 F.2d 1084, 1105-07 (3d Cir.
1990); <u>United States v. Grimes</u>, 641 F.2d 96, 100-04 (3d Cir.

---

Fourteenth Amendment, whereas the <u>Abbate</u> situation of a
successive federal prosecution was subject to the Fifth Amendment
Double Jeopardy Clause.  That distinction was eliminated in 1969,
when the Supreme Court ruled that the Double Jeopardy Clause of
the Fifth Amendment is expressly applied to the states through
the Fourteenth Amendment.  <u>Benton</u>, 395 U.S. at 794.

[6]  Justice Black, dissenting in both <u>Abbate</u> and <u>Bartkus</u>
(joined by Chief Justice Warren and Justice Douglas), assailed
the dual sovereignty doctrine as "a misuse and desecration of the
concept" of federalism, stating:

> The Court apparently takes the position that a second
> trial for the same act is somehow less offensive if one
> of the trials is conducted by the Federal Government
> and the other by a State.  Looked at from the
> standpoint of the individual who is being prosecuted,
> this notion is too subtle for me to grasp.  If double
> punishment is what is feared, it hurts no less for two
> "Sovereigns" to inflict it than for one....  In each
> case, inescapably, a man is forced to face danger twice
> for the same conduct.

<u>Bartkus</u>, 359 U.S. at 155 (Black, J., dissenting).  Scholarly and
judicial criticism of the dual sovereignty doctrine has increased
in recent decades, with the expansion of federal criminal laws
and overlapping federal/state law enforcement.  <u>See, e.g.</u>, <u>United
States v. All Assets of G.P.S. Auto. Corp.</u>, 66 F.3d 483, 493-99
(2d Cir. 1995); <u>United States v. Grimes</u>, 641 F.2d 96, 100-04 (3d
Cir. 1981).

1980); and <u>United States v. Frumento</u>, 563 F.2d 1083, 1085-89 (3d Cir. 1977).[7]

Some circuits recognize what has been called a "<u>Bartkus</u> exception" to the dual sovereignty doctrine.  <u>See, e.g.</u>, <u>United States v. All Assets of G.P.S. Auto. Corp.</u>, 66 F.3d 483, 494-95 (2d Cir. 1995) (collecting cases).  Our circuit has "recognized the potential existence" of a <u>Bartkus</u> exception, but has "never applied the exception to overturn a second state or federal prosecution."  <u>Berry</u>, 164 F.3d at 847.  Based on our careful review of the investigation record in this case, we find that the <u>Bartkus</u> exception, if recognized in our circuit, does not overcome the dual sovereignty doctrine on this record.

Petitioner Bartkus was tried and acquitted in federal court for robbery of a federally insured savings and loan association. He was then convicted in state court under a parallel state law. The facts alleged in the state indictment were substantially identical to those in the prior federal indictment.  <u>Bartkus</u>, 359 U.S. at 121-22.  The relationship between the two prosecuting

---

[7]  The concept of double jeopardy has many applications in criminal law, but this opinion is confined to the dual sovereignty issue presented by the present motion.  For discussion of some other aspects of double jeopardy law in our circuit, <u>see, e.g.</u>, <u>Pungitore</u>, 910 F.2d at 1106 n.18 (collateral estoppel pertaining to relitigation of decided facts, as applied under Double Jeopardy Clause); <u>United States v. Venable</u>, 585 F.2d at 75-79 (same); <u>United States v. Pappas</u>, 445 F.2d 1194 (3d Cir. 1971) (same); <u>Pungitore</u>, 910 F.2d at 1108 n.24 (cumulative sentences); and <u>Busic</u>, 639 F.2d at 944-54 (resentencing).

entities was described and characterized by the Court in <u>Bartkus</u> as follows:

> The state and federal prosecutions were separately conducted.  It is true that the agent of the [FBI] who had conducted the investigation on behalf of the Federal Government turned over to the [state] prosecuting officials all the evidence he had gathered against the petitioner.  Concededly, some of that evidence had been gathered after acquittal in the federal court.  The only other connection between the two trials is to be found in a suggestion that the federal sentencing of the accomplices who testified against petitioner in both trials was purposely continued by the federal court until after they testified in the state trial.  The record establishes that the prosecution was undertaken by state prosecuting officials within their discretionary responsibility and on the basis of evidence that conduct contrary to the [state] penal code ... had occurred within their jurisdiction.  It establishes also that federal officials acted in cooperation with state authorities, as is the conventional practice between the two sets of prosecutors throughout the country.  It does **not** support the claim that the [state] in bringing its prosecution was **merely a tool** of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal.  It does **not** sustain a conclusion that the state prosecution was **a sham and a cover** for a federal prosecution, and thereby in essential fact another federal prosecution.

<u>Id.</u> at 123-24 (footnote omitted) (emphasis added).

Decisions in our circuit addressing a <u>Bartkus</u>-type argument have demonstrated that it is to be narrowly construed.

<u>Berry</u> was a federal indictment for distribution of cocaine base following an earlier plea and sentence in state court arising from the same drug transactions.  There was significant federal/state involvement in both prosecutions, as described in

11

the margin.[8]  On interlocutory appeal from denial of a motion to

---

[8]  The Berry court described the facts favorable to
defendant's Bartkus argument as follows:

    In about December of 1996, Assistant District
    Attorney Nancy Winter, who was cross-designated as a
    Special Assistant United States Attorney, spoke with
    Pennsylvania State Trooper Carlton Watson and told him
    that she knew of a federal cooperator who had
    information that Watson might be able to use.  Watson
    had previously been designated as a federal agent in an
    unrelated case but was not so designated for the
    investigation of Berry.

    On February 7, 1997, Berry sold crack cocaine to
    Watson, who was working undercover.  Within a few days,
    Watson reported this to Winter....  After the third
    sale, ... the Pennsylvania State Police arrested Berry
    and charged him in state court....  Berry pleaded
    guilty in state court and was sentenced....

    A short while later, as part of an ongoing,
    cooperative program between the U.S. Attorney's office
    and the Philadelphia District Attorney's office,
    Berry's case was reviewed and selected for federal
    prosecution.  Berry was federally indicted....  Winter
    had coordinated and organized the FAST (Federal
    Alternatives to State Trials) program with federal
    authorities for more than six years and was cross-
    designated as a Special Assistant U.S. Attorney for
    that purpose.
    ....
    One of the criteria used to determine whether a
    case will be selected for federal prosecution is
    whether a defendant, based on his or her prior criminal
    record, is a career offender under U.S. Sentencing
    Guidelines § 4B1.1.  The quantity of drugs involved is
    a second factor.  Another general factor is whether the
    case is related to an ongoing federal investigation or
    previously-adopted state prosecution.  Berry met each
    of these criteria, and as a result, his case was
    selected for federal prosecution.

    Prosecutor Winter was involved in the selection of
    Berry's case for federal prosecution, but the two
    prosecutors' offices applied the FAST criteria
    separately.  In other words, the [same] criteria were

12

dismiss the federal indictment, the Court of Appeals rejected
defendant's argument that the state prosecution was so influenced
and controlled by the federal authorities that it was merely a
"sham and a cover" for the later federal prosecution.  The court
first observed that "[i]n Bartkus, federal and state officials
cooperated with each other, and this cooperation was sanctioned
by the Supreme Court;" second, the court found that Berry's case
was "selected for federal prosecution based on facts implicating
valid federal interests."  Berry, 164 F.3d at 846-47.

Defendant in Bell was convicted on federal charges of
murdering a witness, after acquittal on state murder charges.
The victim was an informant for a drug task force comprised of
federal, state and local investigators.  After the state
acquittal, federal authorities began their own investigation into
the murder, leading to the federal conviction.  The Court of
Appeals ruled, without elaboration, that defendant "fails in her
attempt to fit this case into the 'Bartkus exception.'"  Bell,
113 F.3d at 1351 n.6.  See also Pungitore, 910 F.2d at 1106-07.[9]

_____

        used first by the District Attorney's office to decide
        whether to present the case to federal authorities, and
        then by the U.S. Attorney's Office to decide whether to
        prosecute the case at the federal level.

Berry, 164 F.3d at 845-46 (footnotes omitted).

        [9]  Judge Greenberg, writing for the panel in Pungitore,
stated in dicta:

        We are not to be understood as suggesting that
        there should be a qualification on the dual sovereignty

13

IV.

Applying these principles to the present motion, we find
that the Bartkus exception is not met here.  All of the relevant
historical facts in the record are undisputed.  As previously
stated, the state Division of Criminal Justice commenced a
criminal investigation of Atlantic States in 1999 when a
petroleum discharge appeared on the Delaware River near the
Phillipsburg, New Jersey site of Atlantic States, on December
4/5, 1999.  (Dkt. 139, Ex. 10, Settlement Agreement at 1.)  That
investigation proceeded to execution of a state search warrant at
Atlantic States on February 24, 2000.  (Id., Ex. 9, Search
Warrant; Ex. 16, Corrected Search Warrant.)  The case agent for
that search warrant was Michael Kane, State Investigator.  Agent
Kane provided the affidavit and application for the warrant,
which was approved and signed also by Deputy Attorney General
Moskowitz.  (Id., Ex. 8, Affidavit and Application for Search
Warrants; Ex. 9, Search Warrant at 1.)  The federal government
was not involved in preparing that search warrant application.
(Dkt. 85-2, Ex. A at 5.)

---

doctrine when the federal prosecutors are intimately
involved in the state proceeding.  In practice a bright
line test based on the identity of the prosecuting
sovereigns may be required, as a more flexible test
considering the degree of federal-state cooperation may
not be workable.

Pungitore, 910 F.2d at 1107 n.20.

A large contingent of federal, state and local government agents executed the search warrant, including additional agents of the New Jersey DCJ, representatives of the state Department of Environmental Protection Emergency Response and Water Resources units, the Phillipsburg police and fire departments, the Warren County Prosecutor's Office, and three FBI agents. (Dkt. 103 at 24.) The names of the FBI agents were Quinn, Smigley and Spence. (Id.) At that time the federal prosecuting authorities who eventually brought this case, namely the U.S. Attorney's Office for the District of New Jersey ("USAO-NJ") and the U.S. Department of Justice, Environmental Crimes Section ("DOJ") were unaware of the participation of FBI agents at the state search warrant execution, and there was no federal investigation underway. (Id. at 22-23.)

The FBI agents at the search warrant execution took no notes and wrote no reports. (Id.) During the search warrant execution on February 24, 2000:

- Mr. Maury, a defendant in this case, was interviewed by state investigator Fernicola and FBI agent Spence; Fernicola wrote a report. (Dkt. 139, Ex. 2.) State agents interviewed Mr. Davidson, another defendant in this case, without FBI present. (Id., Ex. 4.)

- State agents initially took custody of the samples collected. (Id., Ex. 11.) Samples were sent to the Coast Guard lab for analysis. (Dkt. 148 at 3.) This

15

was routine practice at DCJ for petroleum-based samples. (Dkt. 145 at 64.)  A few other samples were sent to a private lab in western New York.  (Id.)

An FBI agent participated with state agent Kane in one interview after the February 24, 2000 search warrant execution. That was an interview of former Atlantic States employee Scott Rodney on May 19, 2000, which was attended by agent Kane, DAG Moskowitz, and FBI agent Quinn.  Agent Quinn took no notes, and the only report of that interview was prepared by agent Kane. (Dkt. 139, Ex. 7; Dkt. 103 at 11.)

The state investigation continued after that period in the year 2000.  It was concluded with the Settlement Agreement entered into between Atlantic States and DCJ on July 12, 2002. (Dkt. 139, Ex. 10.)  The federal government did not participate in the negotiations or as a party to that Settlement Agreement. (Dkt. 165 at 75.)

The federal investigation that led to the present indictment was opened by prosecutors at the USAO-NJ and the DOJ in approximately December, 2002 or early January, 2003.  (Dkt. 90 at 32; dkt. 103 at 12-13.)  This occurred as a result of federal prosecutors becoming aware of a series in the New York Times and in a televised Front Line program about McWane Corporation, of which Atlantic States is a division.  (Id.)  The original investigatory arm of this prosecution was the Environmental Protection Agency, Criminal Investigation Division.  (Id.)  The

16

FBI joined the federal investigatory team after the indictment was filed.  (Dkt. 90 at 33.)  No state or local prosecutors or agencies are part of that team; nor is the federal OSHA agency because it has no criminal powers.  (Id. at 33-38.)

The federal investigation did contact OSHA, New Jersey officials, and county and local officials to seek their cooperation.  Some of those sources will provide witnesses for trial.  (Id.)  The state DCJ provided the federal authorities with its entire original investigation file from the 1999-2002 state investigation.[10]  (Dkt. 145 at 39-47.)  Also, on at least one occasion a state DCJ agent assisted in a federal interview of a prospective witness.  (Dkt. 92 at 30.)  At some point during the federal investigation, the state asked federal prosecutors to convert to a joint federal/state investigation.  That request was

---

[10]  Deputy Attorney General Leahy, the DCJ representative who appeared in this case at a Rule 17 motion hearing, testified:

Court:    [W]hat was ... your institutional view of what you were
          doing when you handed over this box consisting of your
          1999 investigation, now closed and settled file, to the
          feds?
Leahy:    Our view was we were providing evidence to the federal
          authorities to use in their prosecution.  Primarily,
          turning over signed copies of reports as opposed to
          photocopies of reports.  They told us that they wanted
          reports that had the original -- the penned signature
          on them.
          ...
Court:    Who is signing these reports?
Leahy:    State investigators.

(Dkt. 145 at 46.)

specifically rejected by the U.S. Attorney's Office, and the matter remained in the nature of cooperation.  (Dkt. 103 at 13-14.)  When the federal indictment was unsealed on December 15, 2003, the United States Attorney for the District of New Jersey held a press conference and publicly expressed the appreciation of that office for the cooperation of several federal, state and local agencies, including the state Division of Criminal Justice. (Dkt. 92 at 29-30.)

We find that the New Jersey DCJ investigation, which covered the period from December, 1999 until July 12, 2002, was a state investigation in which federal FBI agents provided limited cooperative assistance.  Likewise, the federal investigation that opened in or about December, 2002 and resulted in the indictment filed in this case on December 11, 2003, is a federal investigation in which other federal, state and local agencies have provided cooperation.  In neither investigation can it be said that the investigating sovereign was functioning as a "tool" of the other, or that the resulting action was controlled by any entity except that sovereign.  Bartkus, 359 U.S. at 123-24.  In addition, the scope and content of the Superseding Indictment implicates valid federal law enforcement interests.  Berry, 164 F.3d at 846-47.

For these reasons, the motion to dismiss portions of the Superceding Indictment on grounds of double jeopardy must be denied.[11]

An appropriate order accompanies this opinion.

---

[11]  We have determined that traditional notions of "privity" as found in the civil jurisprudence do not apply in this criminal law context.  <u>See</u> Part II <u>supra</u>.  If that body of law were held to apply, we would reach the same conclusion on this motion.