UNITED STATES OF AMERICA　　　　:
　　　　　　　　　　　　　　　　　:　　CRIMINAL NO. 03-852 (MLC)
　　　　　v.　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
ATLANTIC STATES CAST IRON　　　:　　**MEMORANDUM OPINION**
PIPE COMPANY, JOHN PRISQUE,　　:
SCOTT FAUBERT, JEFFREY MAURY,　:
and CRAIG DAVIDSON,　　　　　　 :
　　　　　　　　　　　　　　　　　:
　　　　　Defendants.　　　　　　 :
＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿:

**OUTLINE OF OPINION**

PRELIMINARY STATEMENT                                                      3

DISCUSSION

I.      LEGAL FRAMEWORK

        A.      The Crime Victims Rights Act - summary of rights and enforcement     6
                provisions

        B.      Definition of "victim" in CVRA and its source statutes, the VWPA
                and MVRA ("statutory victim status")                               11

        C.      Review of case law on disputed factual issues of statutory victim status    34

        D.      Rights of statutory victims against particular defendants in sentencing    46

        E.      Comparison between statutory victim status and information from
                other affected persons                                             67

        F.      Constitutional and statutory rights of defendants in sentencing    74

II.     FINDINGS AND CONCLUSIONS

        A       Indictment -  Allegations and convictions                          84

        B.      Statutes charged in the Indictment                                 104

        C.      OSHA statute - Not charged                                         112

        D.      CVRA contentions in this motion                                    117

        E.      No CVRA contentions prior to this motion                           124

        F.      Findings and conclusions of the Court                              133

# PRELIMINARY STATEMENT

This is a complex criminal case in which an industrial company that operates a cast iron pipe foundry in New Jersey, and four of its employees, were convicted by a jury on charges of an alleged multi-object conspiracy and various substantive counts. Essentially, the indictment alleged that the corporate defendant and numerous indicted and unindicted conspirators – all employees of the company – engaged in a conspiracy and committed substantive offenses relating to violation of the Clean Water Act ("CWA") and the Clean Air Act ("CAA"); and that they systematically obstructed proceedings of the federal Occupational Safety and Health Administration ("OSHA") after incidents in which other employees sustained serious or fatal injuries at work. See infra Secs. II.A, II.B.

Sentencing proceedings are pending. The government has made a motion under the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA"), which defendants oppose. We rule that the motion is moot in part and denied in part.

The offenses of conviction that are relevant to this motion are as follows: First, conspiracy in violation of 18 U.S.C. § 371, with objectives of obstructing pending proceedings before OSHA [contrary to 18 U.S.C. §§ 1505 and 1515(b)], making materially false statements to OSHA [contrary to 18 U.S.C. § 1001], and defrauding OSHA [in violation of the "defraud" clause of 18 U.S.C. § 371]. Second, substantive offenses of: (1) obstruction of OSHA in violation of 18 U.S.C. §§ 1505 and 1515(b); (2) obstruction of OSHA in violation of 18 U.S.C. § 1519 [altering object with intent to obstruct OSHA]; and (3) false statements to OSHA in violation of 18 U.S.C. § 1001. We will refer to those convictions as the "OSHA-related

offers."[1]  The corporate defendant was convicted of those offenses; several of the individual

defendants were also convicted of some of those offenses.  See infra Sec. II.A.[2]

The trial extended over approximately eight months from September 2005 through April

2006.  See infra n.54.  A total of 108 verdict questions were submitted to the jury.  The verdicts

were mixed, including convictions, acquittals, convictions on lesser-included offenses, and no

verdict on one count.  (See dkt. 721 at 3 n.4.)  All but two counts of conviction were upheld by

this Court in ruling upon post-trial motions in August, 2007, and the no-verdict count was

dismissed.  (Id. at 267.)  Since then the sentencing proceedings have been protracted, due to the

size of the case and the number and complexity of sentencing issues.  Final sentencing hearing

dates are set for April 20-24, 2009.

We divided the sentencing briefing process into Step One (Guideline calculations), to be

followed by combined briefing on Steps Two and Three (Guideline departures; imposition of

sentence under 18 U.S.C. § 3553(a)).  Draft and Revised Presentence Reports ("PSRs") were

distributed to the parties by U.S. Probation.  The briefing on Step One was extensive, with the

---

[1]  The corporate defendant and some of the individual defendants were also convicted of
substantive violations of the CWA, 33 U.S.C. §§ 1311, 1319(c)(1)A) & 1319(c)(2)(A); the CAA,
42 U.S.C. § 7413(c); related false statement offenses under 18 U.S.C. § 1001; and conspiracy
objectives relating to those offenses under 18 U.S.C. § 371.  See infra Sec. II.B.  The government
does not refer to those convictions in this motion.

[2]  Most references to the trial record in this opinion are by citation to the Memorandum
Opinion filed herein on 8-2-07 (dkt. 721), containing rulings on post-trial motions.  Terms and
abbreviations used there are incorporated here by reference.  For example, docket entries are
cited as "dkt.," except docketed transcripts cited as "tr."  All of the charges and convictions are
shown in chart form in dkt. 721 at 3 n.4.  The verdicts on the alleged Count 1 conspiracy
objectives are shown in chart form, id. at 112-113 n.64.  When quoting transcripts, we correct
obvious errors without so noting, but we make no material changes to transcript text.  There is an
index of all trial transcripts, showing the trial chronology.  (Dkt. 718.)

parties opposing each other on virtually every issue pertaining to the guidelines calculations and the Revised PSRs. After briefs and oral argument on those issues were complete, the Court adjourned the previously-scheduled sentencing dates while the objections were under review. On December 31, 2008, the Court provided to the parties a lengthy written memorandum containing its intended rulings on Guideline calculations for the individual defendants. The contents of that memorandum will be filed, with any necessary revisions, as an opinion on the docket at the time of sentencing. On February 2, 2009, the Court stated on the record its intended rulings on Guideline calculations for the corporate defendant. Also on that date, the Court conferred with counsel and set the current schedule for the remaining sentencing proceedings, culminating in the sentencing hearings on the stated dates.

While those events were unfolding, on December 1, 2008, the government filed a motion seeking to set a sentencing date, invoking the CVRA. The motion asserted that six individuals, employees who sustained serious or fatal injuries at work during the relevant period, qualify as crime victims under the CVRA because of the OSHA-related convictions in this case. The defendants did not oppose setting a sentencing date, which they understood the Court was going to do even without benefit of the government's motion, but they did oppose designating any persons as victims under the CVRA in this case. The government, in its reply brief, stated that it seeks the further relief that the alleged CVRA crime victims, or their representatives, be afforded the right to allocute at defendants' sentencing hearings. The rescheduled sentencing dates have since been set, so the motion is moot as to the timing aspect. The motion is not moot as to the status of the named individuals as CVRA crime victims, which is the issue we address here.

**DISCUSSION**

## I.     LEGAL FRAMEWORK

### A.     THE CRIME VICTIMS' RIGHTS ACT - SUMMARY OF RIGHTS AND ENFORCEMENT PROVISIONS

The formal name of the CVRA is the Scott Campbell, Stephanie Roper, Wendy Preston, Louarna Gillis, and Nila Lynn Crime Victims' Rights Act, Pub.L.No. 108-405, §§ 101-104, 118 Stat. 2260, 2261-65 (2004) (codified at 18 U.S.C. § 3771), effective Oct. 30, 2004.  The CVRA itself was introduced and moved rapidly through Congress starting in April, 2004, at the end of almost a decade of unsuccessful bipartisan effort by victims' advocates to gain approval of a federal constitutional amendment.[3]  The House Committee Report for the CVRA stated:

> Crime victims already have a listing of rights in Title 42 of the United States Code.  However, because those rights are not enumerated in the criminal code, most practitioners do not even know these rights exist.  Further, the rights as they are currently enumerated do not contain any explicit enforcement provision.  As such, crime victims often feel that they are ignored by a system that gives a great number of rights and protections to the person accused of the crime, but few to the victim.  [This legislation] addresses these problems by moving the victims' rights to Title 18 of the United States Code, where they will be more readily available to practitioners.  It also amplifies the current rights and sets forth an explicit enforcement mechanism for those rights.

H.R. REP. NO. 108-711, at 4 (2004), reprinted in 2005 U.S.C.C.A.N. 2274, 2277 ("House Committee Report").

---

[3]  See The Honorable John Kyl et al., On the Wings of Their Angels:  The Scott Campbell, Stephanie Roper, Wendy Preston, Louarna Gillis, and Nila Lynn Crime Victims' Rights Act, 9 LEWIS & CLARK L. REV. 581, 588-93 (2005).  A number of state constitutions do contain victims' rights amendments.  Id. at 587-88 n.30.  The CVRA provisions gained passage when attached to the "Justice for All Act of 2004."  Id. at 592; see United States v. Marcello, 370 F.Supp.2d 745, 746 n.1 (N.D. Ill. 2005).  The CVRA is sometimes referred to by the latter name.  See, e.g., United States v. Eberhard, 525 F.3d 175, 177 (2d Cir. 2008).  The literature on the developments that led to the passage of the CVRA is cited in United States v. BP Prods. N. Am. Inc., No. 07-434, 2008 WL 501321, at *7 n.4 (S.D. Tex. Feb. 21, 2008).

The eight statutory rights of CVRA crime victims, as summarized in the House Committee Report, are: "the right to be reasonably protected from the accused; the right to be notified of, and not excluded from, public proceedings involving their case; the right to be heard at release, plea, or sentencing; the right to confer with the government attorney; the right to full and timely restitution; the right to be free from unreasonable delays in proceedings; and the right to respect. . . . [CVRA] makes no changes in the law with respect to victims' ability to get restitution." Id. at 2283.[4]

Those eight rights, applicable in every federal criminal prosecution, are codified in the CVRA, 18 U.S.C. § 3771(a)(1)-(8).[5] We discuss those enumerated CVRA rights below, insofar as they pertain to the instant motion. See, e.g., infra Sec. I.D. The law that the CVRA superseded had a similar but not identical formulation of the victims' substantive rights. 42 U.S.C. § 10606 (repealed 2004).

---

[4] The fact that the CVRA makes no change in the laws with respect to victims' ability to be awarded restitution probably means that it creates no ex post facto problem. See 18 U.S.C. § 3771(d)(5) (last sentence); see, e.g., Eberhard, 525 F.3d at 178 ("A law requiring that victims be reasonably heard (if they request) after the defendant has already been convicted does not implicate the Ex Post Facto clause."). This is in contrast to the federal criminal restitution statutes, which have been interpreted in some circuits to avoid potential ex post facto problems. See, e.g., United States v. Catoggio, 326 F.3d 323, 326 n.2 (2d Cir. 2003) (upholding application of mandatory MVRA, instead of discretionary VWPA, to RICO criminal conduct that occurred before, as well as after, effective date of MVRA); United States v. Coates, 178 F.3d 681, 683 (3d Cir. 1999) (observing that VWPA applies to cases in which defendant is convicted before effective date of MVRA); but see United States v. Nichols, 169 F.3d 1255, 1279-80 & n.8 (10th Cir. 1999) (noting circuit split and rejecting views of Third Circuit and others on this issue).

[5] The CVRA also contains separate provisions specifying victims' rights in a federal habeas corpus proceeding arising out of a state conviction. See 18 U.S.C. § 3771(b)(2). That portion of the CVRA contains a different definition of "crime victim." Id. § 3771(b)(2)(D).

There are other crime victims' rights provisions already in place in Title 18, including but not limited to certain restitution statutes that become relevant here. See, e.g., 18 U.S.C. §§ 3510, 3525, 3555, 3556, 3663, 3663A, & 3664. The Court of Appeals for the Fourth Circuit has observed that "[a]lthough the CVRA provides the vehicle for [a petitioner] to assert her right to restitution, it does not create an independent obligation for a district court to order or a defendant to pay such an award. . . . Rather, the CVRA merely protects the right to receive restitution that is provided for elsewhere." In re Doe, 264 Fed.Appx. 260, 262 n.2 (4th Cir. 2007).[6]

The CVRA places responsibility on the court for its implementation, requiring that "the court shall ensure that the crime victim is afforded [those] rights." 18 U.S.C. § 3771(b)(1). It emphasizes the obligations of the responsible federal law enforcement agencies to "make their best efforts to see that crime victims are notified of, and accorded [those] rights." Id. § 3771(c)(1)-(3); see also id. § 3771(f) (procedures to promote compliance); 42 U.S.C. § 10607 (services to victims).

There are two primary innovations embodied in the CVRA. First, it applies to all federal offenses, not just those offenses for which statutory restitution provisions have been enacted. Second, it creates a new and powerful enforcement mechanism. It confers standing upon both the government and the victims themselves to assert the rights afforded under the CVRA. 18

---

[6] It is necessary for us to cite unpublished Court of Appeals decisions in this opinion because, in our observation, most of the few circuit court decisions ruling upon mandamus petitions brought under the procedural provisions of the CVRA are unpublished. We surmise that this is due to the time pressure inherent in the 72-hour written mandamus opinion requirement imposed upon the circuit by Congress in the CVRA. See 18 U.S.C. § 3771(d)(3).

U.S.C. § 3771(d)(1).[7]  It provides that the asserted rights are to be asserted first in the district

court, and if the relief sought is denied the movant may petition for mandamus on an expedited

basis.  This is the statutory mandamus petition procedure:

> The rights described in subsection (a) shall be asserted in the district court
> in which a defendant is being prosecuted for the crime or, if no prosecution
> is underway, in the district court in the district in which the crime occurred.
> The district court shall take up and decide any motion asserting a victim's
> right forthwith.  If the district court denies the relief sought, the movant may
> petition the court of appeals for a writ of mandamus.  The court of appeals
> may issue the writ on the order of a single judge pursuant to circuit rule or
> the Federal Rules of Appellate Procedure.  The court of appeals shall take
> up and decide such application forthwith within 72 hours after the petition
> has been filed.  In no event shall proceedings be stayed or subject to a
> continuance of more than five days for purposes of enforcing this chapter.
> If the court of appeals denies the relief sought, the reasons for the denial
> shall be clearly stated on the record in a written opinion.

Id. § 3771(d)(3).  A companion provision, applicable to "any court proceeding involving a crime

victim," requires that "[t]he reasons for any decision denying relief under this chapter shall be

clearly stated on the record."  Id. § 3771(b)(1).[8]

---

[7]  Those provisions state:

(1)  Rights. – The crime victim or the crime victim's lawful representative, and the
attorney for the Government may assert the rights described in subsection (a).  A
person accused of the crime may not obtain any form of relief under this chapter.

(2)  Multiple crime victims. – In a case where the court finds that the number of
crime victims makes it impracticable to accord all of the crime victims the rights
described in subsection (a), the court shall fashion a reasonable procedure to give
effect to this chapter that does not unduly complicate or prolong the proceedings.

18 U.S.C. § 3771(d)(1)-(2).

[8]  There is a circuit split on the standard of review for mandamus petitions under the
CVRA.  Some circuits apply their usual standards for appellate review, and other circuits apply
the stringent standard for a traditional writ of mandamus.  Compare Kenna v. United States Dist.

The CVRA also provides that the government may assert error under the CVRA in any appeal in the criminal case. Id. § 3771(d)(4). At least one circuit court has held that CVRA crime victims are limited to the mandamus procedure, and may not invoke CVRA rights to participate in a direct appeal of the conviction and sentence. See United States v. Hunter, 548 F.3d 1308, 1309-16 (10th Cir. 2008). This would be a distinction from district court decisions under the restitution statutes, which lack the mandamus procedure. Those decisions have been reviewed on appeals filed by the alleged victims. See, e.g., United States v. Kones, 77 F.3d 66, 67-68 (3d Cir. 1996) (asserted victim/claimant appealed final judgment of conviction of defendant, where district court had denied restitution to that claimant); see also United States v. Gamma Tech. Indus., Inc., 265 F.3d 917, 920-23 (9th Cir. 2001) (defendants appealed restitution granted in favor of asserted victim/claimant; government sided with defendants; circuit court granted amicus status to claimant and affirmed restitution orders).

There are limitations on the relief available under the CVRA. The statute provides that "in no case shall a failure to provide a right under this chapter provide grounds for a new trial."

Court, 435 F.3d 1011, 1017 (9th Cir. 2006) ("Kenna I") (applying usual appellate review standard); In re W.R. Huff Asset Mgmt. Co. [United States v. Rigas], 409 F.3d 555, 561-63 (2d Cir. 2005) (same as Kenna I) with In re Dean, 527 F.3d 391, 393-94 (5th Cir. 2008) (noting circuit split and applying stringent mandamus standard); In re Antrobus, 519 F.3d 1123, 1124-25 (10th Cir. 2008) (same as Dean); see also In re Brock, 262 Fed.Appx. 510, 512 (4th Cir. 2008) (noting but not reaching circuit split issue; finding relief not available even under more relaxed appellate review standard); In re Stewart, 552 F.3d 1285, 1288, 1290 (11th Cir. 2008) (reviewing denial of victim status as a mixed question of law and fact; dissent advocated stringent mandamus standard); In re Doe, 264 Fed. Appx. 260, 262 (4th Cir. 2007) (same as Brock). The Third Circuit has taken no official position to date, but in an unpublished opinion it has indicated that it sides with the "appellate review" standard. In re Walsh, 229 Fed.Appx. 58, 60-61 (3d Cir. 2007) (stating "mandamus relief is available under a different, and less demanding, standard under 18 U.S.C. § 3771" (citing Kenna I and Rigas)). We describe the usual appellate review standards in the Third Circuit, for rulings under the related restitution statutes, infra n.12.

18 U.S.C. § 3771(d)(5).  It expressly creates no cause of action or any duty giving rise to a claim for damages against the government or its personnel, and it is not to be construed to impair prosecutorial discretion.  Id. § 3771(d)(6).  However, the CVRA provides a procedure for a victim to move to re-open a plea or sentence under specified conditions.  Id. § 3771(d)(5).[9]

### B.  DEFINITION OF "VICTIM" IN CVRA AND ITS SOURCE STATUTES, THE VWPA AND MVRA  ("STATUTORY VICTIM STATUS")

A "crime victim" under the CVRA is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense."  Id. § 3771(e).[10]  The House Committee report was silent on the meaning of that term, and there was no Senate Committee

_____

[9]  The CVRA provides its own mechanism for a crime victim to move to re-open a plea or sentence, adding that this provision "does not affect the victim's right to restitution," as provided elsewhere in Title 18:

> A victim may make a motion to re-open a plea or sentence only if --
>
> > (A)  the victim has asserted the right to be heard before or during the proceeding at issue and such right was denied;
> >
> > (B)  the victim petitions the court of appeals for a writ of mandamus within 10 days; and
> >
> > (C)  in the case of a plea, the accused has not pled to the highest offense charged.
>
> This paragraph does not affect the victim's right to restitution as provided in title 18, United States Code.

18 U.S.C. § 3771(d)(5).  See infra Sec. I.F regarding due process rights of defendant in those circumstances.

[10]  The CVRA permits the legal guardians of the crime victim or the representatives of the crime victim's estate, family members, or other persons appointed as suitable by the court to assume the crime victim's rights if the victim is under age 18, incompetent, incapacitated, or deceased.  18 U.S.C. § 3771(e).  This is parallel to similar provisions in the VWPA and MVRA.  See id. § 3663(a)(2); id. § 3663A(a)(2); see infra discussion of VWPA and MVRA.

report on the CVRA. However, one of the chief sponsors of the bill, Sen. John Kyl, has explained that "the CVRA's definition of a crime victim is based on the federal restitution statutes," citing the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, and the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. See Kyl et al., supra n.3, at 594 & n.65; see also Paul G. Cassell, Recognizing Victims in the Federal Rules of Criminal Procedure: Proposed Amendments in Light of the Crime Victims' Rights Act, 2005 BYU L. REV. 835, 857 (2005) (noting that the CVRA's definition of "victim" comes from the MVRA).[11]

The definition of "victim" in the VWPA, which provides for discretionary restitution as part of the sentence for certain federal crimes, has developed over a series of Congressional amendments since its enactment in 1982. The case law interpreting it has evolved as well. In 1996 Congress enacted the MVRA, which requires mandatory restitution for specified crimes and augmented and partially superseded the VWPA in the statutory restitution arsenal. See United States v. Leahy, 438 F.3d 328, 331 nn.3-4 (3d Cir. 2006) (joining circuits holding that Booker does not apply to orders of restitution under MVRA and VWPA). Both the VWPA and the MVRA are subject to the administrative procedures and enforcement provisions of 18 U.S.C. § 3664. Id. at 331 n.4.[12]

---

[11] The Senate Judiciary Committee did prepare a comprehensive report on the proposed Crime Victims' Rights Amendment that was withdrawn in April, 2004 when the CVRA bill was introduced. See S. REP. NO. 108-191 (2003), 2003 WL 22680234. However, that amendment would have provided rights only to victims of violent crimes. Id. The CVRA, in contrast, applies to victims of all federal crimes. 18 U.S.C. § 3771(e).

[12] It is well settled that restitution may only be ordered if authorized by statute. United States v. Rand, 403 F.3d 489, 493 (7th Cir. 2005); United States v. Dickerson, 370 F.3d 1330, 1335 (11th Cir. 2004); United States v. Akande, 200 F.3d 136, 138 (3d Cir. 1999). There other statutory bases for restitution as part of federal sentences. See, e.g., 18 U.S.C. §§ 2248 (sexual abuse), 2259 (sexual exploitation and other abuse of children), 2264 (domestic violence and

Here we quote again the definition of "victim" in the CVRA:

[A] person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia.

18 U.S.C. § 3771(e).

The definition of "victim" in both the VWPA and MVRA is:

[A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2).

There are two main differences between these two definitions of "victim." First, the CVRA definition does not contain the qualifier phrase, "for which restitution may be ordered." The CVRA by its terms, unlike restitution statutes, applies to all federal criminal prosecutions,

_____

stalking), 2327 (telemarketing fraud), 3563 (conditions of probation), 3583(d) (conditions of supervised release); 21 U.S.C. § 853(q) (cleanup of clandestine amphetamine or methamphetamine laboratory sites). Those statutes are not discussed here, but some cases decided under those provisions are described infra Sec. I.C.

    The Third Circuit has been mostly consistent in articulating its standard of review under the VWPA and MVRA. See, e.g., United States v. Fallon, 470 F.3d 542, 548 (3d Cir. 2006) ("We 'review a restitution order under a bifurcated standard: plenary review as to whether restitution is permitted by law, and abuse of discretion as to the appropriateness of the particular award.' (internal quotation and citations omitted)."); United States v. Quillen, 335 F.3d 219, 221-22 (3d Cir. 2003) (same); United States v. Graham, 72 F.3d 352, 355-56 (3d Cir. 1995) (same); but see United States v. Akande, 200 F.3d 136, 138 (3d Cir. 1999) ("We exercise plenary review over the determination that restitution was lawful, and review the amount awarded for clear error."). Other courts have observed that a contested issue of statutory victim status, under the restitution statutes or under the CVRA, is probably a mixed question of fact and law. See, e.g., In re Stewart, 552 F.3d at 1288. We note that only because it may call for a corresponding standard of review. See generally Pierce v. Underwood, 487 U.S. 552, 558 (1988) ("For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable de novo), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion'").).

regardless of whether the offense qualifies for an award of restitution.  See, e.g., Comm. on the Judiciary, Amendments to the Federal Rules of Criminal Procedure, H.R. Doc. No. 110-118, at 51 [hereinafter "Rules Committee Report"] ("The act defines the term 'crime victim' without limiting it to certain crimes.").  Second, the clause in the VWPA and MVRA "victim" definition, after the word "including," which refers to "an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," is absent from the definition of "victim" in the CVRA.  There is no legislative history explaining that omission, but we believe the CVRA definition will be interpreted to include that expansive clause because of the Congressional and case law history of that clause under the VWPA, briefly summarized below. This would be consistent with the stated purpose of the CVRA to strengthen rather than weaken victims' rights in federal criminal prosecutions.[13]

Amendments to the Federal Rules of Criminal Procedure were adopted effective December 1, 2008, to implement the provisions of the CVRA.  See Fed.R.Crim.P. 1(b)(11) ("victim" is a "crime victim" as defined in 18 U.S.C. § 3771(e)); id. 12.1(b) (disclosing government witnesses); id. 17(c)(3) (subpoena for personal or confidential information about a

---

[13]  The House Committee Report expressed the need for the CVRA in general terms:

Victims of crime often do not feel their voices are heard or that their concerns are adequately addressed in the judicial process.  Many express frustration with a judicial system that affords many rights to the accused while giving few to the victim.  This legislation addresses these concerns by codifying the rights of victims and providing the means to enforce those rights.

H.R. Rep. No. 108-711, 2005 U.S.C.C.A.N. at 2276.

victim); <u>id.</u> 18 (place of prosecution and trial); <u>id.</u> 32 (sentencing and judgment); <u>id.</u> 41(b)

(authority to issue a warrant); and <u>id.</u> 60 (victim's rights).  The Committee Note to revised Rule

1(b)(11) ("victim" defined) observes:  "Upon occasion, disputes may arise over the question

whether a particular person is a victim.  Although the rule makes no special provision for such

cases, the courts have the authority to do any necessary fact finding and make any necessary legal

rulings."  RULES COMMITTEE REPORT, <u>supra</u>, at 37.

    This Court is of the view that based on the text, origin and limited legislative history of

the CVRA – and bearing in mind the distinction that the CVRA applies to victims of all federal

crimes while the VWPA and MVRA apply only to restitution rights under specified federal

crimes – nevertheless the definition of "victim" under CVRA will be interpreted consistent with

existing and evolving case law under the VWPA and MVRA.  The court decisions so far under

the CVRA generally reflect this approach, as we describe below.

    The Court of Appeals for the Third Circuit has not yet had occasion to interpret the

meaning of the definition of "victim" in the CVRA.  It has, however, described and interpreted

the definition of "victim" in the VWPA and MVRA as it has evolved.

    The VWPA was the first modern federal restitution statute, enacted in 1982.  As of 1986,

it authorized federal courts, when sentencing under certain offenses, to order "that the defendant

make restitution to any victim of such offense."  <u>Hughey v. United States</u>, 495 U.S. 411, 412-13

& n.1 (1990) (explaining that this provision was recodified effective Nov. 1, 1987, pursuant to

the Sentencing Reform Act of 1984, when it became 18 U.S.C. § 3663, and had received the term

"such offense" in the 1986 amendments).

The term "victim" in the pre-1987 version of the VWPA was not defined with any standard of causation other than the quoted phrase "to any victim of such offense," which is what the Hughey court interpreted. This is in contrast to the "direct and proximate" standard in the current VWPA, MVRA, and CVRA statutes.

In Hughey, the Supreme Court interpreted the phrase "restitution to any victim of such offense," as used in 18 U.S.C. § 3663(a), to authorize restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction." Id. at 413. There, the defendant pled guilty to only one count of use of an unauthorized credit card in violation of 18 U.S.C. § 1029(a)(2). Id. He had been charged with three counts under that offense statute, and three counts of theft by a Postal Service employee in violation of 18 U.S.C. § 1709, and at sentencing he was ordered to pay restitution for loss caused by all of the counts. Id. at 413-14. The Supreme Court held invalid the portions of the sentencing order directing restitution for losses caused by conduct outside the count of conviction. Id. at 422.

The Third Circuit describes the next Congressional step after Hughey as follows:

> Not long after the Supreme Court decided Hughey, Congress amended the VWPA by adding 18 U.S.C. § 3663(a)(2) which provides:
>
>> For the purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any persons directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern.
>
> Crime Control Act of 1990, Pub.L.No. 101-647, 104 Stat. 4789, 4863 (1990). This amendment . . . expands the restitution granting authority of district courts beyond that found in Hughey. By its own terms, however, § 3663(a)(2) applies only in cases where a scheme, conspiracy, or pattern of criminal activity is an element of the offense of conviction. In such cases, § 3663(a)(2) authorizes restitution to "any

person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern" that was an element of the offense of conviction.

Kones, 77 F.3d at 69-70.[14]

Another significant feature of the 1990 amendments to the VWPA, which carries through to the current VWPA and MVRA, was an exception for plea agreements. See United States v. Chalupnik, 514 F.3d 748, 752-53 (8th Cir. 2008) (referring to 18 U.S.C. § 3663(a)(3) as enacted in 1990). That provision in the current version of the VWPA states:

> The court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement.

18 U.S.C. § 3663(a)(3). The VWPA also states that "the court may also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." Id. § 3663(a)(1)(A).

A more complicated version of this exception appears in the MVRA. See id. §§ 3663A(a)(3) & (c)(1)-(3). The MVRA expressly states that a plea agreement can provide for restitution to persons "other than the victim of the offense," and if so the court shall so order. Id. § 3663A(a)(3).

There was no plea agreement in this case, and those provisions of the VWPA and MVRA are not directly relevant here. However, when reviewing case law under the VWPA, the MVRA, and the CVRA, it is important to recognize that plea agreements pertaining to restitution can be entered into for the benefit of persons other than statutory "victims," and under offense statutes

---

[14] Courts have noted that the 1990 amendments would not have changed the result in Hughey even if they had been in effect at the time of Hughey, because the criminal offense in that case did not have a scheme, conspiracy, or pattern as an element. See, e.g., Dickerson, 370 F.3d at 1338 n.14.

for which no statutory right to restitution exists, and for losses and amounts beyond those provided in restitution statutes.  Persons having crime victim status under the CVRA, which applies to all federal offenses, can enforce rights to participate in the plea process even if the actual offense statutes do not carry a statutory right to restitution.  See, e.g., In re Dean, 527 F.3d 391, 395-96 (5th Cir. 2008) (CVRA petitioners sought participation in plea proceedings for offenses to be charged under the CAA), denying mandamus in part in BP Prods. N. Am. Inc., 2008 WL 501321, at *3-*6.

Courts have recognized that the 1990 Congressional amendments to the VWPA definition of "victim" did not vitiate Hughey entirely.  As one circuit court has observed, "Congress responded [to Hughey] by adding a definition of 'victim' that retained the core limiting principle of Hughey but clarified its application to certain offenses and to plea agreements.  See 18 U.S.C. § 3663(a)(2) (Supp. III 1991)."  Chalupnik, 514 F.3d at 752.

The Court of Appeals for the Third Circuit interpreted the "scheme, conspiracy, or pattern of criminal conduct" portion of the VWPA definition of "victim" in its 1996 Kones decision.  77 F.3d at 66-71.  Defendant was a doctor who pled guilty to 200 counts of mail fraud in violation of 18 U.S.C. § 1341 in connection with false insurance claims based on nonexistent services to eighteen of his patients.  Id. at 68.  He agreed that his sentence would include $2 million forfeiture as restitution to the health insurance companies who were the victims of his fraud. Id. Before his sentencing, one of the eighteen patients filed a claim for $1 million in restitution, alleging that defendant gave her prescriptions for excessive amounts of pain killers, which caused her to become addicted, lose her job, and require ongoing treatment.  Id.  She contended

that it was only by inducing her drug dependency that defendant was able to carry out his fraudulent scheme.  Id.

The district court in Kones found that the patient was not a "victim" of defendant's offenses of conviction within the meaning of the VWPA.  Id.  The Third Circuit affirmed.  It stated the controlling principle as follows:

> This [1990 VWPA amendment] expansion of restitution powers, however, is limited by its terms.  Section 3663(a)(2) is not so broad that it permits a district court to order restitution to anyone harmed by any activity of the defendant related to the scheme, conspiracy, or pattern.  Rather, in order for restitution to be permissible, the harm must "directly" result from the "criminal conduct" of the defendant.  In this context, we interpret "direct" to require that the harm to the victim be closely related to the scheme, rather than tangentially linked.  Further, we interpret "defendant's criminal conduct in the course of the scheme, conspiracy or pattern" to mean conduct that is both engaged in the furtherance of the scheme, conspiracy or pattern, and proscribed by the criminal statute the defendant was convicted of violating.

Id. at 70 (emphasis added).[15]

Applying that principle, Kones held on the facts in that case:

> [Patient] is not a "victim" of [defendant's] mail fraud offenses within the meaning of § 3663(a). . . . The conduct that [she] alleges caused her harm is not conduct proscribed by the mail fraud statute.  The conduct proscribed by the mail fraud statute is the use of the mails for the purpose of executing a

---

[15]  The Kones court offered this example:

> [W]here a defendant is convicted of defrauding person X and a fraudulent scheme is an element of that conviction, the sentencing court has power to order restitution for the loss to defrauded person Y directly caused by the defendant's criminal conduct, even where the defendant is not convicted of defrauding Y.

Kones, 77 F.3d. at 70.

19

scheme to defraud. Specifically, in this case it is [defendant's] submission of false insurance claims through the mail. [Patient] does not allege that she was injured by the submission of the insurance claims. She alleges that she was injured by faulty medical services. While [patient] alleges that [defendant's] provision of drugs to her was malpractice and was done in furtherance of his scheme, the provision of drugs, properly or improperly, is not conduct proscribed by the mail fraud statute.

Thus, we agree with the district court that "victim" within the meaning of § 3663(a)(1) and (a)(2) does not include a person who has experienced no harm arising from the criminal conduct that gives rise to the offense of conviction.

Id. at 71. That case, interpreting the VWPA in the context of a mail fraud scheme, prompted the

Kones court to add in a footnote:

We have no occasion here to address, and reserve for another day, the issue of whether in this context 'conduct in the course of the . . . conspiracy' includes only conduct prohibited by the substantive statute which the co-conspirators conspired to violate.

Id. at 70 n.3 (italics in original).[16]

However, the court in Kones did couple its holding with some strong observations about

the process that the VWPA envisioned for determining "victim" status, and the accompanying

right to restitution under that statute. The 1990 version of the VWPA contained the following

provision, as described in Kones:

Even where there is a "victim of the offense," § 3663(d) provides that the court may decline to order restitution "to the extent that the court determines that the complication and prolongation of the sentencing process [required to do so] outweighs the need to provide restitution to any victims."

---

[16]  The 1999 Akande decision, discussed below, did elaborate upon the statutory definition of "victim," in the context of a conspiracy rather than a scheme. But it appears to us that the specific question left open in this footnote in Kones has not been explicitly addressed in the Third Circuit. We believe that the motion we are addressing here does implicate that unanswered question. See infra Sec. II.F.

Id. at 68 (quoting 18 U.S.C. § 3663(d) (1990)) (bracketed material original).  That provision

survives in the current version of the VWPA, and in a modified form in the later-enacted MVRA.

See 18 U.S.C. § 3663(d); id. § 3663A(c)(3).

The Kones court stated:

> We understand this provision to call for a weighing of the burden of
> adjudicating the restitution issue against the desirability of immediate
> restitution – or otherwise stated, a weighing of the burden that would be
> imposed on the court by adjudicating restitution in the criminal case against
> the burden that would be imposed on the victim by leaving him or her to
> other available legal remedies.
>
> . . .
>
> Nothing in the legislative history evidences an expectation that a sentencing
> judge would adjudicate, in the course of the court's sentencing proceeding,
> all civil claims against a criminal defendant arising from conduct related to
> the offense.  Rather, it was expected that entitlement to restitution could be
> readily determined by the sentencing judge based upon the evidence he had
> heard during the trial of the criminal case or learned in the course of
> determining whether to accept a plea and what an appropriate sentence
> would be.  While the original statute, similar to the current version,
> provided for discretion to decline to grant restitution when it would be an
> undue burden to do so, this was not because Congress expected that
> sentencing judges would be required to hold an evidentiary hearing on
> liability issues in the course of the sentencing proceedings.  As the Senate
> Report explains, "the Committee added this provision to prevent sentencing
> hearings from becoming prolonged and complicated trials on the question of
> damages owed the victim."  S.Rep. No. 532, 97th Cong., 2d Sess. 31
> (1982), reprinted in 1982 U.S.C.C.A.N. 2515, 2537 (emphasis added).  The
> kind of case that Congress had in mind was one in which liability is clear
> from the information provided by the government and the defendant and all
> the sentencing court has to do is calculate damages.  See id. at 2536-37
> (discussing a case where the victim of a purse snatching suffered a broken
> hip).
>
> This aspect of Congress' expectation is important because it counsels
> against construing the text of the statute in a way that would bring fault and
> causation issues before the sentencing court that cannot be resolved with the

information otherwise generated in the course of the criminal proceedings on the indictment. We are persuaded that this counsel should guide our interpretation of the restitution provisions of the VWPA.

Kones, 77 F.3d at 68-69 (emphasis in original).

> [W]e agree . . . that "victim" within the meaning of § 3663(a)(1) and (a)(2) does not include a person who has experienced no harm arising from the criminal conduct that gives rise to the offense of conviction. As the facts of this case illustrate, to hold otherwise would unduly burden sentencing courts. No information developed in the course of these proceedings provided the district court with a basis for adjudicating whether [defendant's] treatment of [claimant] was legal or illegal, was consistent or inconsistent with medical standards prevailing in the community, or was or was not causally related to the injuries she allegedly suffered. As the district court aptly observed, it could not grant [claimant's] restitution request without fully litigating a tangentially related medical malpractice case as a part of the sentencing process.

Id. at 71.

Congress revisited the VWPA in 1996. That was the year that the MVRA was enacted.[17] The MVRA partially but not completely superseded the VWPA so as to require mandatory restitution as to specified offenses. Compare 18 U.S.C. § 3663(a)(1) with id. § 3663A(a)(1) & (c); see Leahy, 438 F.3d at 331 nn.3-4; Chalupnik, 514 F.3d at 752 & n.2. It also amplified the definition of "victim" in both statutes and made those definitions identical.

As a reference point for the 1996 amendments, we now quote again, from Kones, the former text of the VWPA that was added as subsection (b)(2) in the 1990 amendments:

> For the purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any

---

[17] The MVRA of 1996 was enacted as Title II, Subtitle A, of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (codified at 18 U.S.C. §§ 3663A, 3664 (1996)). See Edwards, 162 F.3d at 89.

persons directly harmed by the defendant's criminal conduct in the course of
the scheme, conspiracy or pattern.

Kones, 77 F.3d at 69 (quoting Crime Control Act of 1990, Pub.L.No. 101-647, 104 Stat. 4789,

4863 (1990) (codified at 18 U.S.C. § 3663(a)(2) (1960))).

The corresponding 1996 provision, as set forth in both the VWPA and the MVRA as of

the 1996 enactments and as currently in effect, is this text:

> **For the purposes of this section, the term "victim" means a person
> directly and proximately harmed as a result of the commission of an
> offense for which restitution may be ordered, including, in the case of**
> an offense that involves as an element a scheme, conspiracy, or pattern of
> criminal activity, any person directly harmed by the defendant's criminal
> conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663(a)(2) (emphasis added); id. § 3663A(a)(2) (1996) (emphasis added).

The portion of the text shown above in bold type is the new language adopted by

Congress for both the VWPA and the newly-enacted MVRA in 1996.  See Chalupnik, 514 F.3d

at 752-53.  That, as we have seen, is the causation test that the drafters of the CVRA have

adopted for its definition of "victim."  18 U.S.C. § 3771(e).  The Conference Committee Report,

in explaining the 1996 enactment of the MVRA and parallel amendment of the VWPA,

explained the test of causation as follows:

> The committee intends this provision to mean, except where a conviction is
> obtained by a plea bargain, that mandatory restitution provisions apply only
> in those instances where a named, identifiable victim suffers a physical
> injury or pecuniary loss directly and proximately caused by the course of
> conduct under the count or counts for which the offender is convicted.

S. Rep. No. 104-179, at 19 (1996), 1996 U.S.C.C.A.N. 924, 932.  That Report emphasized:

> In all cases, it is the committee's intent that highly complex issues related to
> the cause or amount of a victim's loss not be resolved under the provisions

23

of mandatory restitution.  The committee believes that losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution.

Id.  This statement of Congressional intent echoed the similar expressions of Congress under predecessor versions of the VWPA discussed in Kones.  77 F.3d at 68-71.

The Third Circuit confronted the "conspiracy" portion of the definition of "victim," in both the VWPA and the MVRA after the 1996 amendments, in United States v. Akande.  200 F.3d at 140.  That case involved a guilty plea to a conspiracy rather than a jury verdict, but the court did address the meaning of the "offense," for purposes of determining the scope of conspiracy conduct encompassed within the VWPA/MVRA definition of "victim."  Id.

The defendant in Akande pled guilty to a conspiracy to commit credit card fraud.  Id. at 137.  Her plea agreement specified that restitution would be ordered at sentencing, but it did not mention any particular transactions, victims, or dates.  Id. at 138.  The alleged conspiracy, according to the Information, took place from "on or about" a specified date to "on or about" another specified date.  Id.  At the plea hearing the defendant allocuted to certain transactions within that time period.  Id.  However, the PSR calculated the victims' losses for purposes of restitution under the MVRA to be a sum that included two instances of credit card fraud that predated by more than one month the alleged "on or about" dates in the Information.  Id.  The government stated at sentencing that defendant and her co-conspirators had been involved in both incidents, and asserted that the disputed transactions were part of the charged conspiracy (although not specifically alleged in the Information).  Id.  The district court included the two disputed transactions in the restitution order.  Id.  The circuit reversed and remanded for

restitution to be recalculated without those transactions.  Id. at 140 n.3, 142-43.  The issue in Akande concerned the temporal limits of statutory restitution obligations, rather than, as here, statutory victim status per se.  However, Akande necessarily addressed the MVRA/VWPA definition of "victim" in the context of a conspiracy because that statutory definition was the basis for determining the temporal limits as well.  Id. at 140.

The Akande court began its discussion with a review of the history of statutory restitution authorization, and the corresponding definitions of "victim" in the VWPA (before and after the Supreme Court decision in Hughey), and the MVRA.  It determined that "[t]he history of the pertinent statutes, past and present, reveals that this authorization is limited to the 'offense of conviction.'"  Id. at 138.  It reiterated several of the principles set down in Kones, including that "[t]he victim's harm must be closely connected to the conspiracy or scheme rather than merely tangentially."  Id. at 139 (citing Kones, 77 F.3d at 70).  It concluded that where the plea agreement did not specify a broader scope for restitution, "the offense of conviction is temporally defined by the period specified in the indictment or information."  Id. at 141.

The court in Akande addressed the 1990 VWPA amendments that expanded the definition of "victim" where the offense had an element of scheme, conspiracy, or pattern, as those amendments were carried forward in the 1996 amendments that ushered in the MVRA and updated the VWPA.  The court concluded that the "offense" that defines statutory victim status under the MVRA and VWPA must be the offense of conviction.  Id. at 141-42.  "The conduct underlying the offense of conviction thus stakes out the boundaries of the restitutionary authority."  Id. at 141.  It stated:

The [1990] amendment enlarged the group of victims who would be entitled
to restitution, but the triggering event – the offense of conviction – remains
the same. . . .

Although victims need not be specifically named in the indictment
or at trial, their harm must still be directly and proximately caused by the
criminal conduct that is established by the prosecution.  As the 1990 House
Report made clear, restitution was authorized only for "a victim of the
offense for which the defendant has been convicted". . . . As stated in a later
Senate Report accompanying the enactment of section 3663A, restitution is
to be ordered where the loss was "directly and proximately caused by the
course of conduct under the count or counts for which the offender is
convicted". . . . Congress did not want sentencing to become a forum for
determination of issues better suited to civil proceedings.

Id. (internal citations omitted).

One other point that Akande appeared to settle was the scope of conduct to be considered

in making determinations under the "victim" definition in the MVRA and VWPA.  It clearly

stated that while "relevant" conduct may be a concept appropriate for other sentencing rulings,

such as under the guidelines, that concept has no place in making decisions under the statutory

"victim" definition in the MVRA and VWPA.  Id. at 143.  The court explained that "[a]lthough

judges normally may use any information they possess to enhance a sentence, 'restitution is a

special case,' because the statutes limit restitution to the losses caused by the offense of

conviction. . . .  Accordingly, . . . [in applying these statutes] we look only to the 'specific

conduct' supporting the offense of conviction."  Id. (internal citations omitted).[18]

_____

[18]  The Eleventh Circuit has interpreted Hughey and Akande as follows:

Taken together, Hughey and Akande do not severely restrict the reach of the CCA
[1990 VWPA amendments] and the MVRA.  Both cases suggest that a district
court may not order a defendant to pay restitution for criminal conduct unrelated
to the offense of conviction, i.e., conduct not alleged in the indictment, specified

26

What does "directly and proximately harmed" mean, as used in the VWPA, the MVRA, and now in the CVRA? The Third Circuit interpreted the MVRA test of causation in the context of a scheme-based offense in <u>Fallon</u>. There, the president of a company that manufactured and distributed medical devices was convicted at trial of wire fraud and mail fraud under 18 U.S.C. §§ 1341 and 1343, respectively, in connection with a scheme to attract customers using a fabricated FDA clearance letter. <u>Fallon</u>, 470 F.3d at 545. The district court found that the basis for the fraud charges was the fabricated FDA letter, and that a customer who leased the devices relying on that letter was a fraud "victim" entitled to restitution. <u>Id.</u> at 549. The Court of Appeals agreed with that ruling, which was not challenged on appeal, and remanded only for determination of the amount of losses proximately caused by the offense. <u>Id.</u> at 549-50. Here we quote the portions of the <u>Fallon</u> opinion that interpret the test of causation under the MVRA in the context of a scheme or conspiracy:

> By the statute's explicit terms, loss can only be paid to victims who are "directly and proximately harmed."
>
> Thus, this court, as well as others, has repeatedly recognized that under the MVRA, "restitution must be . . . 'based on *losses directly resulting* from [the defendant's criminal] conduct'". . . . The First Circuit has adopted the following two-prong test:

---

in the plea agreement, or otherwise made a part of the record. We read these cases narrowly for the proposition that even after the CCA and the MVRA, a criminal defendant cannot be compelled to pay restitution for conduct committed outside of the scheme, conspiracy, or pattern of criminal behavior underlying the offense of conviction.

<u>Dickerson</u>, 370 F.3d at 1341 (italics in original; footnote omitted). <u>Dickerson</u> ruled that where a scheme-based offense of conviction reaches back in time before the criminal statute of limitations, restitution may be ordered under the MVRA for the entire period. <u>Id.</u> at 1342-43.

> First:  Restitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct. . . .

> Second:  Even if but for causation is acceptable in theory, limitless but for causation is not.  Restitution should not lie if the conduct underlying the offense of conviction is too far removed, either factually or temporally, from the loss.

Id. at 548-49 (internal citations omitted) (citing United States v. Vaknin, 112 F.3d 579, 589 (1st Cir. 1997)).

The Fallon court further explained as follows:

> For scheme-based crimes such as wire fraud and mail fraud, . . . the term "victim" is broadly defined by the MVRA. . . .

> Several courts have interpreted this language to hold that restitution: 1) may be ordered to a victim not named in the indictment, provided that the victim was "directly harmed by the defendant's criminal conduct in the course of a scheme or conspiracy."  United States v. Henoud, 81 F.3d 484, 489 (4th Cir. 1996); see also United States v. Kones, 77 F.3d 66, 70 (3d Cir. 1996); 2) may be ordered for losses which result from acts or conduct related to the scheme, but for which the defendant was not convicted; cf. United States v. Lawrence, 189 F.3d 838, 846 (9th Cir. 1999); United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996); or 3) may be ordered for losses of a common scheme, even though the loss was caused by conduct occurring outside the statute of limitations.  See United States v. Dickerson, 370 F.3d 1330, 1342 (11th Cir. 2004).

> Nonetheless, despite Congress' clear intent to broaden the district court's authority to grant restitution for crimes involving a scheme or conspiracy, we are unaware of any cases holding that the definition of "victim" for scheme-based crimes diminishes the requirement that losses be "directly" caused by the defendant's actions. . . . Thus, even for scheme or conspiracy based crimes, the government bears the burden of showing that the loss suffered was "directly" caused by defendants' actions.

Id. at 549 n.12.[19]

_____

[19]  This quote from Fallon refers to several precedents that we will briefly summarize here.  The circuit court in Lawrence held that if a mail fraud conviction, which the court was

As the Fallon opinion demonstrates, the term "directly and proximately harmed" serves a two-fold purpose when used in the MVRA [and, by analogy now, the VWPA and the CVRA]. First, it defines who qualifies as a "victim" under the statute. Second, it provides a rule for determining what losses may be claimed as restitution; i.e., only those losses "directly and proximately" caused by defendant's criminal conduct. The issue that required reversal in Fallon was the latter. There was no dispute on appeal that the duped customer was a "victim" of the mail/wire fraud scheme so as to be eligible for restitution under the MVRA. Id. at 549-50.

The Vaknin opinion, which first articulated the two-part test of causation that was cited with approval by our court of appeals in Fallon, provides an in-depth explanation of this concept under the VWPA. Vaknin, 112 F.3d at 589. Vaknin was decided under the pre-1990 version of the VWPA as interpreted in Hughey, before the word "directly" was added for schemes and conspiracy-type offenses in 1990, and before the word "proximately" was added in the 1996 enactments of the VWPA and MVRA. Id. at 583 n.1. Nevertheless, as seen from the above-quoted language in Fallon, the Vaknin court's careful delineation of the meaning of causation in that version of the VWPA appears fully applicable to interpreting the current VWPA and MVRA. Moreover, because the definition of "victim" in the CVRA is derived from the VWPA

_____

reversing for trial error, was retried and a new conviction on that count obtained, the scope of that mail fraud scheme as alleged would permit inclusion in the VWPA restitution award of losses caused by conduct underlying two related substantive counts of conviction that did not contain a scheme or conspiracy element, because the mail fraud count "include[d] language which would cover the acts specifically alleged in [the non-scheme] counts." 189 F.3d at 847. The Henoud decision is summarized infra Sec. II.C. It held that "[b]ecause the indictment allege[d] with specificity a scheme to defraud local and long-distance carriers '[t]he district court had the authority to order restitution for the losses by the entire fraud scheme, not merely for the losses caused by the specific acts of fraud proved by the government at trial.'" Henoud, 81 F.3d at 489 (quoting United States v. Brothers, 955 F.2d 493, 497 (7th Cir. 1992)). The citation to Dickerson is explained supra n.18.

and MVRA, the <u>Vaknin</u> interpretation appears to be applicable as the causation test for determining "victim" status under the CVRA.

In a nutshell, what the court in <u>Vaknin</u> concluded was that neither "but for" [in the sense of being an event preceding the later events leading to the loss], nor "direct" [in the sense of being the event immediately before the loss] causation would satisfy the VWPA as then in effect. Having reviewed the then-existing statutory language, legislative history and case law, the court observed:

> Upon close perscrutation, the extreme positions advocated by the parties do not hold out much promise in our quest for a serviceable standard of causation.
>
> On the one hand, the sort of direct causation standard that the [defendants] propose is simply too rigid. Under their theory of intervening forces, a court could not impose restitution even if the defendant's conduct were a substantial cause of a loss, unless it were the last cause. . . .
>
> On the other hand, concerns of fairness require us to reject the unbridled but for causation standard that the government propounds. Under it, a court could impose restitution based on the most tenuous of connections.

<u>Id.</u> at 588.[20]

The <u>Vaknin</u> court then "distill[ed] certain bedrock principles" from the sources it had consulted, and articulated the two-part test later quoted with approval by the Third Circuit for the MVRA in <u>Fallon</u>. <u>Id.</u> at 589; <u>see</u> <u>Fallon</u>, 470 F.3d at 548-49 (quoted <u>supra</u>). From those principles, it articulated the following causative standard:

> [W]e hold that a modified but for standard of causation is appropriate for restitution under the VWPA. This means, in effect, that the government

---

[20] The panel opinion in <u>Vaknin</u> was authored by Hon. Bruce Selya, U.S.C.J., and contains ancient history as well as stylistic flourishes, but never at the sacrifice of legal clarity.

must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally). The watchword is reasonableness. A sentencing court should undertake an individualized inquiry; what constitutes sufficient causation can only be determined case by case, in a fact-specific probe.

Vaknin, 112 F.3d at 589-90.

Vaknin also suggested a process for analyzing the contentions of the parties in factual disputes on causation. Id. at 590. It used the factual dispute in that case as an illustration. Id. There, the offense was bank bribery; loans had defaulted, leaving the FDIC as the victim. Id. at 582. The factual dispute under the VWPA was the causation of the loss amounts. Vaknin thus further explained the meaning of its test for causation:

[W]here, as here, the government establishes that arrangements for a bribe precede and relate to the making of a loan, a commonsense inference arises that subsequent losses referable to the loan's uncollectibility are causally linked in reasonable proximity to the bribe. . . . Of course, the inference can be rebutted if the defendant produces specific evidence of factual or temporal remoteness. Here, however, [defendant] made no such showing. To the contrary, there is no compelling proof either of an unforeseeable intervening cause or of any cognizable remoteness, factual or temporal.

Id. at 590.

We have included this detailed description of the groundbreaking opinion of the panel in Vaknin because, although it interpreted the pre-1990 version of the VWPA, it appears to express and explain the thinking that has informed courts as they have interpreted the definitions of "victim" as one who was "directly and proximately harmed," under both later versions of the VWPA, and under the MVRA and the CVRA once they were enacted. As demonstrated by the fact that Fallon cited it on this point (as have other courts), the Vaknin opinion deals with the

31

concepts of "direct" and "proximate" causation in a way that helps make those concepts meaningful as courts endeavor to apply them to fact situations under these criminal statutes.

*          *          *

It is necessary to emphasize the following points before we leave this discussion of the definition of "victim" in the VWPA, MVRA, and CVRA. The concept of "related conduct," used by courts for purposes of determining statutory victim status in scheme, conspiracy, or pattern-based offenses, must be distinguished from the concept of "relevant conduct," as used in the federal sentencing guidelines. Here we draw upon some of the decisions summarized supra, as well as some cited infra. See, e.g., Akande, 200 F.3d at 143.

This distinction is illustrated in United States v. Dorcely, which did not involve a scheme-based offense. 454 F.3d 366 (D.C. Cir. 2006). There, defendant was acquitted of conspiracy to defraud the U.S. Department of Education of a substantial sum of money, and also acquitted of conspiracy to launder the money, but convicted of one count of making a false statement during the FBI's ensuing criminal investigation, in violation of 18 U.S.C. § 1001. Id. at 173-75. The circuit court held that the guidelines calculation was properly based on the acquitted "relevant conduct," because it was established by at least a preponderance of the evidence. Id. at 180-81. However, a restitution award for the loss caused to the Department of Education was not proper under the VWPA or the MVRA because the only offense of conviction was the false statement count, which under Hughey could not support restitution except for any loss caused by the specific [non-scheme/conspiracy] offense of conviction. Id.

We believe that where, as here, one of the offenses of conviction does have a scheme, conspiracy, or pattern as an element, the "relevant conduct" for guidelines purposes may or may

not be the same as "related conduct" for purposes of determining statutory victim status under the VWPA, MVRA, or CVRA.  <u>Akande</u>, 200 F.3d at 143.

Likewise, the definition of "victim" in the restitution statutes and the CVRA does not mirror the various definitions of "victim" in the guidelines.  <u>Cf.</u> <u>United States v. Blake</u>, 81 F.3d 498, 506 n.5 (4th Cir. 1996) ("The definition of victim provided in [the VWPA post-1990 amendments] is much narrower than the one in the guidelines, and it is § 3663 – not the guidelines – that governs the authority of a sentencing court to require restitution.").  Indeed, the references to "victims" in the guidelines are not even consistent within the guidelines themselves, by design.[21]

---

[21]  The federal sentencing guidelines do not provide a definition of "victim" for general applicability even within the guidelines.  The word "victim" is not found among the guidelines terms that have definitions of general applicability.  <u>See</u> U.S.S.G. § 1B1.1 cmt. n.1 (definitions of terms of general applicability).  The commentary states that with the exception of terms of general applicability defined under Section 1B1.1, any definitions of terms that appear in various sections "are not designed for general applicability," even in the guidelines; "therefore, their applicability to sections other than those expressly referenced must be determined on a case by case basis."  <u>Id.</u> cmt. n.2.  We are using the 1998 edition of the guidelines in this case.  The word "victim" appears in many places in those guidelines, sometimes with varying definitions and sometimes not defined.  <u>See, e.g.</u>, <u>id.</u> ch. 2, pt. A (Offenses Against the Person); <u>id.</u>ch.3, pt.A (Victim-Related Adjustments); <u>id.</u> ch.3, pt. D (Multiple Counts).  The guidelines expressly recognize that the definitions of "victims" can and do vary as between the guidelines and the restitution statutes, as seen in this commentary:

"Scheme to defraud more than one victim," as used in subsection (b)(2)(B), refers to a design or plan to obtain something of value from more than one person.  In this context, "victim" refers to the person or entity from which the funds are to come directly.  Thus, a wire fraud in which a single telephone call was made to three distinct individuals to get each of them to invest in a pyramid scheme would involve a scheme to defraud more than one victim, but passing a fraudulently endorsed check would not, even though the maker, the payee and/or payor all might be considered victims for other purposes, such as restitution.

<u>Id.</u> § 2F1.1 cmt. n.4 (1998) (repealed 2004); <u>see also</u> <u>id.</u> § 5E1.1 cmt. (background).

Therefore, the terms should not be conflated. It cannot be assumed that "relevant conduct" for guidelines purposes is the same as "related conduct" for purposes of determining statutory victim status under a scheme or conspiracy-based offense. Nor does the term "victim," as variously appearing in the guidelines, inform the determination of statutory victim status under the VWPA, MVRA, or the CVRA.

## C.  REVIEW OF CASE LAW ON DISPUTED FACTUAL ISSUES OF STATUTORY VICTIM STATUS

The parties have not cited, nor has our research revealed, any case in which statutory victim status was established in circumstances similar to this prosecution. We have studied the reported Third Circuit cases under the VWPA, MVRA, and CVRA, and we have surveyed the federal appellate case law in other circuits, in an effort to shed some light on the question presented in this motion. Here we summarize the results of that search.

First we address the case law in the Third Circuit under the VWPA, MVRA, and CVRA.[22] Most of those cases have arisen in prosecutions for property crimes causing pecuniary loss. The type of victim harmed by the criminal conduct was simply not in dispute, and the opinions dealt with other issues.[23]  See, e.g.:

United States v. Hawes, 523 F.3d 245, 255-56 (3d Cir. 2008) (investors were victims of mail fraud);

--------

[22]  A few of these cases arose under other federal restitution statutes such as the Probation Act, 18 U.S.C. § 3563. That made no difference in determining statutory victim status.

[23]  To the degree that Third Circuit case law under the VWPA, MVRA, and CVRA is pertinent to this motion, on topics other than establishing whether statutory victim status exists, we have cited and discussed that precedent in other sections of this opinion. See supra Sec. I.A.; infra Secs. I.D., I.E., I.F. Some of the cases cited in this section have been cited previously. We repeat the full citation here for ease of reference.

United States v. Lessner, 498 F.3d 185, 189-90, 192, 205-06 (3d Cir. 2007) (federal agency was victim of mail fraud and defense procurement fraud);[24]

United States v. Fallon, 470 F.3d 542, 547-48 (3d Cir. 2006) (customer was victim of mail fraud/wire fraud);

United States v. Leahy, 438 F.3d 328, 329-31 (3d Cir. 2006) (consolidated appeals including banks as victims of bank fraud);

United States v. Himler, 355 F.3d 735, 737-38, 744-46 (3d Cir. 2004) (settlement company was victim of being tendered counterfeit checks at real estate closing);

United States v. Syme, 276 F.3d 131, 135-36, 158-59 (3d Cir. 2002) (Medicare/Medicaid programs were victims of mail fraud/wire fraud, False Claims Act violations, and false statements relating to health care matters in false billing of government programs for ambulance trips);

United States v. Jarvis, 258 F.3d 235, 236-39 (3d Cir. 2001) (investors were victims of mail fraud);

United States v. Akande, 200 F.3d 136, 137-38 (3d Cir. 1999) (entities that made cash advances and sold merchandise were victims of conspiracy to commit credit card fraud);

United States v. Holmes, 193 F.3d 200, 201-02, 205-06 (3d Cir. 1999) (attorney's clients and acquaintances were victims of offenses including conspiracy and fraud schemes);

United States v. Voigt, 89 F.3d 1050, 1059, 1091-93 (3d Cir. 1996) (loan applicants and investors were victims of mail fraud/wire fraud scheme to obtain advance fees for loans);

United States v. Copple, 74 F.3d 479, 480-82 (3d Cir. 1996) ("Copple II") (investors were victims of mail fraud);

---

[24] The defendant in Lessner also pled guilty to obstruction consisting of destruction of records during the FBI's criminal investigation, under 18 U.S.C. § 1519 [a statute that is also a count of conviction in this case]. 498 F.3d at 191. However, the only offenses of conviction that gave rise to statutory victim status in Lessner were the defense procurement fraud and related mail fraud, for which the defense procurement agency was the MVRA victim. Id. at 201. Restitution was awarded "in the amount of the uncontested actual loss that the government sustained as a direct result of [defendant]'s fraudulent acts." Id. at 205.

United States v. Graham, 72 F.3d 352, 354-55, 357-58 (3d Cir. 1995) (banks were victims of offenses including bank fraud and conspiracy to make and utter counterfeit checks);

United States v. Carrara, 49 F.3d 105, 106, 108-09 (3d Cir. 1995) (municipality was victim of conspiracy to misappropriate its insurance funds);

Gov't of Virgin Islands v. Davis, 43 F.3d 41, 42-44 & n.4 (3d Cir. 1994) (estate of decedent was victim of mail fraud scheme);

United States v. Copple, 24 F.3d 535, 549-50 (3d Cir. 1994) ("Copple I") (same as Copple II);

United States v. Hallman, 23 F.3d 821, 827-28 (3d Cir. 1994) (bank was victim of forgery and possession of stolen mail offenses);

United States v. Woods, 986 F.2d 669, 670-72, 678-79 (3d Cir. 1993) ("Woods II") (investors were victims of mail fraud);

United States v. Kress, 944 F.2d 155, 157-58 (3d Cir. 1991) (government was victim of contracting fraud; offenses included mail fraud, false statements to government agency, and filing false claims);

United States v. Sleight, 808 F.2d 1012, 1014-15, 1017-18 (3d Cir. 1987) (employer was victim of offenses of conspiracy to defraud it, to obtain money and property by false pretenses, and to deprive it of honest services, as well as mail fraud scheme to defraud it);

United States v. Woods, 775 F.2d 82, 84-87 (3d Cir. 1985) ("Woods I") (same as Woods II);

United States v. Palma, 760 F.2d 475, 476-77 (3d Cir. 1985) (employer bank was victim of bank embezzlement).

See also:

United States v. Turcks, 41 F.3d 893, 895-97, 901-03 (3d Cir. 1994) (remanding for restitution findings including loss to victim banks caused by offenses involving credit card and bank fraud);

United States v. Logar, 975 F.2d 958, 959-62 (3d Cir. 1992) (remanding for restitution findings including loss to investors caused by offenses involving fraudulent tax shelter investment).

There are a few cases in the Third Circuit where the offense was not a property crime, and statutory victim status under the VWPA, MVRA, or CVRA was not dispute. Again, as in the property cases, the rulings on appeal dealt with issues other than whether statutory victim status was shown. See:

United States v. Ausburn, 502 F.3d 313, 315-16, 319-27 (3d Cir. 2007) (sentencing hearing appropriately, under CVRA, included oral victim impact statements by parent and guardian of minor victim of offense under 18 U.S.C. § 2422(b) (using telephone and computer to persuade minor to engage in illegal sexual activity));

United States v. Quillen, 335 F.3d 219, 222-26 (3d Cir. 2003) (state parole board was victim of threatening letter containing white powdery substance mailed by defendant; district court findings under MVRA were sufficient to support restitution award for hazmat response and cleanup even though testing later revealed substance was not hazardous);

United States v. Simmonds, 235 F.3d 826, 828-32 (3d Cir. 2000) (homeowners whose furniture was destroyed by federal arson offense were victims under MVRA);

United States v. Jacobs, 167 F.3d 792, 794-97 (3d Cir. 1999) (victim of federal aggravated assault offense was victim under MVRA).

See also:

United States v. Coates, 178 F.3d 681, 684-85 (3d Cir. 1999) (remanding for restitution findings under MVRA, including loss to victim banks caused by bank robbery);

United States v. Crandon, 173 F.3d 122, 124-27 (3d Cir. 1999) (district court made adequate findings of proximate cause to award restitution for medical expenses incurred by parent for psychiatric treatment of minor victim of child pornography offense, under 18 U.S.C. § 2259(b)(1));

United States v. Johnson, 816 F.2d 918, 924 (3d Cir. 1987) (similar to Coates; bank robbery but restitution governed by VWPA).

We are aware of only four Third Circuit opinions addressing contested issues of statutory victim status under the CVRA, or under any of the federal restitution statutes. Those are easily

summarized as follows. In United States v. Hayward, the defendant was convicted of transporting minors in interstate and foreign commerce with intent to engage in criminal sexual activity. 359 F.3d 631, 632-33 (3d Cir. 2004). The court soundly rejected his contention that the parents were not included as victims, under the MVRA, to obtain restitution for the costs of obtaining their victimized children from London and making them available to participate in the investigation and trial. Id. at 642. United States v. Kones is discussed at length supra Sec. I.B. There, the court held that a patient was not a victim of the defendant physician's insurance mail fraud scheme under the VWPA, because the conduct that allegedly harmed her was not conduct proscribed by the mail fraud statute. 77 F.3d at 70-71. United States v. Cottman held, consistent with other circuits, that the FBI is not a victim, under the VWPA, to obtain restitution of funds expended in a sting operation during a criminal investigation. 142 F.3d 160, 168-70 (3d Cir. 1996). United States v. Hand presented a different factual scenario, and the court held that the government was a victim entitled to restitution under the VWPA. 863 F.2d 1100, 1102-05 (3d Cir. 1988). There, defendant was convicted of contempt of court for her misconduct as a juror in a federal criminal trial that forced the trial judge to vacate the convictions of six defendants. Id. at 1101. An award of restitution for salaries and expenses of Assistant U.S. Attorneys, DEA agents and U.S. Marshals was upheld based on findings that their time and energy was wasted in the trial as a result of defendant's conduct. Id. at 1102-05.[25]

*      *      *

---

[25] The government in the present motion cites a district court opinion in this circuit that discussed potential CVRA allocution rights at sentencing. On appeal after sentencing, the conviction was affirmed in an unpublished opinion that did not refer to the CVRA. See United States v. Sandhu, 462 F.Supp.2d 663, 666 & n.9 (E.D. Pa. 2006); United States v. Sandhu, 268 Fed.Appx. 163, 166 (3d Cir. 2008). We discuss that case infra Sec. II.F.

Next we address case law in other circuits that has addressed whether statutory victim status was established under the VWPA, MVRA, or the CVRA. Cases in which victim status was not in dispute typically had similar fact patterns to those summarized above in the Third Circuit, and we will not list them here. See generally John F. Wagner, Annotation, Who is "victim" so as to be entitled to restitution under Victim and Witness Protection Act, 108 A.L.R. FED. 828 (1992 with pocket part updates).[26] The following collection of citations is limited to cases where statutory victim status was in dispute.[27]

Statutory victim status was found to exist, over objection by one or more of the parties, in cases of which the following are a representative collection:

_____

[26] Mass casualty events can also give rise to statutory victim status under the CVRA, MVRA, VWPA, or other statutes. For example, the Oklahoma City federal courthouse bombing resulted in statutory victim status for those who suffered casualties, as well as the government agency that owned the courthouse. See United States v. Nichols, 169 F.3d 1255, 1277-78 (10th Cir. 1999); United States v. McVeigh, 106 F.3d 325 (10th Cir. 1997) (holding that district court sequestration order, prohibiting from attending trial any persons who would provide victim impact testimony at sentencing, was not reviewable on interlocutory appeal or mandamus petition), superseded by statute, 18 U.S.C. § 3510 (1997). The victims of the 911 terrorist attacks have separate legislative coverage. See Air Transportation Safety Stabilization Act of 2001, Pub.L.No. 107-42, § 403, 115 Stat. 230, 237 (2001) (codified at 49 U.S.C. § 40101). More recently, an explosion at a petroleum refinery that caused mass casualties resulted in CVRA victim status in the ensuing criminal action. In re Dean, 527 F.3d at 395.

[27] The CVRA motion in this case comes at the post-verdict stage, when the offenses of conviction have been determined at the district court level. Courts are required to afford potential victim status to those who qualify, along with commensurate statutory rights of participation, even before a guilty plea or jury verdict has been entered. The CVRA clearly provides for victims' rights at those stages, and indeed before a prosecution has been initiated. See 18 U.S.C. §§ 3771(a), (d)(3), (d)(5). There is a developing body of case law in those circumstances. See, e.g., In re Dean, 527 F.3d at 395; United States v. Rubin, 558 F.Supp.2d 411 (E.D.N.Y. 2008); United States v. Heaton, 458 F.Supp.2d 1271 (D. Utah 2006); United States v. Turner, 367 F.Supp.2d 319 (E.D.N.Y. 2005). We do not include those cases in the collection listed above, except if there was a plea agreement and potential victims sought to participate in the plea proceedings or sentencing. See also District of Montana case discussed infra n.105.

In re Stewart, 552 F.3d 1285, 1288-89 (11th Cir. 2008) (CVRA mandamus petition; circuit court held that mortgage borrowers were CVRA victims of conspiracy to deprive bank of honest services, where defendants were bank officer and co-conspirator whose offense caused borrowers to pay excess fees that defendants pocketed);

United States v. Brock-Davis, 504 F.3d 991, 998-1000 (9th Cir. 2007) (owner of second location at which defendants conspired to manufacture methamphetamine was MVRA victim for resulting cleanup costs although not named in indictment; victim status appropriate either because activity at that location was "related conduct," or it was part of same conspiracy);

United States v. Chalupnik, 514 F.3d 748, 752-55 (8th Cir. 2007) (distributor of copyrighted CDs and DVDs stolen by defendant was MVRA victim of misdemeanor copyright infringement offense);

United States v. Johnson, 440 F.3d 832, 835-39, 849-50 (6th Cir. 2006) (victims of four predicate criminal acts in RICO conspiracy conviction were MVRA victims, where district court found trial evidence established by a preponderance that defendant was actively involved in all four predicate acts);

United States v. Washington, 434 F.3d 1265, 1266-67, 1268-70 (11th Cir. 2006) (police department and another property owner were MVRA victims as to police car and property damaged during chase of defendant fleeing after bank robbery);

United States v. Gee, 432 F.3d 713, 715 (7th Cir. 2005) (local organization that held contracts to administer federal welfare program was MVRA victim of conspiracy to defraud the United States through bribery concerning programs receiving federal funds; organization was a "proxy" for the federal interest because it was a recipient of federal funds designated for a particular use);

United States v. Rand, 403 F.3d 489, 493-96 (7th Cir. 2005) (all individuals who sustained losses caused by acts of identity theft performed in the charged identity theft conspiracy were MVRA victims, not just those listed in the indictment or in the plea agreement);

United States v. Donaby, 349 F.3d 1046, 1047-48, 1051-55 (7th Cir. 2003) (another bank robbery case; police department was MVRA victim as to police car damaged during chase);

United States v. Hackett, 311 F.3d 989, 992-93 (9th Cir. 2002) (insurer of home damaged by fire caused by explosion of chemicals used to manufacture methamphetamine was MVRA victim as to defendant convicted of aiding and abetting manufacture of methamphetamine);

United States v. Gamma Tech. Indus., Inc., 265 F.3d 917, 922-24, 926-28 (9th Cir. 2001) (subcontracts were convicted of paying kickbacks on Navy contracts; individual employee of defense contractor was convicted of conspiracy to provide and receive kickbacks; employer of individual defendant was MVRA victim as to all defendants because amount of the kickbacks paid to defendant employee was reflected in overcharges to employer by subcontractors);

Moore v. United States, 178 F.3d 994, 1001 (8th Cir. 1999) (bank customer was MVRA victim of attempted bank robbery; defendant had stood within six feet of teller and customer and pointed sawed-off gun at both of them);

United States v. Hoover, 175 F.3d 564, 566-69 (7th Cir. 1999) (university was MVRA victim of false statement offense under 18 U.S.C. § 1001, where it provided tuition loan money under federal student loan program based on defendant's misrepresentations in loan application);

United States v. Jackson, 155 F.3d 942, 944-45, 949-50 (8th Cir. 1998) (where defendant was convicted, for check writing fraud scheme, of conspiracy to possess or utter counterfeit securities and related substantive offenses, MVRA victims were all persons and entities harmed by the scheme including those from whom checks were stolen and those who received fraudulent checks that were dishonored, whether or not individually identified in indictment);

United States v. Vaknin, 112 F.3d 579, 583-84, 590-91 (1st Cir. 1997) (three bank customers separately paid bribes to bank officer when applying for loans that eventually went into default; bank later failed and FDIC took over; defendant customers were each convicted of bank bribery; circuit court held that record supported finding that FDIC was VWPA victim as to first defendant, and remanded for factual findings on causation of losses as to other two defendants);

United States v. Hensley, 91 F.3d 274, 275-78 (1st Cir. 1996) (where defendant pled guilty to mail/wire fraud and other charges in indictment alleging that he devised and executed a scheme in Boston to obtain merchandise by false pretenses from computer-products distributors in specified states including California, during an approximate one-month period, and PSR contained undisputed facts about a delivery not specified in the indictment, which was obtained by defendant from a California distributor using same modus operandi during same time period, that distributor was a victim of "unitary scheme" under VWPA [post-1990 amendments]);

United States v. Henoud, 81 F.3d 484, 486-90 (4th Cir. 1996) (telephone companies were VWPA victims of offenses of conspiracy, wire fraud and fraud using access devices, where indictment specifically alleged scheme to defraud local and long-distance carriers; indictment did not have to identify all asserted victims for them to qualify as statutory victims under VWPA);

United States v. Haggard, 41 F.3d 1320, 1323-24, 1329 (9th Cir. 1994) (mother of child missing for several years was VWPA victim of hoax by state inmate who contacted FBI falsely claiming to know location of body and identity of assailant; defendant pled guilty to offenses including obstructing FBI investigation and making false statements to FBI and grand jury; district court found that mother's refreshed grief that manifested as physical illness and disability was a result of defendant's crimes of lying to FBI and grand jury; circuit court concluded that where defendant deliberately targeted an unsuspecting family as the victim of his crimes, VWPA victim status for the mother was established);

United States v. Sanga, 967 F.2d 1332, 1333-35 (9th Cir. 1992) (live-in maid kept as virtual slave by defendants was VWPA victim as to defendants convicted of conspiracy to smuggle aliens; any complicity by victim ended when she became an object of, rather than a participant in, the criminal goals of defendants);

United States v. Spinney, 795 F.2d 1410, 1414-18 (9th Cir. 1986) (deceased man was VWPA victim of misdemeanor conspiracy to commit simple assault where defendant, intending only to assault the victim, supplied a weapon to an intoxicated individual who used it to murder the victim);

United States v. Fountain, 768 F.2d 790, 793-94, 800-04 (7th Cir. 1985) (where defendant federal inmates murdered two guards and permanently disabled another guard and Department of Labor provided some compensation to the injured guards or their estates, all had statutory VWPA victim status).

See also:

In re W.R. Huff Asset Mgmt. Co. [United States v. Rigas], 409 F.3d 555, 557-61, 563-64 (2d Cir. 2005) (CVRA mandamus petition; circuit court held that after two members of securities fraud conspiracy were convicted and were awaiting sentencing, and government was determining whether to prosecute others, those who suffered pecuniary loss resulting from conspiracy were CVRA victims entitled to be heard, but proposed "global" settlement that limited criminal restitution to a $715 million victim compensation fund under which claimants would be required to release civil claims against all except the two convicted defendants was reasonable and did not violate CVRA or MVRA);

United States v. Grundhoefer, 916 F.2d 788, 789-91, 793-95 (2d Cir. 1990) (bankruptcy trustee lacked standing to appeal VWPA restitution orders in favor of students who sustained pecuniary loss from conspiracy to make false claims to federal student loan program and related substantive offenses; circuit court in dicta approved district court finding that students were VWPA victims).

Cf.:

United States v. Kaminski, 501 F.3d 655, 657-58, 665, 669-70 (6th Cir. 2007) (affirming district court finding that "society at large" was the victim of offenses under Food, Drug and Cosmetic Act, 21 U.S.C. § 321 et seq., involving sales of unapproved and adulterated drugs, and imposing restitution as a condition of probation under 18 U.S.C. § 3563(b)(2), in amount of retail sales to consumers).

Statutory victim status was determined not to exist in the following appellate decisions

under the CVRA, MVRA, or VWPA:[28]

In re Antrobus, 519 F.3d 1123, 1124-26, 1127-31 (10th Cir. 2008) (on original petition and on petition for rehearing and rehearing en banc) (CVRA mandamus petition; affirming district court finding that deceased woman was not CVRA victim of offense of transferring a handgun to a juvenile in violation of 18 U.S.C. § 922(x)(1), where defendant supplied a weapon to a juvenile who indicated nothing about his intentions, but more than seven months later as an adult murdered five people, including petitioners' decedent, in shopping mall rampage);[29]

In re Jane Doe, 264 Fed.Appx. 260, 263 (4th Cir. 2007) (CVRA mandamus petition; holding that petitioner was not a statutory victim under CVRA or VWPA, where corporate defendant was convicted of misbranding a prescription drug (OyxContin) with intent to defraud or mislead, in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and entered plea agreement requiring it to pay restitution to various entities affected by its conduct but did not provide for restitution to

---

[28] This collection of appellate decisions excludes, as effectively abrogated by the 1990 VWPA amendments, any case decided under the pre-1990 amendments to the VWPA, if statutory victim status was denied and the conviction had as an element a scheme, conspiracy or pattern of criminal activity. See supra Sec. I.B. We also do not list decisions rejecting apparently frivolous claims. See, e.g., In re Rochester, 292 Fed.Appx. 226, 227 (4th Cir. 2008) (CVRA mandamus petition; holding that state inmate could not raise claims of being a "kidnap victim" due to his conviction and incarceration; all of his claims were fully litigated in prior habeas corpus actions and he was not denied any right under CVRA).

[29] The Tenth Circuit used "traditional mandamus standards" of appellate review in deciding the Antrobus petition brought under the CVRA. 519 F.3d at 1124-25; see id. at 1126 (concurring opinion). In denying a petition for rehearing and rehearing en banc, the court stated that it was not "obvious to us that the outcome would change" under traditional appellate standards. Id. at 1127-31. This highlights the current circuit split as to the standard of review for mandamus petitions under the enforcement mechanism of the CVRA. See supra n.8.

consumers, and petitioner objected and petitioned to set aside plea and reopen sentencing to obtain restitution, contending that she suffered harm from OxyContin addiction);

United States v. Robertson, 493 F.3d 1322, 1326-27, 1333-35 (11th Cir. 2007) (purchaser of stolen goods who was sued by and settled with manufacturer from whom the goods were obtained by defendant by mail/wire fraud, was not an MVRA victim entitled to restitution of money paid under undisclosed terms of settlement with manufacturer);

United States v. Randle, 324 F.3d 550, 555-58 (7th Cir. 2003) (where defendant pled guilty to one count of bankruptcy fraud [an offense not having element of scheme, conspiracy or pattern], and plea agreement did not expand group of victims, under Hughey individuals harmed by similar criminal conduct in dismissed counts were not MVRA victims);

United States v. Cutter, 313 F.3d 1, 2-9 (1st Cir. 2002) (where defendant was convicted of two counts of bankruptcy fraud [offenses not having element of scheme, conspiracy or pattern], but where bankruptcy trustee initiated fraudulent conveyance action against transferee of defendant's prior residence not because of defendant's bankruptcy fraud but because of below-market-value sale price to transferee, loss sustained by transferee when forced to sell the property to settle with bankruptcy trustee did not create MVRA victim status for transferee);

United States v. Elias, 269 F.3d 1003, 1007-08, 1021–22 (9th Cir. 2001) (where defendant was convicted, inter alia, of: (1) one count of storing or disposing of hazardous waste without a permit, knowing that his actions placed others in imminent danger of death or serious bodily injury, under 42 U.S.C. § 6928(e) [RCRA], and (2) false statements to investigators who responded after worker was taken to hospital near death from working inside cyanide-contaminated confined space, holding that worker was not MVRA victim as to 18 U.S.C. § 1001 false statement count, and no federal restitution statute authorized restitution for offenses under Title 42);[30]

_____

[30] The circuit court in Elias explained this conclusion as follows:

> Although, as a theoretical matter, § 1001 offenses may support the imposition of restitution (footnote 75:  See, e.g., United States v. Hoover, 175 F.3d 564, 569 (7th Cir. 1999)), Elias's § 1001 offense cannot support the court's order of restitution for [worker] because [worker] was not a victim of that particular crime.  (Footnote 76:  See United States v. Rodrigues, 229 F.3d 842, 845 (9th Cir. 2000)).  Elias did not harm [worker] by lying; he harmed him by knowingly exposing him to hazardous waste. This latter offense is one of the few for which Congress has not sanctioned the imposition of restitution.  Perhaps this case will change that.  At present,

United States v. Ramirez, 196 F.3d 895, 896-97, 899-900 (8th Cir. 1999) (investors in separate fraudulent investment scheme, which was not stated or implied to be the subject of wire fraud scheme described in the indictment, were not MVRA victims);

United States v. Upton, 91 F.3d 677, 679-81, 686-87 (5th Cir. 1996) (materialmen and suppliers who were left unpaid when defendant failed to complete bonded Air Force construction job, were not VWPA victims of the conspiracy and substantive counts of conviction, which were based on a scheme to defraud the Air Force by obtaining reimbursement for fraudulent surety bonds);

United States v. Broughton-Jones, 71 F.3d 1143, 1144-49 (4th Cir. 1995) (where defendant pled guilty to perjury before grand jury [an offense not having element of scheme, conspiracy, or pattern], and grand jury had been investigating her for suspected fraudulent financial dealings, but conviction was only for perjury and plea agreement did not provide for restitution to any financial victims, individual who had sustained financial harm in scheme alleged in dismissed wire fraud count was not VWPA victim under Hughey and post-1990 amendments).[31]

---

however, we conclude that the law does not sanction the imposition of restitution in this instance.

Elias, 269 F.3d at 1021-22. Elias was decided in 2001, before enactment of the CVRA. It is clear that under current law, the injured worker in Elias would have CVRA victim status because as the court held, he was harmed as a result of the RCRA offense [not the subsequent false statement offense], and the CVRA applies to all federal offenses. That worker probably still would not have restitution rights, because to our knowledge the federal restitution statutes still do not apply to Title 42 or other environmental or worker safety statutes (unless, of course, a defendant in a plea agreement expressly accepts a restitution obligation not otherwise imposed by law). See 18 U.S.C. § 3663(a)(3). We have summarized the Hoover case (cited by Elias) in this Section supra. The citation in the same text to Rodrigues was a reference to the Hughey rule, as it continues to apply to offenses that do not have an element of scheme, conspiracy, or pattern of criminal activity. 229 F.3d at 844-45.

[31] The Broughton-Jones court stated in a footnote:

Though we have been advised of no decision imposing or affirming restitution for loss to a victim of perjury, we may assume that such a loss is conceivable (e.g., by delaying Government efforts to recover stolen or defrauded money), but no factual basis for any such claim is present here.

Id., 71 F.3d at 1149 n.3.

<u>Cf</u>:

<u>United States v. Blake</u>, 81 F.3d 498, 501-02, 505-07 (4th Cir. 1996) (persons from whom defendant stole credit cards that he used to commit [non-conspiracy] offense of fraudulent use of unauthorized access devices were not VWPA victims [using narrow reading of <u>Hughey</u>, post-1990 amendments and before 1996 amendments]; circuit court suggesting that if "directly harmed" were added to VWPA statutory victim definition, this result would be corrected).[32]

*          *          *

We summarize this case law survey with the point made at the outset: The existing legal landscape does not feature any case in which statutory victim status was asserted or found to exist in circumstances similar to this prosecution. They do provide useful background, however, as we render our findings and conclusions <u>infra</u> Sec. II.F.

## D.     RIGHTS OF STATUTORY VICTIMS AGAINST PARTICULAR DEFENDANTS AT SENTENCING

We next review the rights that all statutory victims have in sentencing proceedings under the CVRA and related statutes.

The CVRA provides that where a person is a "crime victim," as defined in that statute, a crime victim has the following enumerated rights:

(1) The right to be reasonably protected from the accused.

(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

---

[32] We have also searched the standard sources for decisions issued under the CVRA at the district court level. To the degree that any of those may assist in the determination of statutory victim status on the present motion, we cite and discuss them <u>infra</u> Sec. II.F.

(4)  The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5)  The reasonable right to confer with the attorney for the Government in the case.

(6)  The right to full and timely restitution as provided in law.

(7)  The right to proceedings free from unreasonable delay.

(8)  The right to be treated with fairness and with respect for the victim's dignity and privacy.

18 U.S.C. § 3771(a); see id. § 3771(e) (defining "crime victim").  The CVRA specifies:

In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection(a).

Id. §3771(b)(1).

Officers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection(a).

Id. § 3771(c)(1).

The prosecutor shall advise the crime victim that the crime victim can seek the advice of an attorney with respect to the rights described in subsection(a).

Id. § 3771(c)(2).[33]

---

[33]  The CVRA contains the following express limitation on its enforcement:

Nothing in this chapter shall be construed to authorize a cause of action for damages or to create, to enlarge, or to imply any duty or obligation to any victim or other person for the breach of which the United States or any of its officers or employees could be held liable in damages.  Nothing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction.

18 U.S.C. § 3771(d)(6); see also id. § 3771(d)(5), quoted supra n.9.

The CVRA does not itself confer a right to restitution.[34]  It is, however, obvious that if a person is a "crime victim" under the CVRA, and if the offense of conviction is one specified in the restitution statutes, MVRA or VWPA, then that person also has statutory victim status under the restitution statutes.[35]  This is evident from the fact that, as we have seen, the definition of "crime victim" in the CVRA is based on the definition of "victim" in both the MVRA and the VWPA.  See supra Sec. I.B.

All of the OSHA-related offenses in this case are violations of Title 18 of the United States Code.  See supra n.1 and accompanying text.  The VWPA (discretionary restitution statute) applies to all offenses arising under Title 18, as well as other specified statutes, except those carved out for mandatory treatment in the MVRA.  See 18 U.S.C. § 3663(a)(1)(A).  The offenses to which the MVRA (mandatory restitution statute) applies include "an[y] offense against property under [title 18], including any offense committed by fraud or deceit," and crimes of violence as defined in 18 U.S.C. § 16.  See 18 U.S.C. § 3663A(c)(1)(A).

The VWPA certainly applies in this case if any persons are "crime victims" of the offenses of conviction, although in our view the MVRA would not arguably apply.  Neither of those statutes is new, and neither was amended when the CVRA was enacted in 2004.  Therefore, with the filing of the present motion asserting that individuals are "crime victims" under the CVRA, it is clear to us that the Court's review of the rights of victims must include awareness of the restitution provisions of the VWPA.

---

[34]  See supra n.4 and accompanying text.

[35]  It appears that would also be the result if the offense of conviction is covered under any other federal restitution laws.  See, e.g., statutory provisions cited supra, n.12.

Case law under both the VWPA and the MVRA is relevant here because many of the provisions are parallel. Also, the requirements for issuance and enforcement of restitution orders under both statutes are specified in one place: 18 U.S.C. § 3664 (Procedure for issuance and enforcement of order of restitution). The name of Section 3664 is somewhat of a misnomer because it treads into substantive territory as well as procedural ground. See, e.g., infra n.40 and accompanying text. Implementation of the VWPA and MVRA, as well as the CVRA, is also governed by the Federal Rules of Criminal Procedure.[36]

\* \* \*

Here we provide an overview of the substantive restitution rights of statutory victims under the VWPA, and the restitution-related procedural rights of statutory victims under 18 U.S.C. § 3664 and the Federal Rules of Criminal Procedure.[37] Relevant case law under both the VWPA and MVRA is also cited. Next, we describe how the CVRA provisions are implemented in the sentencing process, including but not limited to the restitution aspect of sentencing.

The substantive provisions of the VWPA state in pertinent part:

> The court, when sentencing a defendant convicted of an offense under this title, . . . may order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to any victim of such offense, or if the victim is deceased, to the victim's estate.

18 U.S.C. § 3663(a)(1)(A); see also id. § 3663(a)(2) (defining "victim").

---

[36] As noted supra Section I.B, the Federal Rules of Criminal Procedure were amended effective December 1, 2008, to implement the CVRA. Those changes specific to the sentencing process are discussed infra n.41 and accompanying text.

[37] Of course, procedural provisions in Section 3664 and the Federal Rules of Criminal Procedure address rights of defendants as well as victims. In this Section we focus primarily on victims' rights in the sentencing process. Defendants' rights are more specifically addressed infra Section I.F.

The court, in determining whether to order restitution under this section, shall consider –

> (I)  the amount of the loss sustained by each victim as a result of the offense; and
>
> (II)  the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

Id. § 3663(a)(1)(B)(i).

To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order.

Id. § 3663(a)(1)(B)(ii).

The order may require that such defendant --

> (1)  in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense –
>
> > . . . .
>
> (2)  in the case of an offense resulting in bodily injury to a victim . . . --
>
> > (A)  pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;
> >
> > (B)  pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and
> >
> > (C)  reimburse the victim for income lost by such victim as a result of such offense;
>
> (3)  in the case of an offense resulting in bodily injury [that] also results in the death of a victim, pay an amount equal to the cost of necessary funeral and related services;
>
> (4)  in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense;

(5) in any case, if the victim (or if the victim is deceased, the victim's estate) consents, make restitution in services in lieu of money, or make restitution to a person or organization designated by the victim or the estate.

Id. § 3663(b).

An order of restitution made pursuant to this section shall be issued and enforced in accordance with section 3664.

Id. § 3663(d).

The VWPA codifies the "basic rule that restitution in a criminal case may only compensate a victim for actual losses caused by the defendant's criminal conduct." Gamma Tech, 265 F.3d at 926. Therefore, consequential or contingent losses may not be included in a restitution award. United States v. George, 403 F.3d 470, 474 (7th Cir. 2005); United States v. Richard, 234 F.3d 763, 771 (1st Cir. 2000); Rodrigues, 229 F.3d at 845; Davis, 43 F.3d at 45. Lost wages, however, are not considered consequential damages, and circuits have held that an award of lost income resulting from an offense causing bodily injury or death, including future lost income (based on the period after the judgment of conviction is entered), may be included in a restitution award under the VWPA, and is mandatory, at least for violent crimes, under the MVRA. See United States v. Cienfuegos, 462 F.3d 1160, 1163-69 (9th Cir. 2006) (MVRA); Fountain, 768 F.2d at 802 (VWPA). In addition, the Third Circuit has ruled that the VWPA implicitly authorizes a district court to include in a restitution order both pre-judgment interest from the date of loss and post-judgment interest. See Davis, 43 F.3d at 47.

The provisions of Section 3664, pertaining to issuance of a restitution order under either the VWPA or the MVRA, state in pertinent part:

(a)  For orders of restitution under this title, the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order.  The report shall include, to the extent practicable, a complete accounting of the losses to each victim, . . . and information relating to the economic circumstances of each defendant.  If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court.

(b)  The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section.

. . .

(d)      (1)  Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution.

(2)  The probation officer shall, prior to submitting the presentence report under subsection (a), to the extent practicable –

(A)  provide notice to all identified victims of --

(i)  the offense or offenses of which the defendant was convicted;
(ii)  the amounts subject to restitution submitted to the probation officer;
(iii)  the opportunity of the victim to submit information to the probation officer concerning the amount of the victim's losses;
(iv)  the scheduled date, time, and place of the sentencing hearing;
(v)  the availability of a lien in favor of the victim pursuant to subsection (m)(1)(B); and
(vi)  the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution; and

(B)  provide the victim with an affidavit form to submit pursuant to subparagraph (A)(vi).

(3)  Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.

(4)  After reviewing the report of the probation officer, the court may require additional documentation or hear testimony.  The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

(5)  If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.  If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order.  Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

(6)  The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.

(e)  Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.  The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. . . .  The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

(f)(1)          (A)  In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court

and without consideration of the economic circumstances of the defendant.[38]

(B)  In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.

(2)  Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of –

(A)  the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

(B)  projected earnings and other income of the defendant; and

(C)  any financial obligations of the defendant; including obligations to dependents.

(3)(A) . . . .

(B)  A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

18 U.S.C. § 3664 (a)-(f).[39]

The district court is required to make findings of fact on all factual issues relevant to restitution under the VWPA.  Palma, 760 F.2d at 480.  Sentencing decisions are routinely vacated in the Third Circuit for failure to make adequate findings under the VWPA or MVRA.  See, e.g., Fallon, 470 F.3d at 549-50; Holmes, 193 F.3d at 205; Turcks, 41 F.3d at 901-03; Logar, 975 F.2d

---

[38]  See infra n.96.

[39]  These procedures have not been initiated in this case to date.  See infra Sec. II.E.

at 961-62. At least one circuit has ruled, even before enactment of the CVRA, that under Section 3664(d) the court can permit the asserted victim to assume the burden of proof on restitution. Gamma Tech, 265 F.3d at 924 ("So long as the district court orders defendants to pay restitution only after *someone* proves the amount by a preponderance of the evidence, there is no reason a non-party like [victim] can't carry the burden.").

If restitution is ordered in the absence of a plea agreement for a specific sum, the district court cannot delegate or defer its obligation to specifically identify victims and make at least reasonable estimates of their losses in ordering restitution. See, e.g., United States v. Catoggio, 326 F.3d 323, 328-29 (2d Cir. 2003) (holding that where a defendant's complex fraud scheme resulted in approximately 10,000 victims and $192 million in actual losses, the district court erred in ordering restitution to unidentified, as opposed to unidentifiable, victims and in an amount ($80 million) that probably did not represent the actual losses to the victims). Moreover, despite the exception in the VWPA, and the MVRA (at least for property crimes), permitting the court to decline to impose restitution on the ground that "complication and prolongation of the sentencing process . . . outweighs the need to provide restitution to any victims," this exception has been interpreted narrowly. 18 U.S.C. § 3663(a)(1)(B)(ii); see id. § 3663A(c)(3); Catoggio, 326 F.3d at 328 ("[W]e find meritless [defendant]'s argument that the number of victims is too large for restitution to be practicable and that the issues . . . are so complex that the need for restitution is outweighed by the burden on the sentencing process.").

Section 3664 expressly allows for varying amounts of restitution to be imposed upon different defendants. Section 3664 also permits joint and several liability among co-defendants:

(h)  If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

(i)  If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and . . . circumstances of each victim.  In any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution before the United States receives any restitution.

18 U.S.C. § 3664 (h)-(i).

It has long been settled in this circuit that restitution imposed in differing amounts and joint and several restitution liability, regardless of precise culpability of each co-defendant, are within the court's discretion under the VWPA.  See, e.g., United States v. Hunter, 52 F.3d 489, 494-95 (3d Cir. 1995); Palma, 760 F.2d at 478.  This type of disparity does not violate the Equal Protection Clause.  Palma, 760 F.2d at 478.  The joint and several liability authorization was explicitly added in the 1996 amendments to Section 3664.  See United States v. Trigg, 119 F.3d 493, 501 n.6 (7th Cir. 1997).  It is also recognized that co-conspirators are jointly and severally liable for losses caused by the foreseeable acts of their co-conspirators, and this principle applies in ordering restitution for losses caused by the conspiracy.  See, e.g., Rand, 403 F.3d at 495; Nichols, 169 F.3d at 1278.

The district court is not limited to the evidence presented at trial in determining the scope of harm caused by the scheme or conspiracy for purposes of determining restitution.  See, e.g., United States v. Martin, 195 F.3d 961, 968-69 (7th Cir. 1999).  If the district court decides that an evidentiary hearing is necessary to complete the record on victim status or the amount of

victims' losses, the court is required to conduct a full and fair hearing on the issue of restitution.

See Gamma Tech, 265 F.3d at 925 ("We doubt the district court could *ever* abuse its discretion

by accepting evidence relevant to a sentencing decision . . . .").

Collateral sources of reimbursement may be compensated under a VWPA restitution

order, but not until all direct restitution of victims has been paid; amounts later recovered as civil

damages are to be offset against restitution obligations:

> (j)　　(1) If a victim has received compensation from insurance or any other
> source with respect to a loss, the court shall order that restitution be paid to
> the person who provided or is obligated to provide the compensation, but
> the restitution order shall provide that all restitution of victims required by
> the order be paid to the victims before any restitution is paid to such a
> provider of compensation.
>
> (2) Any amount paid to a victim under an order of restitution shall be
> reduced by any amount later recovered as compensatory damages for the
> same loss by the victim in --
>
> > (A) any Federal civil proceeding; and
> > (B) any State civil proceeding, to the extent provided by the law of
> > the State.

18 U.S.C. § 3664 (j); see also Himler, 355 F.3d at 745 (concluding that district court did not err

in providing that amount of restitution would be reduced by setoff at such time in the future when

property on which restitution order was based could be sold).

An order of restitution in the judgment of conviction is declared by this statute to

constitute a collateral estoppel bar, preventing the defendant from denying the essential

allegations of the offense in any subsequent civil proceeding by the victim:

> (*l*) A conviction of a defendant for an offense involving the act giving rise to an
> order of restitution shall estop the defendant from denying the essential allegations

of that offense in any subsequent Federal civil proceeding or State civil
proceeding, to the extent consistent with State law, brought by the victim.

18 U.S.C. § 3664(*l*).[40]

       \*            \*            \*

The enactment of the CVRA has introduced significant changes in the sentencing process.
Here we will summarize two of those changes as they have been implemented in the federal
courts:  (1)  the effect of the CVRA upon restitution procedures under the VWPA and MVRA;
and (2) the extent of participation by CVRA crime victims in preparation for and during the
sentencing hearing.

Restitution Procedures

The legislative history of the CVRA includes the following statement of sponsor Senator
Kyl on the right to "full and timely restitution as provided in law," 18 U.S.C. § 3771(a)(6):

This right, together with the other rights in the [A]ct to be heard[,] and confer with
the government's attorney . . . , means that existing restitution laws will be more
effective.

150 CONG. REC. S10910, S10911 (daily ed. Oct. 9, 2004) (statement of Sen. Kyl).

Even before the CVRA was enacted, one of the leaders of the victims' rights movement,
then-District Judge Paul Cassell, wrote about the duties of the court to ensure proper
consideration of victims' rights to restitution.  The discussion was in the context of the MVRA

-------

[40]  The federal appeals courts have rejected arguments that this collateral estoppel law
violates a defendant's Seventh Amendment right to jury trial in the related civil actions.  See
Palma, 760 F.2d at 479-80.

rather than the VWPA, but the following text highlighted Section 3664's procedural provisions

governing both the MVRA and the VWPA:

> [O]n close examination of the [Section 3664] statutory scheme, neither a request from the probation officer nor from the prosecutor is required for the court to impose restitution. . . . It is well-settled that "[t]he probation officer acts as an *agent of the court* for the purpose of gathering and classifying information and informing the court in the exercise of its sentencing responsibility." Thus, the probation officer works for the court – not the other way around. Accordingly, if the court believes that a possible approach to restitution ought to be investigated, the probation officer must undertake the investigation.
>
> The objection that a prosecutor must request restitution is likewise unfounded. . . . [P]rosecutors are certainly empowered (if not, indeed, required) to pass along restitution information to the probation officer. But prosecutorial action is no prerequisite. To be sure, § 3664 first requires the probation officer to collect from the prosecutor whatever information the government has relevant to restitution. But after that, the probation officer must give the victim notice of her opportunity to submit to the court "a *separate* affidavit" regarding restitution – i.e., an affidavit separate from the prosecutor's information. If the statute were not already plain enough, it goes on to provide that "[a]fter reviewing the report of the probation office, *the court* may require *additional* documentation or hear testimony" – i.e., additional documentation apart from the prosecutor's. . . . The court cannot be blocked from the discharge of *its* duty to fashion an appropriate restitution order [under MVRA] by prosecutors' decisions.

United States v. Serawop, 303 F.Supp.2d 1259, 1263 (D. Utah 2004) (footnotes omitted), rev'd

on other grounds sub nom. United States v. Bedonie, 413 F.3d 1126 (10th Cir. 2005); see also

Gamma Tech, 265 F.3d at 924 ("The statute [18 U.S.C. § 3664(a)], by its plain language, gives

the district court discretion to identify victims other than those brought to its attention by the

government or the probation office.").

The CVRA, enacted in 2004, expressly imposes on the court, not the prosecutor, the

primary obligation for its implementation: "In any court proceeding involving an offense against

a crime victim, the court shall ensure that the crime victim is afforded the rights described in [the

59

CVRA]." 18 U.S.C. § 3771(b)(1) (emphasis added). This has spurred district courts to take responsibility not only for responding to restitution requests by identified crime victims or the prosecutor, but also for initiating efforts to identify all persons having statutory crime victim status in order to afford restitution rights, if any. See, e.g., United States v. Brennan, 526 F.Supp.2d 378, 391-92 (E.D.N.Y. 2007) (directing government, on eve of sentencing, to answer questions regarding identifying potential MVRA victims for restitution).

We have previously noted that the Federal Rules of Criminal Procedure ("Rule" or "Rules") were amended, effective December 1, 2008, to implement the CVRA. The primary amendment was to replace a narrower definition of "crime victim" in former Rule 32(a), with the following:

"Victim" means a "crime victim" as defined in 18 U.S.C. § 3771(e).

Fed.R.Crim.P. 1(b)(11); see RULES COMMITTEE REPORT, supra, at 37, 46.[41]

The detailed amendments cover various aspects of the CVRA including the addition of a new Rule 60, entitled Victim's Rights. Here we only point out the Rule amendments that particularly affect questions of restitution. The Rules have long required the Presentence Investigation Report to contain, "when the law provides for restitution, information sufficient for a restitution order." Fed.R.Crim.P. 32(d)(2)(D). To implement the CVRA, the following amendments were adopted pertaining to restitution:

Rule 32. Sentencing and Judgment.
. . . .
(c)        Presentence Investigation.

---

[41] All citations to the Federal Rules of Criminal Procedure refer to the amended Rules effective December 1, 2008.

(1)        Required Investigation.
. . . .

        (B)        *Restitution.* If the law [strike out "requires"] <u>permits</u> restitution, the probation officer must conduct an investigation and submit a report that contains sufficient information for the court to order restitution.

(d)        Presentence Report.
. . . .

        (2)        Additional Information. The presentence report must also contain the following [strike out "information"]:
. . .

        (B)        [Strike out "verified"] information, [strike out "stated in a nonargumentative style;"] that assesses [strike out "the"] <u>any</u> financial, social, psychological, and medical impact on any <u>victim</u> [strike out "individual against whom the offense has been committed"];

Rᴜʟᴇs Cᴏᴍᴍɪᴛᴛᴇᴇ Rᴇᴘᴏʀᴛ, <u>supra</u>, at 46-48.[42]

These amendments clearly require that even where restitution is discretionary, such as under the VWPA, the sentencing court must now obtain and review, <u>in the PSR</u>, restitution information. The prior version of Rule 32(c)(1)(B), which required a PSR containing sufficient information to order restitution only if restitution was mandatory, no longer exists.[43] The CVRA

---

[42] Rule 32(d)(2)(B), quoted above in its amended form, pertains to both restitution and the broader concept of crime victim impact in the sentencing process.

[43] Rule 32(c)(1)(A)(ii) states that with the exception of the material required under Rule 32(c)(1)(B), the court may dispense with presentence investigation and submission of a PSR if "the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its finding on the record." Fed.R.Crim.P. 32(c)(1)(A)(ii). As described in the above text, the December 1, 2008 revisions to Rule 32(c)(1)(B) now <u>require</u> a presentence investigation and report containing sufficient information for the court to order restitution "if the law <u>permits</u> restitution." Fed.R.Crim.P. 32(c)(1)(B) (emphasis added).

enforcement mechanism is available to obtain relief for failure to comply with these procedures.

See infra nn. 47-48 and accompanying text.

<u>Participation by CVRA crime victims in preparation for and during sentencing</u>

Here we incorporate by reference the foregoing discussion of the CVRA "right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). The other CVRA rights that particularly pertain to the sentencing process are:

> (4)  The right to be reasonably heard at any public proceeding in the district court involving . . . sentencing . . . .
>
> (5)  The reasonable right to confer with the attorney for the Government in the case.

Id. § 3771(a)(4), (5). Where there are multiple crime victims, this also applies:

> Multiple crime victims. –  In a case where the court finds that the number of crime victims makes it impracticable to accord all of the crime victims the rights described in subsection(a), the court shall fashion a reasonable procedure to give effect to this chapter that does not unduly complicate or prolong the proceedings.

Id. § 3771(d)(2). Of course, all of the more generalized rights apply to the sentencing stage as well. See id. § 3771(a)(2), (3), (7), (8).

The Rules, as amended December 1, 2008, provide:

> Rule 32. Sentencing and Judgment.
> . . . .
> (i)      Sentencing.
> > . . . .
> > (4)      Opportunity to Speak.
> >
> > > (A)      By a Party. . . .
> > >
> > > (B)      By a Victim.  Before imposing sentence, the court must address any victim of the crime who is present at

> sentencing and must permit the victim to be reasonably
> heard.

Fed.R.Crim.P. 32(i)(4).[44]

There was an initial flurry in the district courts as to whether this CVRA right "to be heard" means that the crime victim normally has the right to "speak" at sentencing. See Kenna v. U.S. Dist. Court for the Cent. Dist. of Cal. (Kenna I), 435 F.3d 1011, 1013-14 (9th Cir. 2006) (citations omitted). It has, however, quickly been recognized in the appellate courts, including our own, that a crime victim does have the right to speak at sentencing unless special circumstances exist. Id. at 1013-16. The Third Circuit has directly addressed this issue, stating:

> The right is in the nature of an independent right of allocution at sentencing. . . .
> Under the CVRA, courts may not limit victims to a written statement.

United States v. Vampire Nation, 451 F.3d 189, 197 n.4 (3d Cir. 2006) (citing Kenna I, 435 F.3d 1011).

The district judge has statutory discretion to "fashion a reasonable procedure to give effect" to this right where there are multiple victims. 18 U.S.C. § 3771(d)(2). For example, in Kenna I, where scores of victims were swindled out of almost $100 million, more than sixty victims submitted written victim impact statements and several of them spoke at the first defendant's sentencing hearing. Kenna I, 435 F.3d at 1012-13. No appeal or petition resulted from that procedure.

What presents a more challenging problem, and prompted the CVRA mandamus petition decided in Kenna I, is what to do if there is more than one defendant to be sentenced for the

---

[44] The Rules Committee has recommended that "[a]bsent unusual circumstances, any victim who is present should be allowed a reasonable opportunity to speak directly to the judge." RULES COMMITTEE REPORT, supra, at 51.

offense that harmed the victims. Defendants in <u>Kenna I</u> were a father and son both convicted of the same wire fraud scheme, who were sentenced three months apart. <u>Id.</u> The circuit court held that the district court committed legal error by refusing to allow the victim/petitioner to allocute at the second defendant's sentencing, and granted his mandamus petition. <u>Id.</u> at 1017-18. The court stated the rationale as follows:

> Victims now have an indefeasible right to speak, similar to that of the defendant, and for good reason: The effects of a crime aren't fixed forever once the crime is committed – physical injuries sometimes worsen; victims' feelings change; secondary and tertiary effects such as broken families and lost jobs may not manifest themselves until much time has passed. The district court must consider the effects of the crime on the victims at the time it makes its decision with respect to punishment, not as they were at some point in the past. Moreover, the CVRA gives victims the right to confront every defendant who has wronged them; speaking at a co-defendant's sentencing does not vindicate the right of the victim to look *this* defendant in the eye and let him know the suffering his misconduct has caused.

<u>Id.</u> at 1016-17.[45] Beyond that holding in <u>Kenna I</u>, there are few answers to these questions of how to afford the right of crime victim allocution in complex cases at this early stage in the developing jurisprudence under the CVRA.[46]

---

[45] There are procedural and potential constitutional issues concerning the relief to be granted when a CVRA petitioner obtains a writ of mandamus seeking to reopen a judgment of conviction, as discussed in <u>Kenna I</u>. <u>See</u> <u>infra</u> Sec. I.F.

[46] A concurring member of the panel in <u>Kenna I</u>, Senior Circuit Judge Daniel M. Friedman, writing "dubitante," gave the following hypothetical:

> Suppose a case with five defendants and 20 victims. Does each victim have the right to speak at the sentencing of each defendant? . . . I think that the statutory standard of "reasonably heard" may permit a district court to impose reasonable limitations on certain oral statements.

<u>Kenna I</u>, 435 F.3d at 1018-19.

The Kenna I appellate panel retained jurisdiction over any future mandamus petitions arising out of the underlying criminal case.  Id. at 1018.  Six months later, petitioner Kenna provided another opportunity for the panel to address the rights of crime victims in the sentencing process.  See In re Kenna (Kenna II), 453 F.3d 1136 (9th Cir. 2006).

The mandamus petition in Kenna II challenged the district court's rejection of petitioner's request that the entire PSR of the defendant be released to him in advance of the resentencing hearing.  Id. at 1137.  The panel noted that petitioner had rejected an offer by the district court to disclose "specific portions" (not otherwise identified) of the PSR to him.  Id.  It held that petitioner's argument that the CVRA confers a general right for crime victims to obtain disclosure of the PSR was not supported by the language or legislative history of the CVRA, nor had petitioner demonstrated that his reasons for the request outweighed "the confidentiality of the report under the traditional 'ends of justice' test."  Id. (citations omitted).  Thus it found no error of law or abuse of discretion by the district court, and denied the petition.  Id.

A similar mandamus petition was presented to the Court of Appeals for the Fourth Circuit.  See In re Brock, 262 Fed.Appx. 510 (4th Cir. 2008).  Petitioner Brock was the victim of a criminal assault by the two defendants.  Id. at 511.  Two days before their sentencing hearing, petitioner (who was represented by counsel) filed a CVRA motion in the district court seeking disclosure of four parts of defendants' PSRs:  (1) the background/statement of facts; (2) the restitution section, including any discussion of Brock's losses and the defendants' ability to pay; (3) the section calculating the guidelines sentencing range; and (4) the "upward departure section."  Id.  He and his counsel already possessed and had access to the sentencing memorandum of one defendant and two sentencing memoranda of the government.  Id.  The

court noted that those "memoranda summarized the substance of the PSRs and also included comprehensive discussions of the Guidelines calculations contained in the PSRs in addition to other facts relevant to the district court's sentencing decision." Id.

The district court in Brock had declined to release the PSRs, relying on the local criminal rule of the district and on Rule 32(e)(2). Id. [We note that Rule 32(e)(2) remains unchanged in the Rules effective December 1, 2008.] At the sentencing hearing, the district court denied petitioner's motion for release of the PSRs, finding that he was present and had all the information he needed to make a victim impact statement. Id. Petitioner had already filed a written victim impact statement and a "Restitution Affidavit," and the district court afforded him the opportunity to "make whatever further impact statement he want[ed] to make," and petitioner did make an oral statement. Id. (alteration in original) (quotation and citation omitted). In so ruling, the district court declined to hear testimony or arguments from petitioner related to guidelines calculations, but it did recognize that he had a right to be heard with respect to the sentences to be imposed. Id.[47] The mandamus panel, citing Kenna II, held there was no legal error or abuse of discretion, because the record showed that petitioner "was provided ample information concerning the applicable Sentencing Guidelines and other issues related to the defendants' sentencing. And, of course, he did not need access to the PSR to describe the crime's impact on him." Id. at 512; see also BP Prods. N. Am. Inc., 2008 WL 501321, at *9

---

[47] The Brock court noted in a footnote that petitioner had also argued that he needed the PSR to obtain information related to his entitlement to restitution, but at the sentencing hearing the court postponed determination of the amount of restitution because it had insufficient information to calculate that amount. Brock, 262 Fed.Appx. at 512 n.*; see 18 U.S.C. § 3664(d)(5). Petitioner did not pursue that argument in his mandamus petition. Brock, 262 Fed.Appx. at 512 n.*.

(collecting cases addressing whether victims have a right to copies of the PSR or related documents prior to sentencing).[48]

*      *      *

We have summarized in this Section the rights of persons qualifying for statutory crime victim status under the restitution statutes and the CVRA. In the process, we have reviewed the procedural protections for statutory crime victims under those statutes, as interpreted in the federal courts. We have also identified the recent amendments to the Rules that implement the CVRA and pertain specifically to sentencing.

### E. COMPARISON BETWEEN STATUTORY VICTIM STATUS AND INFORMATION FROM OTHER AFFECTED PERSONS

Courts conducting sentencing have received information such as victim impact statements, both written and oral, before enactment of the CVRA in 2004. The Second Circuit summarized that tradition as follows:

---

[48] One of the cases collected in the above citation is a district court decision in a pending CAA prosecution not involving a mass casualty event, in which the court denied a motion by the government to unseal its own submission to the probation office for use in preparing the PSR. United States v. Citgo Petroleum Corp., No. 06-563, 2007 WL 2274393, at *1 (S.D. Tex. Aug. 8, 2007). The stated grounds for the motion were to aid the government in discharging its duties under the CVRA, and to counter certain publications of defendant. Id. at *2. The court gave several reasons for denying the motion, including privacy interests of the defendant, compromising government investigations, reliance by the court on the vital transmission of information to Probation by the parties and cooperating third parties, and the fact that alternative methods of public notification of the government's positions were functioning and available. See id. at *1-*2. The public docket in that case contains an order filed on March 28, 2008, setting forth a procedure for discovery and depositions leading to an adversarial evidentiary hearing to determine whether individuals identified by the government as alleged victims quality as "crime victims" under the CVRA. See 3-28-08 Order, United States v. Citgo Petroleum Corp., No. 06-563 (S.D. Tex. Mar. 28, 2008). The current docket indicates that the sentencing process is ongoing in that case.

> Sentencing courts had access to victim statements long before the Justice for All Act. We noted in 1989 that "[t]he sentencing court's discretion is 'largely unlimited either as to the kind of information [it] may consider, *or the source from which it may come*.'" United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989) (quoting United States v. Tucker, 404 U.S. 443, 446, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972)) (emphasis added). And 18 U.S.C. § 3661, which was enacted in 1948, provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." By the end of 1994, district courts were *required* to allow victims of violence and sexual abuse to speak at sentencing, see Fed.R.Crim.P. 32(i)(4)(B) (2004), and were *permitted* to allow any other victim to speak, see Fed.R.Crim.P. 32 advisory comm. note, 1994 amendments, sub. (e).

Eberhard, 525 F.3d at 177 (alterations in original), referring to CVRA as Justice for All Act; see supra n.3.

Only those holding statutory crime victim status have rights of allocution at sentencing under the CVRA. 18 U.S.C. § 3771(a)(4), (e). The Rules have been amended to afford those rights. See supra Sec. I.D.

Nothing in the CVRA or the Rules, however, diminishes the discretionary authority of the court to receive information from a wider range of affected individuals under 18 U.S.C. § 3661, enacted in 1948. The Ninth Circuit, commenting upon the court's discretion under Section 3661, observed well before enactment of the CVRA:

> This is in keeping with the court's duty to set a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. See 18 U.S.C. § 3553(a). Thus, the district court has virtually unfettered discretion in allowing affected individuals to present sentencing information to the court. See Roberts v. United States, 445 U.S. 552, 556, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980) ("Two Terms ago, we reaffirmed the fundamental sentencing principle that a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.") (internal quotations omitted).

<u>Gamma Tech</u>, 265 F.3d at 924 (permitting asserted victim to provide information supporting its claim for statutory crime victim status to obtain restitution under VWPA).

Sentencing courts in this and other circuits have exercised that discretion for many years, receiving written and oral statements even in the absence of statutory provisions recognizing a right to allocution for certain persons at the time. For example in the following cases, persons who today would have CVRA rights, but had no such rights at the time, were permitted to make oral statements at sentencing. <u>See, e.g.</u>, <u>Jarvis</u>, 258 F.3d at 236-38 (mail fraud); <u>United States v. Dominguez</u>, 951 F.2d 412, 417 (1st Cir. 1991) (pre-VWPA crime; robbery-related offenses involving murdered drug money courier).[49]

Recent circuit court rulings have highlighted this distinction between the CVRA statutory crime victim right of allocution at sentencing and the broader discretion of the court to receive information from affected persons under Section 3661. In each of the following cases, the circuit court did not rule that the persons who had been permitted to speak at sentencing had statutory crime victim status under the CVRA. Nevertheless, the district court's decision to hear their statements was found to be either not error or, at most, harmless error.

<u>United States v. Duffy</u> was an appeal from a conviction for the offense of felon in possession of a firearm under 18 U.S.C. § 922(g)(1), which was characterized as a "victimless

---

[49]  The procedural provisions applicable to the VWPA and MVRA provide a statutory crime victim with the right to submit a separate affidavit relating to the amount of the victim's losses subject to restitution, and permit the court to require additional documentation or hear testimony in sentencing. <u>See</u> 18 U.S.C. § 3664(d), quoted <u>supra</u> Sec. I.D. Those provisions do not include a right of crime victim allocution at the sentencing hearing. The Rules, immediately prior to the December 1, 2008, amendments implementing the CVRA, required a right of allocution only for a victim of a crime of violence or sexual abuse (or their representative). <u>See</u> Fed.R.Crim.P. 32(i)(4)(B) (2007) (repealed 2008).

crime."  No. 08-10241, 2009 WL 235669, at *1-*2 (11th Cir. Feb. 3, 2009).  The district court

found by a preponderance of the evidence that defendant committed an uncharged crime of

burglary in the chain of events linked to the offense of conviction.  Id. at *3.  The district court

permitted the burglary victims to testify at sentencing to the impact of the burglary on them.  Id.

at *2.  The circuit court found that was proper under 18 U.S.C. § 3661, and it declined to address

defendant's argument that they were not "crime victims" under the CVRA, 18 U.S.C. § 3771(e).

Id. at *3 & n.4.

     United States v. Kennedy was an appeal from defendant's conviction on a guilty plea for

knowingly making a false statement in connection with an application to purchase a firearm, in

violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2), and being a prohibited person in possession of

firearms and ammunition, in violation of 18 U.S.C. § 922(g)(3).  292 Fed.Appx. 240, 241 (4th

Cir. 2008).  His arrest leading to the convictions stemmed from this tragic event, "[Defendant]'s

son, . . . after experiencing a significant decline in his mental health, stole seven of [defendant]'s

guns, drove to the local police station, and shot [two police officers].  Both officers died, and

responding officers shot and killed [defendant's son]."  Id.

     Investigation determined that, approximately fifteen months before his son's death,

defendant had purchased a semi-automatic weapon, for which he completed an ATF form falsely

swearing that he was not an unlawful user of marijuana.  Id.  That conduct was his offense of

conviction.  Id.  At the sentencing hearing, the government called the widow of one of the two

slain officers to provide victim impact testimony.  Id. at 242.  Defendant objected, contending

that in rejecting a guidelines enhancement for reasonable foreseeability that the firearm he

purchased would be used in connection with another offense [USSG § 2K2.1(b)(6)], the court

had implicitly found that the slain officers were not "directly and proximately harmed" by defendant's criminal conduct underlying the offenses of conviction, and therefore they would not be considered "crime victims" under the CVRA. Id. at 242-43. The district court overruled the objection and received the widow's testimony. Id. at 242. The circuit court affirmed, holding:

> Even if we assume the admission of the victim impact evidence was erroneous, the error was harmless. There is no indication in the record that the district court was "substantially swayed" by [the widow]'s testimony. The district court fully accepted the Guidelines as stipulated in the plea agreement, rejecting the enhancement, and sentenced [defendant] . . . toward the low end of the applicable Guidelines range. . . . Moreover, because [the widow] simply read the statement she had already submitted to the court, her testimony was cumulative.

Id. at 243 (citations omitted).

United States v. Poole was another appeal from a conviction for felon in possession of a firearm under 18 U.S.C. § 922(g)(1), based on a guilty plea. 241 Fed.Appx. 153, 154 (4th Cir. 2007). During the arrest that led to the conviction, defendant had struggled with the officers, tried to get both of their guns, succeeded in getting one gun, striking one officer with it and inflicting injuries, and then continued to struggle until they subdued him. Id. At sentencing, the court allowed evidence from the two arresting officers. Id. The evidence consisted of a letter from one of them concerning the events leading to arrest and commenting on sentencing, a photograph of the other officer's injuries, and oral reading by the injured officer of a written statement concerning the effect of defendant's actions on that officer. Id. The district court admitted that evidence, stating that the injured officer had "a right under the criminal rules . . . as a victim." Id. (alteration in original). Defendant did not object at the time, but did appeal, contending that neither officer was a "crime victim" of the charged offense under the CVRA, and

that his due process rights were violated because the statements were unduly prejudicial.  Id.  The circuit court affirmed, on plain error review, stating:

> Even assuming that the district court erred in admitting the victim evidence at sentencing, and that error was plain, it did not affect [defendant]'s substantial rights.  The evidence was not so unduly prejudicial as to render [defendant]'s sentence unfair; contrary to [defendant]'s contentions, it did not so "inflame the emotions of the sentencing court" that the court sentenced [defendant] to the top of . . . or above the Guidelines range. . . . Moreover, the victim statements of [the officers] were largely cumulative of evidence not subject to challenge.  Much of the information related by [the officers] concerning the events leading up to [defendant]'s arrest, while not as detailed as their statements, was contained in the presentence report and thus was already before the court and not prejudicial.  Therefore, any error by the district court in admitting the victim statements did not affect [defendant]'s substantial rights.

Id. at 155.

United States v. Leach was also an appeal from a guilty plea to being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g).  206 Fed.Appx. 432, 433 (6th Cir. 2006).  There, the evidence was seized during a lawful search of defendant's vehicle.  Id. Defendant and his estranged wife were in the midst of a "very contentious divorce," and the presentence report indicated that defendant had previously threatened her with violence.  Id. at 434-35.  The wife attended the sentencing, and the government repeatedly told the district court that she did "want to be heard," to "make a statement as a victim of [defendant]'s crime."  Id. at 433-35.  The district court permitted her to testify about defendant's threats to her, and her belief that "as long as [his] trigger finger works, there are people that are in danger."  Id. at 434 (alteration in original).  The district court referred to some of that testimony in its justification for the sentence imposed.  Id.  The circuit court found no error in that respect, nor any effect on defendant's substantial rights, stating:

At sentencing, trial courts have considerable discretion to permit the introduction of evidence related to, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). . . .

For better or worse, [wife]'s statement at the sentencing hearing plainly was relevant to [defendant]'s "background, character, and conduct.". . .

It thus makes no difference for our purposes whether [wife] had "standing" to testify under the Crime Victim's Rights Act, . . . a point we would have to consider if the district court had *denied* her an opportunity to be heard. No matter whether the Act applies to [her] testimony or not, the fact remains that the Act did not alter (or, more importantly, limit) a district court's traditionally broad discretion to consider "a wide variety of factors" at sentencing. . . .

Nor does it change matters that the district court permitted her to testify because it thought that the Act *required* her to have this opportunity. The fact remains that [wife] had access to considerable evidence bearing on [defendant]'s sentence. . . . Under these circumstances, [defendant] cannot show that any error in permitting her to testify, if indeed it was error, "affect[ed] [his] substantial rights." Fed.R.Crim.P. 52(b). No plain error occurred.

Id. at 434-35.

\*　　　　\*　　　　\*

The cases summarized here, which were the only ones we found discussing the CVRA on this point, were appeals from convictions on substantive firearms offenses rather than scheme or conspiracy-based offenses. Nevertheless, they demonstrate the distinction between statutory crime victim status, which carries a right to allocute at sentencing under the CVRA, and the position of other affected persons who may seek to provide information to the court, individually or through the prosecutor. As to the latter group, the court retains broad discretion on the scope of information to be considered under 18 U.S.C. § 3661.

### F.  CONSTITUTIONAL AND STATUTORY RIGHTS OF DEFENDANTS IN SENTENCING

When participation of a statutory crime victim or other affected person becomes an issue in the sentencing process, the court facing those issues must not lose sight of the rights of the defendant.  We do not propose to list all of the rights of a defendant in the sentencing process here, but this discussion would be incomplete without consideration of a defendant's statutory and constitutional rights in this setting.  We will start with the broad outline of the procedural rights of the defendant in the sentencing process, then describe some specific constitutional concerns under the CVRA.

A defendant has a due process right not to be sentenced based upon materially false information.  See United States v. McDowell, 888 F.2d 285, 290 (3d Cir. 1989) (citing Townsend v. Burke, 334 U.S. 736, 741 (1948) and United States v. Cifuentes, 863 F.2d 1149, 1153 (3d Cir. 1988)).  "In particular, due process in criminal sentencing requires that a defendant receive notice of, and a reasonable opportunity to comment on, (a) the alleged factual predicate for his sentence, and (b) the potential punishments which may be imposed at sentence." Ausburn, 502 F.3d at 322 (citing United States v. Nappi, 243 F.3d 758, 763-64 (3d Cir. 2001)).  "In federal practice, a defendant's 'due process right to be sentenced based upon accurate information' is 'safeguard[ed] by Federal Rule of Criminal Procedure 32 . . . .'" Id. (alteration in original) (quoting Nappi, 243 F.3d at 763).  The provisions of Rule 32 are familiar to all parties and the court in any sentencing, but here we note these key features:

Rule 32.  Sentence and Judgment
. . . .
(c)    Presentence Investigation.
        (1)    Required Investigation.

. . . .

(B)  Restitution.  If the law permits restitution, the probation officer must conduct an investigation and submit a report that contains sufficient information for the court to order restitution.

. . . .

(d)    Presentence Report.
    (1)    Applying the Advisory Sentencing Guidelines.  The presentence report must:
        (A)    identify all applicable guidelines and policy statements of the Sentencing Commission;
        (B)    calculate the defendant's offense level and criminal history category;
        (C)    state the resulting sentencing range and kinds of sentences available;
        (D)    identify any factor relevant to:
            (i)    the appropriate kind of sentence, or
            (ii)    the appropriate sentence within the applicable sentencing range; and
        (E)    identify any basis for departing from the applicable sentencing range.

    (2)    Additional Information.  The presentence report must also contain the following:
        (A)    the defendant's history and characteristics, including . . . ;
        (B)    information that assesses any financial, social, psychological, and medical impact on any victim;[50]
        (C)    . . .
        (D)    when the law provides for restitution, information sufficient for a restitution order;
        (E)    . . .
        (F)    any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a).

. . . .

(e)    Disclosing the Report and Recommendation.

---

[50]  As previously noted, the definition of "victim" in the Rules is now based on the CVRA, 18 U.S.C. § 3771(e).  Fed.R.Crim.P. 1(b)(11).

(1)    . . . .

(2)    Minimum Required Notice.  The probation officer must give the presence report to the defendant, the defendant's attorney, and an attorney for the government at least 35 days before sentencing unless the defendant waives this minimum period.

. . . .

(f)    Objecting to the Report.

(1)    Time to Object.  Within 14 days after receiving the presentence report, the parties must state in writing any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report.

. . . .

(3)    Action on Objections.  After receiving objections, the probation officer may meet with the parties to discuss the objections.  The probation officer may then investigate further and revise the presence report as appropriate.

(g)    Submitting the Report.  At least 7 days before sentencing, the probation officer must submit to the court and to the parties the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them.

(h)    Notice of Possible Departure from Sentencing Guidelines.  Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure.  The notice must specify any ground on which the court is contemplating a departure.

(i)    Sentencing.

(1)    In General.  At sentencing, the court:

(A)    must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report;

(B)    . . .

(C)    must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence; and

(D)    may, for good cause, allow a party to make a new objection at any time before sentence is imposed.

(2) Introducing Evidence; Producing a Statement. The court may permit the parties to introduce evidence on the objections. If a witness testifies at sentencing, Rule 26.2(a)-(d) and (f) applies. . . .

(3) Court Determinations. At sentencing, the court:
(A) may accept any undisputed portion of the presentence report as a finding of fact;
(B) must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing; and
(C) must append a copy of the court's determinations under this rule to any copy of the presentence report made available to the Bureau of Prisons.

(4) Opportunity to Speak.
(A) By a Party. Before imposing sentence, the court must:
(i) provide the defendant's attorney an opportunity to speak on the defendant's behalf;
(ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence; and
(iii) provide an attorney for the government an opportunity to speak equivalent to that of the defendant's attorney.
(B) By a Victim. Before imposing sentence, the court must address any victim of the crime who is present at sentencing and must permit the victim to be reasonably heard.

Fed.R.Crim.P. 32.[51]

Additional notice requirements and procedures for adjudication are applicable where restitution is sought for a statutory crime victim, as we have detailed in Section I.D. Those

---

[51] Rule 32 also provides that "[t]he court must impose sentence without unnecessary delay," but "[t]he court may, for good cause, change any time limits prescribed in this rule." Fed.R.Crim.P. 32(b)(1)-(2).

procedures include a requirement that "not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution." 18 U.S.C. § 3664(d)(1). Further, "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." Id. § 3664(d)(5).

Restitution orders in favor of crime victims under the VWPA require findings by the court on (1) the amount of loss, (2) the defendant's ability to pay and the financial needs of the defendant and the defendant's dependents, and (3) how the amount of restitution imposed relates to any loss caused by the conduct underlying the offenses for which defendant was convicted. See, e.g., Logar, 975 F.2d at 961. If restitution is ordered, the court must also designate the timing and amount of the restitution payments and cannot delegate that responsibility to others. Coates, 178 F.3d at 683-85; Graham, 72 F.3d at 356-57.

If the defendant is not afforded the opportunity to present factual claims and objections, or the court fails to make particularized findings on restitution, defendant's due process and equal protection rights may be violated. See Palma, 760 F.2d at 477-78; cf. United States v. Reano, 298 F.3d 1208, 1211-13 (10th Cir. 2002) (concluding that failure of government and the district court to follow procedural requirements of Section 3664 did not prevent remand for restitution hearing because "imposition of restitution at sentencing put the defendant on notice that restitution would be imposed and thus served as the functional equivalent of the notice required under the MVRA").

78

If the sentencing process becomes a complicated damages dispute, due process may also be violated.  See Palma, 760 F.2d at 477-78; see also Kones, 77 F.3d at 69 ("The kind of case that Congress had in mind [in the VWPA] was one in which liability is clear from the information provided by the government and the defendant and all the sentencing court has to do is calculate damages.").  "The essential factor in the procedure leading to a restitution award is that defendant be given the opportunity to contest the information on which the restitution award was based."  Sleight, 808 F.2d at 1016.

There is no absolute requirement in the Third Circuit that written victim impact statements, or a summary of anticipated oral victim impact statements, be produced before sentencing.  See Ausburn, 502 F.3d at 319, 324, 326; see also Vampire Nation, 451 F.3d at 197 n.4 ("Given that it would be impossible to predict what statements victims might offer at sentencing, it would be unworkable to require district courts to provide advance notice of their intent to vary their discretionary sentence based on victim statements that had not yet been made.").  This is because the provisions of Rule 32, even before the recent CVRA-related amendments, require that the PSR's "victim impact" section should provide notice of the material facts alleged in victim impact statements, as well as the claimed emotional impact on the victim.  Ausburn, 502 F.3d at 323-24 & n.17.  Nor would the "emotional appeal" presented by the victim impact statement generally violate defendant's due process rights because "this is inherent in the victim's right to attend court and present his or her own account of the crime and its impact."  Id. at 324 n.17.  On the other hand, the possibility is not foreclosed that in a particular case a district court's failure to permit a defendant to respond to undisclosed facts or statements could violate due process.  Id. at 326-27.  As our court of appeals stated in Ausburn:

> [W]e expect that existing procedures – such as the right to object to sentencing information at any time upon good cause and the option to move for a continuance to avoid unfair surprise – will provide an effective remedy in individual cases . . . .

Id. at 327.[52]

Other circuits have approached defendant's due process rights to notice of restitution claims, or victim impact information, in much the same manner. See, e.g., Eberhard, 525 F.3d at 178 (described in the margin);[53] United States v. Gale, 468 F.3d 929, 942 (6th Cir. 2006) (defendant did not dispute accuracy of restitution amounts in PSR, but argued at sentencing

---

[52] There is also a common-sense due process limitation on the scope of information the court may allow, even under the broad discretion conferred by 18 U.S.C. § 3661. "[A]s a matter of due process, factual matters may be considered as a basis for sentence only if they have some minimal indicium of reliability beyond mere allegation" and "bear some rational relationship to the decision to impose a particular sentence." United States v. Baylin, 696 F.2d 1030, 1040 (3d Cir. 1982), superseded by statute on other grounds, Sentencing Reform Act of 1984, Pub.L.No. 98-473, 98 Stat. 1987, as recognized in United States v. Essig, 10 F.3d 968, 970 (3d Cir. 1993). This principle was applied in a recent district court decision in our circuit, where the court granted defendant's motion to exclude a letter that contained "40 year old uncorroborated allegations" against defendant by a person who undisputedly did not qualify as a CVRA crime victim in the case, and the information lacked sufficient indicia of reliability. United States v. Forsyth, No. 06-429, 2008 WL 2229268, at *1-*2 (W.D. Pa. May 27, 2008).

[53] In Eberhard, an investment fraud case, the government disclosed all victim impact letters to defendant in advance of the sentencing hearing, and defendant raised no objection either to the number of victims or their identity. 525 F.3d at 176, 178 n.1. However, he appealed the prejudicial nature of the oral victim impact statements presented at sentencing. Id. at 177. The Second Circuit affirmed, stating:

> [Defendant] also complains that he received insufficient notice both of the identity of the victims who would address the sentencing court and of the nature of their statements. But the court afforded [defendant] an opportunity to respond after hearing from the victims. [Defendant] neither objected to the victim statements nor requested additional time to prepare a more thorough response. It was not plain error for the district court to impose sentence immediately thereafter.

Id. at 178.

hearing that he had made additional payments to the victim; the district court adjourned the sentencing hearing to give the parties additional time to gather evidence, then completed the sentencing hearing); United States v. Hayes, 171 F.3d 389, 390-92 (6th Cir. 1999) (the sentencing court relied extensively on ex parte victim impact letters that were sent directly to the court and were never made available to the defendant; defendant was not even aware that the letters existed prior to imposition of sentence; circuit court found plain error).

*          *          *

We turn now to due process rights of defendants in relation to the enforcement mechanism created by the CVRA, again limited to the context of sentencing. One problem became evident as soon as an asserted victim petitioned for mandamus to reopen a sentence. Under the CVRA statutory scheme, the defendant is not a party to that mandamus proceeding. See 18 U.S.C. § 3771(d)(5), quoted supra n.9. Kenna I brought that problem to the foreground when the circuit court determined under the CVRA that petitioner had a right to allocute at defendant's sentencing, which had been denied him by the district court when it imposed sentence. 435 F.3d at 1013, 1017. In that case, the sentencing was complete when the mandamus petition was filed. Id. at 1013. The circuit court, having ruled in favor of petitioner, then directed as follows:

> [T]he district court here committed an error of law by refusing to allow petitioner to allocute at [defendant]'s sentencing and we must therefore issue the writ. We turn now to the scope of the remedy. [Petitioner] asks us to vacate [defendant]'s sentence, and order the district court to resentence him after allowing the victims to speak. The problem is that the CVRA gives district courts, not courts of appeals, the authority to decide a motion to reopen in the first instance. See 18 U.S.C. § 3771(d)(5). Moreover, [defendant] is not a party to this mandamus action, and reopening his sentence in a proceeding where he did not participate may well violate his right to due process. It would therefore be imprudent and

81

perhaps unconstitutional for us to vacate [defendant]'s sentence without giving him an opportunity to respond.

We could delay further our consideration of the petition and order briefing from the defendant, but we think it more advisable to let the district court consider the motion to reopen in the first instance. In ruling on the motion, the district court must avoid upsetting constitutionally protected rights, but it must also be cognizant that the only way to give effect to [petitioner]'s right to speak as guaranteed to him by the CVRA is to vacate the sentence and hold a new sentencing hearing. We note that if the district court chooses not to reopen the sentence, [petitioner] will have another opportunity to petition this court for mandamus pursuant to the CVRA. Likewise, defendant will be able to contest any change in his sentence through the normal avenue for appeal. . . .

Footnote 5: We note . . . that our task in crafting an effective remedy would have been greatly simplified, had the district court postponed [defendant]'s sentencing until the petition for writ of mandamus was resolved. District courts may consider whether to routinely postpone final imposition of sentence in cases where they deny a request by victims to exercise rights granted by the CVRA.

<u>Id.</u> at 1017-18 & n.5.

The guidance of <u>Kenna I</u> is that where a district court denies a motion made under the CVRA to afford allocution rights at sentencing, the district court should postpone completing the sentencing long enough for a mandamus petition to be filed and decided.

\*          \*          \*

It seems that there may also be Sixth Amendment <u>Booker</u> concerns if the definition of statutory "crime victim," which is essentially the same definition under the CVRA, the MVRA, and the VWPA, is interpreted so broadly that it is not based upon the offense established by the guilty plea or jury verdict. <u>See</u> <u>supra</u> Sec. I.B. This problem has not been addressed by the parties in this motion. However, the very foundation of the jurisprudence holding that restitution under the VWPA and the MVRA does not violate the right to jury trial in a criminal case is that

this punishment does not exceed the authorization of the verdict or the guilty plea. The majority

opinion of the Court of Appeals for the Third Circuit articulated this rationale in Leahy, 438 F.3d

328, indeed in the context of a scheme-based offense (bank fraud). There the court stated:

> Under both the VWPA and the MVRA, when a defendant is convicted of certain specified offenses, restitution is authorized as a matter of course "in the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A). Hence, under a plain reading of the governing statutory framework, the restitution amount authorized by a guilty plea or jury verdict – the full amount of loss – may not be exceeded by a district court's restitution order; that is, a district court is not permitted to order restitution in excess of that amount. In imposing restitution, a district court is thus by no means imposing a punishment beyond that authorized by jury-found or admitted facts. Though post-conviction judicial fact-finding determines the amount of restitution a defendant must pay, a restitution order does not punish a defendant beyond the "statutory maximum" as that term has evolved in the Supreme Court's Sixth Amendment jurisprudence. See Booker, 125 S.Ct. at 749 (defining "statutory maximum" as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*") (citing Blakely, 542 U.S. at 303, 124 S.Ct. 2531) (emphasis in original) . . . . There can therefore be no Booker violation in the imposition of restitution under the VWPA or the MVRA.

> . . . [W]hen the court determines the amount of loss, it is merely giving definite shape to the restitution penalty born out of the conviction.

Leahy, 438 F.3d at 337.

It is clear that the definitions of "victim" under the CVRA, MVRA and VWPA have been

aligned by Congress to identify a common core group of persons who have powerful and

enforceable rights under those statutes. See supra Sec. I.B. Therefore, it appears that any Sixth

Amendment limitation on the MVRA and VWPA is equally applicable to determinations of

"crime victim" status and commensurate rights under the CVRA. See infra Sec. II.F.

*          *          *

We have summarized in this Section some of the rights of a defendant in the sentencing process. Those include the procedural requirements of due process, as codified in the Rules and, where restitution is an issue, in 18 U.S.C. § 3664. The process for the court to receive and utilize victim impact information from statutory crime victims and other affected persons, consistent with defendant's due process rights, has also been reviewed. We have described the special due process problem that must be addressed when the circuit court grants a writ of mandamus seeking to reopen a sentence to afford CVRA rights. Finally, we have noted a potential Sixth Amendment Booker issue in interpreting the common definition of "crime victim" under the CVRA, the MVRA and the VWPA.

## II. FINDINGS AND CONCLUSIONS

### A. INDICTMENT - ALLEGATIONS AND CONVICTIONS

Defendant Atlantic States Cast Iron Pipe Company ("Atlantic States") is a manufacturer of ductile cast iron pipe, operating a foundry in Phillipsburg, New Jersey. Atlantic States is a division of McWane, Inc. ("McWane"), an Alabama corporation. Atlantic States and three of the individual defendants, who were supervisor-level employees of Atlantic States, were found guilty of what we refer to as the OSHA-related offenses in this case. See text accompanying supra n.1.[54]

---

[54] The original 35-count indictment was filed on December 11, 2003. (Dkt. 1.) A superseding 35-count indictment was filed on September 14, 2004. (Dkt. 95.) By Order filed on March 11, 2005, the Court approved a voluntary dismissal without prejudice of count 34, which resulted in renumbering original count 35 as count 34. (Dkt. 120.) The resulting 34-count superseding indictment was prepared by the government and received in chambers on July 21, 2005, but was not filed on the docket. We had a copy of that version docketed. (Dkt. 711.) We refer to the July 21, 2005, version in this opinion as the "indictment," unless otherwise specified. Before the indictment went to the jury for the deliberation phase, the Court directed redaction of some text, in consultation with the parties. (See dkt. 717 at 66 (jury instructions).) We have docketed that jury version of the indictment. (Dkt. 754.) The jury was sworn and the trial commenced on September 27, 2005. (Tr. 234.) The verdicts were rendered on April 26, 2006. (Tr. 590.) See generally dkt. 718 (Index to Transcripts of Trial Proceedings).

The indictment alleged one multi-object conspiracy (Count 1), having three objectives that were partly or wholly OSHA-related and two other objectives to violate the CWA and the CAA. (Dkt. 711 at 11-13.) There were also OSHA-related substantive charges, as well as other substantive charges. The statutory bases of all charges are summarized below in Section II.B. In this Section we concentrate on the details of the OSHA-related charges.

The verdict sheets included questions as to each alleged object of the Count 1 conspiracy, which were answered as to each defendant. (Dkt. 609, 610, 611, 612, 613, 614.) Atlantic States and individual defendants John Prisque ("Prisque"), Scott Faubert ("Faubert"), and Jeffrey Maury ("Maury") were found guilty on all OSHA-related conspiracy objectives. (Dkt. 721 at 112 n.64.)

The OSHA-related substantive counts were Counts 2, 5, and 7 through 11. (Dkt. 711 at 1-43.) Atlantic States was found guilty of all OSHA-related substantive offenses except Count 2. (Dkt. 609 at 1-2.) Individual defendants Prisque, Faubert, and Maury were guilty of one or more of the substantive OSHA-related offenses charged against them, as listed below. (See dkt. 610, 611, 612.)

One individual defendant was acquitted of all charges against him. (Dkt. 613; dkt. 721 at 3.) The jury failed to reach a verdict on Count 2, which we dismissed under Rule 29 after trial. (Dkt. 721 at 135-36.) Another individual defendant, Craig Davidson ("Davidson"), was convicted of certain non-OSHA-related charges and is also pending sentencing. (See dkt. 614.) The verdict found him not guilty of any OSHA-related fraud or obstruction objectives, and there was no evidence against him of participating in any false statement conspiracy objective as to OSHA. (See id.) Nor was he charged in any of the OSHA-related substantive counts. (Dkt. 721

at 3 n.4, 133-34.)  Therefore, we do not consider defendant Davidson to have been convicted of any OSHA-related conspiracy objectives or substantive offenses.[55]

The verdicts as to each defendant convicted on the OSHA-related substantive counts were:

(1)     Atlantic States:          Guilty on Counts 5 and 7 through 11.

(2)     Prisque:                     Guilty on Counts 8, 9, and 11.

(3)     Faubert:                     Guilty on Counts 7, 9, and 10.

(4)     Maury:                       Guilty on Count 9.

(Id. at 3 n.4.)

Counts 5 and 7 charged false statement offenses under 18 U.S.C. § 1001.  (Dkt. 711 at 37, 39.)  Counts 8, 9, and 10 charged obstruction of pending OSHA proceedings under 18 U.S.C. § 1505.  (Id. at 40-42.)  Count 11 charged altering a tangible object with intent to obstruct an OSHA investigation.  (Id. at 43.)  Those statutes are quoted and discussed in Section II.B.  All substantive counts in the indictment also charged aiding and abetting under 18 U.S.C. § 2.  (Id. at 34-48.)

The government's present motion contends that there are six individuals who qualify as crime victims under the CVRA ("statutory crime victims") in this case.  (Dkt. 744 at 2, 5.)  Each was an Atlantic States employee who sustained serious injuries in incidents that occurred while

---

[55] Davidson was convicted of one substantive false statement offense pertaining to an investigation by FBI and EPA/NJDEP officials of suspected CWA violations, Count 4.  (Dkt. 721 at 141-42.)  He was also convicted of the false statements objective of the Count 1 conspiracy, as well as the CWA conspiracy objective and some CWA substantive offenses.  (Id. at 3 n.4, 112 n.64.)  We consider all of his convictions to be related to the CWA allegations of the indictment.

on the job at the foundry.  (Id. at 2.)  One of them died, and at least two of the others suffered

permanent injury.[56]

The inclusive dates of the alleged conspiracy were from approximately October 31, 1995,

to August, 2003.  (Dkt. 711 at 11.)[57]  The names of those individuals, and the dates of the

particular incidents in which they were injured, were:

| | |
|---|---|
| Alfred Coxe, deceased | March 24, 2000 |
| Randall Lieberman | March 1, 1996 |
| Gabriel Marchan | April 27, 1999 |
| Robert Owens | June 25, 1999 |
| Eloy Rocca | May 10, 2000 |
| Hector Velarde | December 7, 2002 |

The indictment alleged a total of eighty-one overt acts under the Count 1 conspiracy,

some of which directly corresponded to the allegations of the substantive OSHA-related offenses

of conviction.[58]  (See id. at 15-34, 37, 39-43.)  Those six individuals and their injuries were

---

[56]  We note here again that representatives of a crime victim's estate, or family members
or other persons appointed as suitable by the court, may assume the crime victim's rights where
appropriate.  See supra n.10.

[57]  The text of the indictment alleges that the time period of the conspiracy was
"[b]eginning at a time unknown to the Grand Jury but no later than October 31, 1995, and
continuing thereafter until a time unknown to the Grand Jury but no earlier than August 2003."
(Dkt. 711 at 11.)

[58]  Some portions of the indictment were redacted before the indictment was sent to the
jury for deliberations.  See supra n.54.  In that process, the government voluntarily withdrew
seven alleged overt acts, and the jury was so instructed.  (Dkt. 717 at 66.)  Thus, exactly seventy-
four alleged overt acts were submitted to the jury, of which forty-eight were OSHA-related.  The
jury was instructed that at least one overt act was an essential element of the conspiracy offense,
but it need not be a crime or even be an overt act alleged in the indictment.  (Id. at 28-29, 37.)

described in the overt acts portion of the indictment, and four of them were also referred to in certain substantive counts, as described below.  (See id. at 21-23, 26-30, 34, 39-43.)  Evidence pertaining to defendants' alleged obstruction of OSHA's investigations of all six incidents was presented at trial.  The five workers still living testified as witnesses at trial.  We will refer to those six individuals as the "six named workers."  There were also other workplace injuries and deaths referred to in the indictment, specifically and generally.  We will describe those after the summary of allegations pertaining to the six named workers.

We repeat here the CVRA definition of crime victim, as derived from the VWPA and the MVRA.  See supra Sec. I.B.  A "crime victim" under the CVRA is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense."  18 U.S.C. § 3771(e).  We have already stated that we will interpret this definition to include the expansive language of the VWPA and MVRA where, as here, one of the offenses is a conspiracy.  See supra Sec. I.B.  That language is re-quoted in the margin.[59]

_____

Following common practice in this district, no separate questions directed to particular overt acts were requested or included in the verdict sheets.  The withdrawn alleged overt acts do not affect the analysis of this motion, and we do not refer to them in this opinion.

[59]  The complete definition of "victim" in the current VWPA and MVRA is quoted here. The expansive language pertaining to offenses that have an element of scheme, conspiracy, or pattern of criminal activity, added in the 1990 amendments to the VWPA and carried forward into the MVRA when it was enacted in 1996, is shown in bold type:

For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, **including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.**

18 U.S.C. § 3663(a)(2); id. § 3663A(a)(2) (1996) (emphasis added).

This definition of "crime victim" requires the court to find what each "federal offense" is in this case. There was no guilty plea and the case was tried to verdict. Therefore, we must look at the indictment to determine the offenses of conviction.

- We will first quote the OSHA-related charging language of the conspiracy count and the related alleged means and methods.

- Next, we quote each alleged overt act referring to one of the six named workers and any corresponding substantive count of conviction. Four of the six named workers are referred to in both alleged overt acts and substantive counts. The substantive counts refer to the workplace incidents involving Mr. Coxe, Mr. Marchan, Mr. Owens, and Mr. Velarde, so we will address those four named workers in that order. Then we will quote the alleged overt acts referring to the incidents involving Mr. Lieberman and Mr. Rocca, which have no corresponding substantive counts.

- Next, we quote additional alleged overt acts referring specifically to other workplace injuries. Those allegations have no corresponding substantive counts.

- Finally, we quote some of the alleged overt acts describing generalized acts in the conspiracy designed to obstruct OSHA.

This Court has quoted each substantive OSHA-related count of conviction, and summarized the trial evidence for those counts in detail, in forty-one pages of our Memorandum Opinion ruling upon the Rule 29/Rule 33 motions. (Dkt. 721 at 147-88.) Here we simply quote the pertinent portions of the indictment.

Indictment - Conspiracy charging language

The charging language of the conspiracy count, Count 1, is confined to paragraph 39.

(See tr. 165 at 31-32.)  Here we quote the OSHA-related allegations of that charging language:

**The Conspiracy**

39.  Beginning at a time unknown to the Grand Jury but no later than October 31, 1995, and continuing thereafter until . . . no earlier than August, 2003, in the District of New Jersey and elsewhere, the defendants
[NAMED DEFENDANTS]
did knowingly and willfully conspire and agree with each other and others to commit the following offenses against the United States, that is:

A.  [Clean Water Act violation objective];

B.  [Clean Air Act violation objective];

C.  To defraud the United States, that is, to hamper, hinder, impede, impair and obstruct by craft, trickery, deceit, and dishonest means, the lawful and legitimate functions of the [Department of Labor] and its agency, OSHA, in enforcing the federal safety and health regulations covering certain workers throughout the United States . . . ;

D.  To knowingly and willfully make materially false, fictitious and fraudulent statements and representations and make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, in matters within the jurisdiction of OSHA, . . . in violation of Title 18, United States Code, Section 1001; and

E.  To corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due and proper administration of law under which a pending proceeding is being had before OSHA, . . . in violation of Title 18, United States Code, Sections 1505 and 1515(b).

. . . .

In violation of Title 18, United States Code, Section 371.

(Dkt. 711 at 11-12, 33.)

＊　　　　　＊　　　　　＊

The charging language of Count 1 is followed by three portions:  (1) alleged purpose of the conspiracy (¶ 40); (2)  alleged means and methods (¶¶ 41-49); and (3)  alleged overt acts (¶ 50 [with subsections containing eighty-one numbered acts]).  (Id. at 13-33.)

The alleged purpose of the overall conspiracy (including the environmental and the OSHA-related objectives) was "to enrich defendants [NAMED DEFENDANTS], and their co-conspirators by maximizing the production of cast iron pipe at the Phillipsburg facility, without concern to environmental pollution and worker safety risks."  (Id. at 13, ¶ 40.)

＊　　　　　＊　　　　　＊

Indictment -  Alleged means and methods of conspiracy

Count 1 states that "[a]mong the means and methods employed . . . to carry out the conspiracy and effect its unlawful objects were those set forth in Paragraphs 42 through 47."  (Id. at 13, ¶ 41.)  Here we quote the OSHA-related allegations of those paragraphs.

**Means and Methods of the Conspiracy**

. . . .

46.  Defendants [NAMED DEFENDANTS], and their co-conspirators repeatedly exposed workers to unsafe and dangerous conditions, resulting in deaths and serious injuries to workers.

47.  Defendants [NAMED DEFENDANTS], and their co-conspirators systematically altered accident scenes and existing conditions at the Phillipsburg facility in order to conceal the unsafe working practices from OSHA.

48.  In order to permit continuation and prevent detection of the conduct referred to in Paragraphs 42 through 47, defendants [NAMED DEFENDANTS], and their co-conspirators regularly lied to and obstructed government officials conducting investigations into activities at the Phillipsburg facility.

49. In order to coerce defendant [ATLANTIC STATES]'s employees into committing, and to prevent these employees from revealing, certain conduct referred to in Paragraphs 42 through 47, defendants [NAMED DEFENDANTS], and their co-conspirators utilized tactics involving intimidation and retaliation.

(Id. at 13-14.)

Indictment -  Alleged overt acts - Introduction and caveat

As stated above, the conspiracy count contains paragraphs stating alleged overt acts referring to the workplace incidents involving each of the six named workers. Four of those incidents are also referred to in substantive counts. We have organized those allegations by the name of the worker injured in the incident, quoting the alleged Count 1 overt acts pertaining specifically to that incident, as well as any substantive count or counts pertaining to that incident. There are also alleged overt acts referring to other specific worker injury incidents. There are also alleged overt acts describing generalized acts in the conspiracy designed to obstruct OSHA.

An important caveat to keep in mind when reading these alleged overt acts is that the jury was not asked any questions in the verdict sheets as to whether any of those acts were performed, or whether the person or persons named did perform any of those acts. See supra n.58 and accompanying text. The Court has made some findings regarding sufficiency of the evidence in ruling upon the Rule 29/Rule 33 motions. (Dkt. 721 at 130-265.) We are also called upon to make some factual determinations, under the preponderance of evidence standard, in the sentencing process, and we have issued some tentative guideline rulings to the parties at this stage. See infra n.104. But we have not made, and we will not be required to make in the sentencing process, factual findings on all of the overt acts alleged in Count 1 of the indictment.

This Court has found sufficient evidence to support those counts of conviction described in this opinion. However, we expressly state no factual findings in this opinion as to whether any particular overt act was established in the evidence, or if so, whether it was established against any or all of the individual defendants named in the overt act.[60]

Indictment - Alleged overt acts referring to incidents involving the six named workers, with any corresponding substantive counts of conviction

Alfred Coxe

**Overt Act Number 29:** From in or about 1999 through in or about 2000, on a routine and regular basis, including on or about March 23, 2000, employees were forced by [NAMED DEFENDANTS] to drive faulty and unsafe forklifts.

**Overt Act Number 30**: From in or about 1999 through in or about 2000, on a routine and regular basis, [NAMED DEFENDANTS] failed to obtain parts required to fix forklifts they knew were unsafe and faulty.

**Overt Act Number 31**: Between in or about March 1998 and in or about March 1999, [NAMED DEFENDANT][61] instructed an employee of defendant [ATLANTIC STATES] to teach a fellow employee how to drive a forklift with inoperable brakes.

**Overt Act Number 32**: From in or about 1999 through in or about 2000, on a routine and regular basis, including on or about March 23, 2000, employees were forced by [NAMED DEFENDANTS] to drive forklifts without receiving proper training in their operation.

---

[60] The caveat we set forth here is significant to our ultimate findings and conclusions on the pending CVRA motion. See infra Sec. II.F.

[61] This alleged overt act names only defendant Davidson, whom we have found not to be convicted on any OSHA-related conspiracy objectives, and who was not named in any OSHA-related substantive counts. See supra n.55 and accompanying text. We quote this language here only insofar as it may relate to convictions of those defendants who do stand convicted of those conspiracy objectives and any related substantive charges.

**Overt Act Number 33**: On or about March 24, 2000, [NAMED DEFENDANTS] permitted a forklift with faulty brakes to be used by inadequately trained and uncertified employees of defendant [ATLANTIC STATES], which contributed to the death of Alfred Coxe, an employee of defendant [ATLANTIC STATES].

**Overt Act Number 34**: On or about March 24, 2000, [NAMED DEFENDANTS] took steps to conceal facts regarding the forklift fatality earlier that day from law enforcement officials and an OSHA inspector by causing the forklift's brakes, which were known to leak brake fluid, to be repaired before the OSHA inspector inspected it.

**Overt Act Number 35**: On or about March 24, 2000, [NAMED DEFENDANTS] performed a misleading demonstration of the forklift involved in the fatality earlier that day in order to deceive an OSHA inspector into believing that the brakes were fully operational.

**Overt Act Number 36**: On or about March 24, 2000, [NAMED DEFENDANT] instructed an employee to provide a misleading account of the fatality in order to hide from OSHA inspectors that the forklifts were faulty.

**Overt Act Number 37**: On or about March 25, 2000, [NAMED DEFENDANT] prepared a misleading report that indicated the forklift involved in the fatality the day before was inspected and found to be in "perfect operating condition."

**Overt Act Number 38**: On or about July 24, 2000, [NAMED DEFENDANT] made a misleading statement to OSHA inspectors when, after being asked why the forklifts were being used despite numerous inspection sheets showing, among other things, problems with the brakes, steering, and horn, he stated that just because an employee turns in an inspection sheet for a forklift does not mean that the forklift was used by that employee.

(Dkt. 711 at 21-23.)

## <u>COUNT 9</u>
### (Obstruction of OSHA)

1. Paragraphs [identifying defendants, describing OSHA] are hereby realleged . . . .

94

2.  Between on or about March 24, 2000, and on or about March 25, 2000, . . . defendants [ATLANTIC STATES], JOHN PRISQUE, SCOTT FAUBERT, and JEFFREY MAURY, did corruptly obstruct, impede, and endeavor to obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had before [OSHA] . . . , by taking steps to conceal facts regarding the forklift fatality on March 24, 2000 from [OSHA] inspectors.

In violation of Title 18, United States Code, Sections 1505 and 2.

(Id. at 41.)[62]

## COUNT 5[63]
### (Making A Materially False Statement to OSHA)

1.  Paragraphs [identifying defendants, describing OSHA] are realleged . . . .

2.  On or about March 25, 2000, . . . defendant[] [ATLANTIC STATES] in a matter within the jurisdiction of [OSHA], ... knowingly and willfully did make a materially false, fictitious, and fraudulent statement and representation and did make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, that is, defendant . . . prepared a report that indicated:

The forklift involved in the fatality the day before was inspected and found to be in "perfect operating condition;"

When in truth and in fact, as defendant . . . then well knew and believed, such forklift had several defects, including faulty brakes.

In violation of Title 18, United States Code, Sections 1001 and 2.

---

[62]  Defendants Atlantic States, Prisque, Faubert, and Maury were convicted on Count 9. (Dkt. 721 at 3 n.4.)

[63]  We are quoting the allegations of Count 5 after Count 9 here because, chronologically, the events described in Count 5 are alleged to have occurred on March 25, 2000, whereas the events described in Count 9 are alleged to have begun the previous day, March 24, 2000, after the fatal forklift incident occurred that morning.

(Id. at 37.)[64]

**Overt Act Number 53**:  In or about May 1999, [NAMED DEFENDANT] and his co-conspirators caused defendant [ATLANTIC STATES] to maintain a false OSHA 200 log by failing to include complete and accurate entries regarding an incident on April 27, 1999, in which [Gabriel Marchan] had sustained a broken leg after being struck by a forklift.

**Overt Act Number 54**:  On or about April 7, 2000, [NAMED DEFENDANTS], and their co-conspirators presented OSHA with a false OSHA 200 log, in which complete and accurate entries regarding the April 27, 1999 incident described in Overt Act Number 53, were omitted.

**Overt Act Number 55:**  On or about May 11, 2000, [NAMED DEFENDANT] falsely told OSHA inspectors that the reason that there was no entry on the OSHA 200 log concerning the April 27, 1999 incident was because the employee's leg had not been broken.

**Overt Act Number 56**:  On or about July 24, 2000, under instructions from [NAMED DEFENDANTS], [Gabriel Marchan] falsely told OSHA inspectors that his leg had not been broken when he had been struck by a forklift on April 27, 1999.

(Id. at 27.)

---

[64]  Only defendant Atlantic States was convicted on Count 5.  (Dkt. 721 at 3 n.4.)  We have eliminated the name of defendant Maury when quoting Count 5 because although he was also charged in Count 5, he was acquitted of that substantive count.  (Id.)  Maury, however, was convicted of all OSHA-related objectives of the alleged Count 1 conspiracy.  (Id. at 112 n.64.)

[65]  The indictment refers to "employee 'A'."  (Dkt. 711 at 27, 39, 42.)  The jury, however, was instructed during trial that the identity of that worker was Gabriel Marchan, who testified as a government witness.  (See dkt. 721 at 149-59.)  The final jury instructions also referred to Mr. Marchan by his name.  (Dkt. 717 at 22-23.)  Therefore, when quoting portions of the indictment referring to him, we have inserted his name in brackets.

## COUNT 7
### (Making A Materially False Statement to OSHA)

1.  Paragraphs [identifying defendants, describing OSHA] are hereby realleged . . . .

2.  On or about May 11, 2000, . . . defendants [ATLANTIC STATES] and SCOTT FAUBERT, in a matter within the jurisdiction of [OSHA], . . . did knowingly and willfully make a false and fictitious statement and representation, that is, defendant SCOTT FAUBERT stated to [OSHA] inspectors:

> That the reason why there was no entry on the OSHA 200 log concerning a April 27, 1999 incident was because [Gabriel Marchan] did not break his leg;

When in truth and in fact, as defendant SCOTT FAUBERT then well knew and believed, [Gabriel Marchan] sustained a fractured bone in his leg on April 27, 1999, after being struck by a forklift.

In violation of Title 18, United States Code, Sections 1001 and 2.

(Id. at 39.)[66]

## COUNT 10
### (Obstruction of OSHA)

1.  Paragraphs [identifying defendants, describing OSHA] are hereby realleged . . . .

2.  On or about July 24, 2000, . . . defendants [ATLANTIC STATES] . . . and SCOTT FAUBERT, did corruptly obstruct, impede, and endeavor to obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had before [OSHA] . . . , by instructing [Gabriel Marchan] to falsely inform the [OSHA] inspectors that his leg had not been broken when he had been struck by a forklift on April 27, 1999.

In violation of Title 18, United States Code, Sections 1505 and 2.

---

[66] Defendants Atlantic States and Faubert were convicted on Count 7. (Dkt. 721 at 3 n.4.)

(Id. at 42.)[67]

<u>Robert Owens</u>

**Overt Act Number 57**: In or about July 1999, [NAMED DEFENDANT] falsely told an OSHA inspector, who was investigating a June 25, 1999 incident in which an employee sustained a fractured skull and lost an eye when a saw blade broke apart, that the saw safety shield had not been changed since the incident, when in fact a steel wire screen had been added to the shield after the incident.

**Overt Act Number 58**: In or about July 1999, under instructions from [NAMED DEFENDANT], employee "B" falsely told an OSHA inspector, in substance, that the saw safety shield had not been changed since the incident described in Overt Act Number 57, when in fact a steel wire screen had been added to the shield after the incident.[68]

(Id. at 27-28.)

## COUNT 8
### (Obstruction of OSHA)

1. Paragraphs [identifying defendants, describing OSHA] are hereby realleged . . . .

2. In or about July 1999, . . . defendants [ATLANTIC STATES] and JOHN PRISQUE, did corruptly obstruct, impede, and endeavor to obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had before [OSHA] . . . , by instructing employee "B" to falsely inform the [OSHA] inspectors that the saw safety shield had not been changed since the June 25, 1999 incident in which an employee sustained a

---

[67] Defendants Atlantic States and Faubert were convicted on Count 10. (Dkt. 721 at 3 n.4.) We have eliminated the name of defendant Prisque when quoting Count 10 because although he was also charged in Count 10, he was acquitted of that substantive count. (Id.) Prisque, however, was convicted of all OSHA-related objectives of the alleged Count 1 conspiracy. (Id. at 112 n.64.)

[68] "Employee 'B,'" described in this alleged overt act and in Count 8, did testify as a government witness and his name was stated in the evidence. (See id. at 159-63.) He was not one of the six named workers described in this motion.

fractured skull and lost an eye when a saw blade broke apart, when, in fact, a steel wire screen had been added to the shield after the incident.

In violation of Title 18, United States Code, Sections 1505 and 2.

(Id. at 40.) Alleged overt acts 57-58, and Count 8, refer to the OSHA investigation of a June 25, 1999, incident in which Robert Owens sustained the described injuries. Mr. Owens testified as a government witness. (See dkt. 721 at 159-63.)[69]

Hector Velarde

**Overt Act Number 67**: In or about May 2002, [NAMED DEFENDANTS] caused the bypass of a manufacturer-installed safety device on a new cement mixer because they believed the device would slow down the production of pipes by stopping the mixer when its doors were opened.

**Overt Act Number 68**: Between December 7, 2002, when an employee had three fingers amputated inside the cement mixer because the mixer's safety device had been bypassed, and December 18, 2002, when OSHA first inspected the mixer as a result of the amputation, [NAMED DEFENDANT] and Co-Conspirator "Y" directed that the safety device be concealed from OSHA.[70]

**Overt Act Number 69**: On or about December 18, 2002, during OSHA's initial inspection of the cement mixer, [NAMED DEFENDANT] and Co-Conspirator "Y" falsely informed OSHA that the mixer had originally arrived from the manufacturer without a safety device for its doors, but told OSHA that such a device could be installed on the mixer.

**Overt Act Number 70**: Between December 18, 2002, when OSHA was falsely informed that the mixer did not originally have a safety device for its doors but that one could be put on the mixer, and January 2, 2003, the date of OSHA's follow-up inspection, [NAMED DEFENDANTS] and Co-Conspirator "Y"

---

[69] Defendants Atlantic States and Prisque were convicted on Count 8. (Id. at 3 n.4.)

[70] The jury was instructed as to the name of alleged Co-Conspirator "Y," who did not testify at trial. (Dkt. 717 at 38.)

directed the installation of a safety device similar to the one originally installed by the manufacturer.

**Overt Act Number 71**:  On or about March 20, 2003, after admitting to OSHA that the cement mixer had actually arrived from the manufacturer with the safety device referred to in Overt Act Number 67 installed on it, [NAMED DEFENDANT] and Co-Conspirator "Y" falsely informed OSHA that they believed the safety device was removed by an unnamed employee who had quit.

(Dkt. 711 at 29-30.)

## COUNT 11
### (Obstruction of OSHA)

1.  Paragraphs [identifying defendants, describing OSHA] are hereby realleged . . . .

2.  In or about December 2002, . . . defendants [ATLANTIC STATES] and JOHN PRISQUE, did knowingly alter, conceal, and cover up a tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within jurisdiction of [OSHA], . . . by altering the condition of a cement mixer and concealing from the [OSHA] inspectors that they had bypassed a safety device designed to shut down the cement mixer when its doors were opened, which led to the amputation of three of an employee's fingers.

In violation of Title 18, United States Code, Sections 1519 and 2.

(Id. at 43.)  Alleged overt acts 67-71, and Count 11, refer to the OSHA investigation of a December 7, 2002, incident in which Hector Velarde sustained the described injuries.  Mr. Velarde testified as a government witness.  (See dkt. 721 at 176-88.)[71]

Randall Lieberman

**Overt Act Number 50**:  Between on or about February 26, 1996, and on or about March 1, 1996, [NAMED DEFENDANT] falsely told OSHA inspectors

--------

[71]  Defendants Atlantic States and Prisque were convicted on Count 11.  (Dkt. 721 at 3 n.4.)

that the plant was closed down for the week and that there were no work activities taking place, when in fact certain work-related activities were occurring, including maintenance of the cupola during which an employee fell off a rope ladder and broke bones in his back, pelvis, and ankle.

**Overt Act Number 51**:  On or about March 4, 1996, [NAMED DEFENDANT] falsely told OSHA inspectors that the rope ladder involved in the incident described in Overt Act Number 50 had been discarded into a dumpster after the incident because a particular employee of defendant [ATLANTIC STATES] had issued an order to do so, when in fact no such order had been given by this employee.

**Overt Act Number 52**:  On or about March 27, 1996, [NAMED DEFENDANT] falsely told OSHA inspectors that the rope ladder involved in the incident described in Overt Act Number 50 was torn after it had been discarded into a dumpster following the incident, when in fact the ladder was torn during the incident itself.

(Dkt. 711 at 26.)  Alleged overt acts 50-52 refer to the OSHA investigation of a March 1, 1996, incident in which Randall Lieberman sustained the described injuries.  Mr. Lieberman testified as a government witness.  (Tr. 359 at 125-214; tr. 362 at 4-131.)[72]

Eloy Rocca

**Overt Act Number 60**:  In or about May 2000, [NAMED DEFENDANT] and his co-conspirators caused defendant [ATLANTIC STATES] to maintain a false OSHA 200 log by failing to include complete and accurate entries regarding an incident on May 10, 2000, in which an employee had burned his leg and missed six weeks of work.

**Overt Act Number 61**:  On or about July 13, 2000, [NAMED DEFENDANTS], and their co-conspirators presented OSHA with a false OSHA 200 log which failed to include complete and accurate entries regarding the May 10, 2000 incident described in Overt Act Number 60.

---

[72]  This incident was not the subject of any substantive counts charged in the indictment.

**Overt Act Number 62**:  On or about July 24, 2000, [NAMED DEFENDANT] falsely told OSHA inspectors that the reason that there was no entry on the OSHA 200 log concerning the May 10, 2000 incident was because he thought that the employee had quit.

**Overt Act Number 63**:  On or about August 22, 2000, [NAMED DEFENDANTS], and their co-conspirators presented OSHA with a false OSHA 200 log by modifying its earlier entry concerning the May 10, 2000 incident but still failing to include complete and accurate entries regarding that incident.

(Dkt. 711 at 28-29.)[73]  Alleged overt acts 60-63 refer to the OSHA investigation of a May 10, 2000, incident in which Eloy Rocca sustained the described injuries.  Mr. Rocca testified as a government witness.  (Tr. 422 at 146-160; tr. 424 at 4-81.)

Indictment -  Alleged overt acts referring to incidents involving other specific worker injuries

**Overt Act Number 59**:  On or about August 6, 1999,  [NAMED DEFENDANT] falsely told OSHA inspectors that he was unaware of a pit excavated in the casting department that had collapsed onto an employee's leg.

(Dkt. 711 at 28.)[74]

**Overt Act Number 66**:  On or about December 7, 2000, [NAMED DEFENDANT] directed an employee of defendant [ATLANTIC STATES] to falsely report that an injury to that employee, in which the employee had a finger

---

[73]  This incident was not the subject of any substantive counts charged in the indictment.

[74]  This incident appears to be the subject of substantive Count 2, which charged defendants Atlantic States and Faubert, but the jury failed to reach a verdict and we dismissed it post-trial.  (Dkt. 721 at 135-136.)  Atlantic States and Faubert, however, were convicted of all OSHA-related alleged objectives of the Count 1 conspiracy.  (Id. at 112 n.64.)  This also brings up, for purposes of this motion, the aspect that according to the trial evidence, the work referred to in alleged overt act number 59 was being performed on-site at Atlantic States by employees of an independent contractor.  Atlantic States contracted with a variety of independent contractors to perform construction and other jobs on-site.  (See tr. 213 at 5.)

partially cut off and sewed back on, took place at the home of that employee when, in fact, it occurred at the Phillipsburg facility.

(Id. at 29.)[75]

Indictment -  Alleged overt acts describing generalized acts in the conspiracy designed to obstruct OSHA, under heading "Atmosphere of Fear, Intimidation, and Retaliation"

**Overt Act Number 75:**  From in or about 1999 through in or about 2003, on a routine and regular basis, [NAMED DEFENDANTS], . . . took steps to deter employees from telling OSHA inspectors about the unsafe conditions at the plant.

**Overt Act Number 76:**  From in or about 1999 through in or about 2003, on a routine and regular basis, [NAMED DEFENDANTS] instructed employees to provide misleading descriptions and accounts to OSHA inspectors in order to conceal the unsafe conditions at the Phillipsburg facility.

. . . . .

**Overt Act Number 78:**  From in or about 1999 through in or about 2003, on a routine and regular basis, [NAMED DEFENDANT] retaliated and threatened to retaliate against employees if they filed a grievance with the union concerning conditions of their employment, including the unsafe conditions at the Phillipsburg facility.

**Overt Act Number 79:**  Beginning . . . no later than 1997 and ending . . . not earlier than 1999, [NAMED DEFENDANT] threatened to fire employees if they pursued workers' compensation claims against defendant [ATLANTIC STATES] following injuries suffered at the Phillipsburg facility.

---

[75]  This incident was not the subject of any substantive counts charged in the indictment. We repeat, however, that Atlantic States, Prisque, Faubert, and Maury were convicted of all OSHA-related alleged objectives of the Count 1 conspiracy.  (Dkt. 721 at 112 n.64.)  The trial evidence indicated that this alleged overt act refers to a workplace injury sustained by unindicted co-conspirator George Shepherd, who was so identified to the jury.  (Dkt. 717 at 38.)  Mr. Shepherd testified as a cooperating government witness at trial.  This brings up, for purposes of this motion, the aspect that although the CVRA excludes defendants from qualifying as guardians of "crime victims," and states that "a person accused of the crime may not obtain any . . . relief" under the CVRA, see supra n.7, the CVRA is silent as to whether an unindicted co-conspirator may qualify as a statutory crime victim.  See 18 U.S.C. § 3771(e).

**Overt Act Number 80:** From in or about 1999 through in or about 2003, in order to intimidate employees into committing, and to prevent them from revealing, the conduct referred to in Paragraphs 42 to 47, [NAMED DEFENDANTS], . . . instructed mid-level supervisors to instill fear in the employees by using retaliation tactics.

**Overt Act Number 81**: From in or about 1999 through in or about 2003, in order to intimidate employees into committing, and to prevent them from revealing, the conduct referred to in Paragraphs 42 to 47, [NAMED DEFENDANTS], and Co-Conspirator "Z" utilized coercive measures, which included (a) assigning employees to work on casting machine #3, the hottest machine at the plant, as a punishment; (b) assigning Spanish-speaking employees to work in the most dangerous parts of the plant; and (c) forcing employees to douse themselves with water and realign pipes in a 2,000 degree Fahrenheit annealing oven.

(Id. at 31-33.)[76]

This completes our description of the charged OSHA-related offenses and convictions. The indictment actually has two major components, OSHA-related offenses and environmental offenses. In this motion for relief under the CVRA, the government does not contend that in this case there are any "statutory crime victims" of the environmental offenses or the corresponding conspiracy objectives. (Dkt. 744.) There are, however, sharp contrasts between the OSHA-related and the environmental-related aspects of the indictment, which in our view directly impact the outcome of this motion. We describe those contrasts in the following two Sections.

**B.     STATUTES CHARGED IN THE INDICTMENT**

The indictment in this case has been described by its drafters as "pioneering." This is the first, and to our knowledge the only case to date, that has been actually litigated under this novel

---

[76] These alleged acts were not the subject of any substantive counts charged in the indictment. They were, however, alleged under the Count 1 conspiracy, on which Atlantic States, Prisque, Faubert, and Maury were convicted of all OSHA-related objectives. (Dkt. 721 at 112 n.64.)

structure for an indictment. There are numerous novel aspects to this case, but one aspect stands out as pertinent to the pending motion. It will be recalled that this motion invokes the CVRA to seek statutory victim status with respect to six named workers, each of whom suffered injuries in a separate workplace incident.

The novelty is in the fact that while the environmental offenses charged in this case include violations of the CWA and the CAA (along with related false statement offenses and conspiracy objectives), in contrast the so-called "OSHA-related" offenses charged here do not include one single violation of the federal OSHA statute, or any alleged conspiracy objective to violate that statute.

In the next Section we provide a summary of the criminal offenses available to be pleaded under the OSHA statute, 29 U.S.C. §§ 666(e), (f) and (g), as well as the civil enforcement scheme under the OSHA statute. Suffice it to point out here that none of those criminal OSHA offenses are charged in this case, nor does Count 1 allege a conspiracy objective to commit any of those offenses.

There were substantive environmental offenses charged in this case, and convictions obtained. Counts 12 through 33 charge substantive violations of the CWA, consisting of knowingly causing the discharge of petroleum-contaminated wastewater from a point source at the Atlantic States facility into the waters of the United States, without a permit authorizing such discharge, in violation of the CWA, 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A).[77] Count 34 charges

---

[77] The verdicts found Atlantic States guilty as charged on all CWA counts, Counts 12-33. (See dkt. 721 at 3 n.4 & 189-243.) The individual defendants charged in Counts 12-27 were found guilty only of lesser-included negligent offenses under the CWA, 33 U.S.C. § 1319(c)(1)(A). (Id. at 3 n.4 & 189-231.) Both Atlantic States and Maury were found guilty as

a substantive violation of the CAA by knowingly operating the facility in violation of its air permit requirements by causing more than 55 gallons per day of waste paint to be burned in the cupola, in violation of the CAA, 42 U.S.C. § 7413(c)(1).[78]

The charged illegal objectives of the Count 1 conspiracy also included objectives to violate those provisions of the CWA and the CAA (Count 1, ¶ 39, alleged objectives A and B). (Dkt. 711 at 11-12.)  To be sure, the alleged objectives of the conspiracy also included defrauding the EPA in enforcing the environmental regulations, and making false statements to the EPA and FBI in that connection (Count 1, ¶ 39, portions of objectives C and D).  (Id. at 12.) But violations of the environmental laws were specifically alleged as objectives of the conspiracy, upon which convictions were obtained.[79]

This anomaly in the indictment can be described graphically as follows:

Charged Offenses:

|  | Violation of regulatory statute | Conspiracy to violate that statute |
|---|---|---|
| CWA | Yes | Yes |
| CAA | Yes | Yes |
| OSHA | No | No |

---

charged of the CWA offenses in Counts 28-33.  (Id. at 3 n.4 & 231-243.)  But the distinctions between knowing and negligent CWA violations are not pertinent to this motion.

[78]  Defendants Atlantic States and Prisque were found guilty as changed in Count 34. (See dkt. 721 at 3 n.4 & 243-257.)

[79]  Defendants Atlantic States, Prisque, Maury, and Davidson were convicted of the conspiracy objective to knowingly violate the CWA, Objective A.  All of them were also convicted of the conspiracy objective to make false statements to the EPA and FBI (which were the federal agencies investigating suspected CWA violations in this case), portions of Objective D.  All of them except Davidson were also convicted of the conspiracy objective to defraud the EPA, portions of Objective C.  Defendants Atlantic States and Prisque were also convicted of the conspiracy objective to knowingly violate the CAA, Objective B.  (See dkt. 711 at 12; dkt. 721 at 112-113 n.64.)

In other words, what we refer to as the "OSHA-related" offenses in this indictment are limited to obstruction and false statement offenses, and corresponding conspiracy objectives, all based upon deception of OSHA rather than violating OSHA workplace standards. Those statutes are 18 U.S.C. §§ 1001, 1505 and 1519.[80] Those are the statutes upon which the jury was instructed and rendered its verdicts. (See dkt. 717 at 17-18, 31-32, 42-49 (jury instructions).)

Here we quote the substantive statutes of conviction for the OSHA-related counts and the corresponding conspiracy objectives:

> [W]hoever, in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, knowingly and willfully –
>
>> . . .
>>
>> (2) makes any materially false, fictitious, or fraudulent
>
> statement or representation;
>
>> . . .
>
> [shall be guilty of this offense].

18 U.S.C. § 1001(a). This statute was charged in Counts 5 and 7 of the OSHA-related substantive counts, and was the subject of alleged unlawful Objective D of the Count 1 conspiracy. (Dkt. 711 at 12, 37, 39.)

> Whoever corruptly . . . endeavors to . . . obstruct[] or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States [shall be guilty of violating this law].

18 U.S.C. § 1505. This statute was charged in Counts 8, 9, and 10 of the OSHA-related substantive counts, and was the subject of alleged unlawful Objective E of the Count 1

---

[80] The alleged OSHA-related conspiracy objectives also included the "defraud" clause of 18 U.S.C. § 371, a Klein-type conspiracy objective of conspiring to defraud OSHA, Objective C of the Count 1 conspiracy. (Dkt. 711 at 12.)

conspiracy.  (Dkt. 711 at 12, 40-42.)[81]

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . [shall be guilty of this offense].

18 U.S.C. § 1519.  This statute was charged in Count 11 of the OSHA-related substantive counts, but has no corresponding alleged unlawful objective in Count 1.  (Dkt. 711 at 43.)

The omission of any indictment charges under the OSHA statute was intentional, as explained by the federal prosecutors who drafted it for the submission to the grand jury that indicted defendants.[82]

The original indictment in this case was handed down on December 11, 2003.  It was widely reported at the time that this case (and investigation of other McWane, Inc. facilities) was prompted by articles in the New York Times and a PBS television documentary program on "Frontline" describing workplace injuries at McWane facilities.  The New York Times reported later, on May 2, 2005, that this prosecution was part of a new initiative to forge collaboration between OSHA, the EPA, and Justice Department prosecutors.  The newspaper provided

_____

[81]  Counts 8-10 and Objective E of the Count 1 conspiracy also cite 18 U.S.C. § 1515(b). (Dkt. 711 at 12, 40-42.)  That is a definition section, defining the term "corruptly" as used in Section 1505.  Both Section 1505 and Section 1515(b) were quoted and explained in the jury instructions.  (Dkt. 717 at 46-50.)

[82]  Normally it is not appropriate to quote or cite press releases and public statements by counsel for the parties in a formal opinion of this Court.  But we believe it is entirely appropriate here, because not only were public statements made by the prosecutors who described the crafting of this indictment, but those statements were further explained by the prosecutors in a submission to this Court in the course of the litigation, as we describe here.  We hasten to add that the jury was not aware of the publicity to which we refer, as reflected in the exhaustive voir dire conducted during jury selection.

background written by its journalists, then quoted federal officials, including one of the prosecutors in this case.  It reported:

> For decades, the most egregious workplace safety violations have routinely escaped prosecution, even when they led directly to deaths or grievous injuries. Safety inspectors hardly ever called in the Justice Department.  Congress repeatedly declined to toughen criminal laws for workplace deaths.  Employers with extensive records of safety violations often paid insignificant fines and continued to ignore basic safety rules.

> Inside the Bush administration, though, a novel effort to end this pattern of leniency has begun to take root.

> With little fanfare and some adept bureaucratic maneuvering, a partnership between the Occupational Safety and Health Administration, the Environmental Protection Agency and a select group of Justice Department prosecutors has been forged to identify and single out for prosecution the nation's most flagrant workplace safety violators.

> The initiative does not entail new legislation or regulation.  Instead, it seeks to marshal a spectrum of existing laws that carry considerably stiffer penalties than those governing workplace safety alone.  They include environmental laws, criminal statutes more commonly used in racketeering and white-collar crime cases, and even some provisions of the Sarbanes-Oxley Act, a corporate reform law.

> The result, those involved say, should be to increase significantly the number of prosecutions brought against dangerous employers, particularly in cases involving death or injury.

> This new approach addresses a chronic weakness in the regulatory system – the failure of federal agencies to take a coordinated approach toward corporations that repeatedly violate the same safety and environmental regulations. . . . [T]he central premise of this unfolding strategy is that shoddy workplace safety often goes hand in hand with shoddy environmental practices.

> "If you don't care about protecting your workers, it probably stands to reason that you don't care about protecting the environment either," said David M. Uhlmann, chief of the Justice Department's environmental crimes section, which is charged with bringing these new prosecutions.

The effort is noteworthy in an administration that has generally resisted efforts to increase penalties for safety and environmental violations.  It has declined to support such steps as making it a felony for employers to commit willful safety violations that cause a worker's death.  Such violations are currently misdemeanors, punishable by up to six months in jail. . . .

The new initiative is already at an advanced stage of planning.  Hundreds of senior OSHA compliance officers have attended training sessions led by Justice Department prosecutors and criminal investigators from the E.P.A.  In several regions of the country, OSHA managers have begun making lists of the worst workplaces and sharing them with E.P.A. investigators and prosecutors, who select the most promising cases for investigation.  Several criminal inquiries and prosecutions are under way.

. . .

Even so, it is difficult to gauge the degree of political support for more prosecutions. . . .

[I]n March, a news conference to announce the initiative was canceled.  The name of the program was also changed.  What was to have been called the Worker Endangerment Initiative is now described as a "policy decision" –  not an "initiative" –  aimed at achieving "environmental protection in the workplace."

. . .

Richard E. Fairfax, OSHA's director of enforcement programs, described the initiative as part of a broader effort by the agency to crack down on companies that persistently flout workplace safety rules.

. . . .

If some hesitation exists at the political level, enthusiasm is high in the trenches of OSHA and the E.P.A.  Andrew D. Goldsmith, assistant chief of the environmental crimes section, has led most of the OSHA training sessions, in which he describes the many ways criminal and environmental statutes can be brought to bear.  It has been a revelation of sorts, he says, to watch agency compliance officers grasp at the chance at last to seek significant criminal penalties against defiant employers.

"You see a glint in these people's eyes, and you see them getting very enthusiastic," Mr. Goldsmith said.  "You see hands start shooting up.  They view us like the cavalry coming over the hill."

. . . .

All federal environmental crimes carry potential prison sentences, including up to 15 years for knowingly endangering workers. And unlike OSHA, the E.P.A. has some 200 criminal investigators with extensive experience building cases for federal prosecutors.

. . . .

With nearly 40 prosecutors, the environmental crimes section of the Justice Department has a long record of bringing complex criminal cases against major employers. By contrast, before this initiative, only one prosecutor at the Justice Department focused full time on workplace safety crimes. Now, after identifying promising cases from the lists sent by OSHA, prosecutors are also checking for significant records of environmental infractions. If a plant is part of a larger conglomerate, they are checking the records of sister plants, too.

"We can see all the pieces," Mr. Goldsmith said. "We can coordinate."

The value of that coordination became obvious, he and other officials said, during a recent federal investigation into a New Jersey foundry owned by McWane Inc., the nation's largest manufacturer of cast-iron pipe. The investigation was prompted by articles in The Times and a companion documentary on the PBS television program "Frontline" that described McWane as one of the most dangerous employers in America.

Senior officials at OSHA, the E.P.A. and the Justice Department saw a way to produce an indictment that would "tell the whole picture" of how a company could put profit ahead of all other considerations, said Mr. Uhlmann, the chief of the environmental crimes section.

. . .

The case is pending, but Justice Department officials called it a "pioneering indictment."

David Barstow & Lowell Bergman, With Little Fanfare, a New Effort to Prosecute Employers That Flout Safety Rules, N.Y. TIMES, May 2, 2005.

That article, and other publicity participated in by both sides of the case, prompted applications to this Court regarding subpoena disputes and concerns on both sides about pretrial publicity. There was an exchange of letter briefs on those issues, which were resolved.

The government, in one of its letter briefs at that time, acknowledged the accuracy of that New York Times article regarding "this new prosecution priority of the Justice Department and the impact these cases will bring." (5-16-05 Gov. Ltr. Br. at 2, undocketed, with attachments). It confirmed that the prosecutors responsible for drafting this indictment were part of the Environmental Crimes Section of the Justice Department and the United States Attorney's Office for the District of New Jersey. (Id. at 2 n.1.) We can add that the conduct of the trial was also a team effort by those prosecutorial offices, resulting in sweeping convictions under this indictment.

The point for present purposes, however, is that the Justice Department and the United States Attorney's Office purposely avoided charging any workplace violations under the OSHA statute in crafting this indictment. Instead, for the OSHA aspect of this case, they charged a conspiracy and substantive offenses under the obstruction and false statement laws. In the next Section we briefly review the OSHA statute itself, and what Congress has and has not provided for its criminal enforcement.

### C.    OSHA STATUTE - NOT CHARGED

The Supreme Court has described the passage of the Occupational Safety and Health Act of 1970, with its federal regulatory scheme, as follows:

> After extensive investigation, Congress concluded, in 1970, that work-related deaths and injuries had become a "drastic" national problem. Finding the existing state statutory remedies as well as state common-law actions for negligence and wrongful death to be inadequate to protect the employee population from death and injury due to unsafe working conditions, Congress enacted the Occupational Safety and Health Act of 1970 (OSHA or Act), 84 Stat. 1590, 29 U.S.C. § 651 et seq. The Act created a new statutory duty to avoid maintaining unsafe or unhealthy working conditions, and empowers the Secretary of Labor to promulgate health and safety standards.

112

Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n, 430 U.S. 442, 444

(1977); see 29 U.S.C. § 651 (Congressional statement of findings and declaration of purpose and

policy).

> The statute provides that each employer:
>
> (1)  shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;[83]
>
> (2)  shall comply with occupational safety and health standards promulgated under this [Act].

29 U.S.C. § 654(a).

> The statute also states that each employee:
>
> shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this [Act] which are applicable to his own actions and conduct.

Id. § 654(b).

The civil enforcement scheme under the OSHA statute is unique to that statute.  It

features an elaborate civil regulatory process that does not include adjudication in the district

court, nor a right to trial by jury, but includes a right of direct appeal to a Circuit Court of

Appeals from the findings of an administrative law judge, after review by an Occupational

Health and Safety Review Commission.  As summarized in Atlas Roofing, this is the civil

process:

---

[83]  This subsection of the OSHA statute was quoted and cited in the "Background" section of the indictment.  (Dkt. 711 at 5.)  See discussion n.93 infra and accompanying text.

Two new remedies were provided permitting the Federal Government, proceeding before an administrative agency, (1) to obtain abatement orders requiring employers to correct unsafe working conditions and (2) to impose civil penalties on any employer maintaining any unsafe working condition. Each remedy exists whether or not an employee is actually injured or killed as a result of the condition. . . .

Under the Act, inspectors, representing the Secretary of Labor, are authorized to conduct reasonable safety and health inspections. 29 U.S.C. [§] 657(a). If a violation is discovered, the inspector, on behalf of the Secretary, issues a citation to the employer fixing a reasonable time for its abatement and, in his discretion, proposing a civil penalty. [§§] 658, 659. Such proposed penalties may range from nothing for de minimis and nonserious violations, to [stated fine ranges], [§§] 658(a), 659)(a), 666(a)-(c) and (j).

If the employer wishes to contest the penalty or the abatement order, he may do so by notifying the Secretary of Labor within 15 days, in which event the abatement order is automatically stayed. [§§] 659(a), (b), 666(d). An evidentiary hearing is then held before an administrative law judge of the Occupational Safety and Health Review Commission. The Commission consists of three members, ... each of whom is qualified 'by reason of training, education or experience' to adjudicate contested citations and assess penalties. [§§] 651(b)(3), 659(c), 661, 666(I). . . . The judge's decision becomes the Commission's final and appealable order unless within 30 days a Commissioner directs that it be reviewed by the full Commission. [§§] 659(c), 661(I). . . .

If review is granted, the Commission's subsequent order directing abatement and the payment of any assessed penalty becomes final unless the employer timely petitions for judicial review in the appropriate court of appeals. 29 U.S.C. [§] 660(a) The Secretary similarly may seek review of Commission orders, [§] 660(b), but, in either case, '(t)he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.' [§] 660(a).

Atlas Roofing, 430 U.S. at 445-47.

There are three degrees of civil violations of regulations and standards under the OSHA

statute: (a) willful or repeated, (b) serious, or (c) not serious. 29 U.S.C. §§ 666(a), (b), (c). A

serious violation is defined in the statute; those other two degrees are not.  Id. § 666(k).  Other terms are defined, such as "person," "employer," "employee," and "occupational safety and health standard."  Id. § 652.

Reviewing circuit courts have developed standards for interpreting and applying those terms, and reviewing the numerous issues that arise on appeal under the civil regulatory scheme. See, e.g., Sec'y of Labor v. Trinity Indus., Inc., 504 F.3d 397, 399-403 (3d Cir. 2007) (reviewing ALJ findings, inter alia, that violations were "non-serious" and whether employees of on-site contractor were "employees" of the alleged employer).  The standard of appellate review of the ALJ and agency decision is highly deferential, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  Id. at 400.  No right to jury trial applies, and the Supreme Court has ruled that the Seventh Amendment is not violated by those civil enforcement remedies.  Atlas Roofing, 430 U.S. at 461.

Despite its grand declaration of purpose and policy, 29 U.S.C. § 651, Congress created few and narrow criminal sanctions in the OSHA statute.  Those are:

(e)  Willful violation causing death to employee

Any employer who willfully violates any standard, rule, or order promulgated pursuant to section 655 of this title, or of any regulations prescribed pursuant to this chapter, and that violation caused death to any employee, shall, upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than six months, or by both; except that if the conviction is for a violation committed after a first conviction of such person, punishment shall be by a fine of not more than $20,000 or by imprisonment for not more than one year, or by both.

(f)  Giving advance notice of inspection

Any person who gives advance notice of any inspection to be conducted under this chapter, without authority from the Secretary or his designees, shall,

upon conviction, be punished by a fine of not more than $1,000 or by imprisonment for not more than six months, or by both.

(g) False statements, representations or certification

Whoever knowingly makes any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained pursuant to this chapter shall, upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than six months, or by both.

29 U.S.C. §§ 666 (e)-(g). All of these criminal offenses, even for a willful violation causing death to an employee, carry only misdemeanor penalties.

Criminal liability under 29 U.S.C. § 666(e), for a willful violation causing the death of another, is limited to the employer only. An employee can neither directly commit that criminal offense nor aid and abet the employer in its commission of the offense. See, e.g., United States v. Shear, 962 F.2d 488, 490-95 (5th Cir. 1992) (superintendent was not "employer" to be held criminally liable for company's OSHA violation, nor could he be held liable as aider and abettor); United States v. Doig, 950 F.2d 411, 412-16 (7th Cir. 1991); United States v. Cusack, 806 F.Supp. 47, 48-52 (D.N.J. 1992).

Congress, in enacting the OSHA statute, carefully limited the reach of its criminal provisions. The Supreme Court, explaining the Congressional enactment of OSHA in 1970, stated that "existing state statutory and common-law remedies for actual injury and death remain unaffected." Atlas Roofing, 430 U.S. at 445.[84]

---

[84] New Jersey, for example, does have a broad criminal offense statute for knowingly violating legally-imposed duties intended to protect public safety, N.J.S.A. § 2C:40-18; and a state counterpart to the federal OSHA statute, id. § 34:6A-1 et seq.; as well as all of the common-law crimes. See generally id. ch. 2C.

*  *  *

The indictment in this case does not charge any defendant with a criminal violation of the OSHA statute.  Summarizing the provisions cited above, it is clear that Congress, in enacting the federal OSHA statute, has refused to criminalize violations of OSHA workplace standards that cause injury to an employee, no matter how severe, unless death results.  Even then, the employer's violation must be "willful," a term defined not in the statute but in administrative and judicial precedent interpreting the OSHA statute.  Nor does the OSHA statute permit an employee, even a supervisory-level employee, to be criminally charged under the OSHA statute in connection with a fatal workplace incident.

Defense counsel has pointed out in arguing this motion, and the government does not dispute, that OSHA itself did not deem it appropriate to seek prosecution of Atlantic States under the OSHA statute, 29 U.S.C. § 666(e), in connection with the death of Mr. Coxe.  OSHA therefore made no referral to the Department of Justice seeking prosecution under that statute. (Tr. 752 at 16-17.)  Again, no criminal charges would be available under the OSHA statute to prosecute the employer (or supervisory employees) for non-fatal injuries sustained by any workers.

### D. CVRA CONTENTIONS IN THIS MOTION

<u>Contentions of the government</u>

The government argues in the present motion that the six named workers are "crime victims" under the CVRA.  It focuses primarily on the conspiracy count in support of that contention.  It states as to the incidents in which the six named workers were injured:

117

For each of these individuals, the jury learned about Defendants' elaborate efforts to deceive OSHA about the circumstances that led to the injuries and death. In each case, those efforts were alleged in the superseding indictment to be among the overt acts that were part of the charged conspiracy. All of these events were supported by evidence during trial.

(Gov. mot. br., dkt. 744 at 2.)

The government recognizes that the relevant objectives of the conspiracy, as charged in the indictment, were to obstruct, defraud, and make false statements to OSHA. (Indictment, ¶ 39, dkt. 711 at 11-12.) However, as it stated at oral argument on this motion:

[T]he government's theory of the case here is that the continuing deception of OSHA not only involved the coverup after the injuries, but in large measure was responsible for the injuries themselves.

(Tr. 752 at 27.)[85]

The government points to the "Means and Methods" section of the indictment, which we have quoted supra Section II.A, including paragraph 46 that alleged:

46. Defendants [NAMED DEFENDANTS], and their co-conspirators repeatedly exposed workers to unsafe and dangerous conditions, resulting in deaths and serious injuries to workers.

(Dkt. 711 at 14 (cited in gov. reply br., dkt. 747 at 3).)[86]

_____

[85] The following exchange along the same lines took place at oral argument:

COURT: [T]he theory of the government is that there's a conspiracy that's been proven here, an obstruction of OSHA conspiracy, and thereby persons injured along the way are crime victims. . . . I think I've stated that accurately. Have I, Mr. [AUSA]?

[GOV. COUNSEL]: Yes, it is. . . . Yes.

(Tr. 752 at 18-19.)

[86] The government also states that "[a]dditional paragraphs of the Superseding Indictment that amplify this allegation include ¶¶ 14 and 47-49." (Gov. reply br., dkt. 747 at 3 n.1.) We

The government in its reply brief cites alleged overt acts as to each of the six named workers, then refers to trial evidence pertaining to the incidents in which they were injured. (Gov. reply br., dkt. 747 at 3-4.)[87]  It states its argument as to why each of them should qualify as a CVRA statutory crime victim [here we quote the government's reply brief], as follows:

- Defendants "permitted a forklift with faulty brakes to be used by inadequately trained and uncertified employees of Atlantic States, which contributed to the death of Alfred Coxe"

(Id. (quoting alleged overt act 33).)

- [T]he same inadequately trained forklift driver who ran over Mr. Coxe also injured Gabriel Marchan

(Id. (citing alleged overt acts 53-56).)

- Defendant Scott Faubert "falsely told OSHA inspectors that the plant was closed down for the week and that there were no work activities taking place," which prevented OSHA from being able to monitor Randy Lieberman's cleaning of the cupola during which he fell and sustained multiple fractures

(Id. (citing alleged overt act 50).)

- Robert Owens sustained a fractured skull and lost his eye when working on a cut saw which had been dangerously modified to speed up production

(Id. (citing alleged overt act 57).)

- Eloy Rocca burned his leg when he stepped into scalding water that was exposed because production trumped safety in the casting department, as elsewhere, at Atlantic States

(Id. (citing alleged overt act 60).)

---

have quoted the additional "Means and Methods" paragraphs, 47-49, supra Section II.A. Paragraph 14 of the indictment is quoted and discussed infra, n.93 and accompanying text.

[87]  The government, in its brief setting forth this argument, cites either directly to trial transcripts, or to portions of this Court's post-trial memorandum opinion (dkt. 721) that in turn cited to trial transcripts.  (Gov. reply br., dkt. 747 at 3-4.)

- Hector Velarde had three fingers chopped off in the cement mixer because Defendant Prisque ordered a safety device on the mixer to be bypassed rather than slow down production

(Id. at 3-4 (citing alleged overt acts 67-68).)[88]

The government cited the CVRA at oral argument, arguing that "[u]nder the plain language of the statute, a party may qualify as a victim even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission." (Tr. 752 at 10.) The government concludes that "as alleged by overt acts contained in the Superseding Indictment, and as proven by the United States at trial, there was a direct nexus between Defendants' conduct and the injuries and death sustained by the victims." (Gov. reply br., dkt. 747 at 3.)

The government opposes any argument by defendants that this Court may not make findings of fact to establish statutory crime victim status just because the jury did not make specific findings as to alleged overt acts. It contends that determinations of statutory crime victim status, like factual findings under the guidelines, are to be made by the district court under a preponderance of the evidence standard. It asserts that the trial evidence is sufficient for that purpose here, and acknowledges that if necessary the Court may receive additional evidence to resolve disputed issues of fact. (See tr. 752 at 13-14, 30, 35-36.)

---

[88] This text from the government's reply brief, which we have quoted and organized by bullet points above, does not purport to be a direct quote from the cited alleged overt acts in the indictment, except where the government used quotation marks as to alleged overt act 33, referring to the Coxe incident. Rather, this text sets forth a summary of the government's argument as to why each of the six named workers qualifies as a statutory crime victim here.

This Court inquired during oral argument whether, in the government's view, a deceased Atlantic States worker named Sonny Peacock, who was not named in the indictment but who did sustain fatal workplace injuries at Atlantic States during the period of the alleged conspiracy, is also a statutory crime victim in this case. (Id. at 35.) We asked because the government had already sent to the Court, in preparation for sentencing, victim impact statements from Mr. Owens, and the widow of Mr. Coxe, and the widow of Mr. Peacock. When asked this question at oral argument on this motion, the government initially stated that it did not consider Mr. Peacock to be a statutory crime victim because this Court excluded all evidence about him or the circumstances of his demise from the trial evidence. (Id. at 35-36.)[89] But the government requested some time after oral argument to consider the question. No further word having been communicated by the government on that question, we assume that its position remains that only the six named workers are in the status of statutory crime victims in this case. On the other hand, the government agreed at oral argument that persons not named in an indictment can be found to be statutory crime victims, with all attendant rights under the CVRA, if the Court so finds. (Id. at 32-36.)

---

[89] (See, e.g., tr. 213 at 20-22, 37-39; tr. 231 at 20-23; tr. 509 at 46.)

Contentions of defendants[90]

Defendants argue several points in opposition to the government's contention in this motion that the six named workers are "crime victims" under the CVRA. Their main contentions can be summarized as follows:

- The trial testimony provided by, or about, the six named workers did not pertain to the CWA or CAA offenses or conspiracy objectives, so those aspects of the case are not relevant to this motion.

- There were no charges or convictions for violations of the OSHA statute, or conspiracy to violate the OSHA statute.

- All of the offenses of conviction referring to OSHA were either substantive obstruction or false statement offenses, or a conspiracy to accomplish those unlawful objectives. The jury was so instructed.

- The injuries suffered by the six named workers were not part of the elements of any of those substantive offenses, nor were those injuries part of the charged objectives of the conspiracy offense.

- The government cannot show that the injuries suffered by the six named workers were directly and proximately linked to the essential elements of the offenses of conviction, as required under the CVRA. Any such asserted nexus is too factually and temporally attenuated to meet that standard.

- The only identifiable "victim" of a false statement or obstruction offense is the United States.

_____

[90]    There was no joint defense agreement among the defendants, although they have frequently submitted motions or briefs as a group when appropriate. They submitted a joint opposition brief on this motion, and argued individually at oral argument while adopting each others' arguments as well. We believe that the issues raised by the government in this motion are common to defendants Atlantic States, Prisque, Faubert and Maury, so here we refer to them collectively as the defendants. We do not include defendant Davidson in this analysis, because we have ruled that he was not convicted of any OSHA-related offenses. See supra n.55 and accompanying text.

- "The [government] should be precluded from converting the 'victim' for sentencing purposes from the United States to [these workers] because Defendants were <u>not</u> charged with causing the accidents; they were only charged with conduct after the accident."

(Def. opp. br., dkt. 745 at 2-8; quoted portion is <u>id.</u> at 2 (emphasis in original).)[91]

Defendants emphasized at oral argument their position that the government cannot show that the trial evidence, even viewed under a preponderance of the evidence standard, would support a finding by the Court that the injuries sustained by any of the six named workers were directly and proximately caused by the offenses charged. (Tr. 752 at 15-26.) Thus, they dispute factually whether the trial evidence does or could support a finding of direct and proximate causation under the CVRA standard. In that connection, they assert that there are facts both in evidence and not yet in evidence indicating that each of the six named workers contributed to their own injury. (<u>Id.</u> at 22-23.)

Counsel for Atlantic States summed up defendants' position by stating: "Every one of these situations was an accident, Judge. What happened afterwards is what is the subject of this indictment." (<u>Id.</u> at 20.) Defendants contend that for the Court now to resolve factual issues of

---

[91] Defendants argue further that "[w]ithout knowing which specific act(s) the jury found to be in furtherance of the conspiracy, not one of the overt acts can be used to support the [government's] theory that the "victims" are the [named workers]." (Def. opp. br., dkt. 745 at 3.) They also posit that the United States itself cannot be a "person" within the meaning of the CVRA. (<u>Id.</u>) No case law is cited for these points. We reject the first as contrary to established authority, as discussed in this opinion. We need not reach the second because the government does not assert CVRA "victim" status on behalf of the United States in this motion. We note, however, that in appropriate circumstances an agency of the federal government can qualify for statutory victim status under the restitution statutes. <u>See</u> <u>supra</u> Sec. I.C.

direct and proximate causation regarding the injuries to the six named workers, under the CVRA standard, would "elongate this sentencing process way beyond what anybody expects." (Id.)[92]

*          *          *

The parties offer a few case law citations in their briefing materials on this motion, but none are even closely analogous. As we stated in describing the federal appellate case law supra, Section I.C, there is no authority under the VWPA, the MVRA, or the CVRA that is factually similar to this case. Our findings and conclusions, set forth below, do address the case law cited by the government in support of its position. See infra Sec. II.F.

### E.    NO CVRA CONTENTIONS PRIOR TO THIS MOTION

This case has an extensive litigation history prior to the current motion. The government did not refer to the Crime Victims' Rights Act or mention potential statutory crime victim status for any injured workers before it filed this motion. Here we describe the significant points in the litigation history where that topic naturally would have come up or would have been suggested by the discussion on the record among Court and counsel, but it did not.

Numerous pretrial motions were filed by defendants. Those motions included a motion to strike alleged surplusage from the indictment. (Dkt. 126.) That motion argued that the allegations in the indictment concerning causation of injuries to the six named workers were surplusage and should be struck as unfairly prejudicial because defendants were not charged with causing those injuries. (Dkt. 127 at 9-11.) The government responded that such evidence was

---

[92] This argument was in response to the government's asserted conclusion that "[d]uring the trial of this matter, the Government demonstrated by a preponderance of the evidence that Defendants' commission of overt acts in furtherance of the conspiracy 'directly and proximately harmed' Alfred Coxe, Gabriel Marchan, Randy Lieberman, Robert Owens, Eloy Rocca, and Hector Velarde." (Gov. reply br., dkt. 747 at 4.)

relevant and admissible because it was part of the links in the chain of events supporting the conspiracy to defraud OSHA, and was necessary to complete the story of that crime. (Dkt. 146 at 105-07.) It contended that "the injuries provide critical background or context for much of the obstructive conduct and false statements alleged in the . . . Indictment." (Id. at 107.) We denied that motion prior to trial, without prejudice, because of that representation by the government. (Tr. 213 at 56-57; dkt. 201, 9-8-05 Order.) However, at the close of trial we did redact as surplusage, from the version of the indictment provided to the jury, the entire "Background" section of the indictment that alleged the statutory and regulatory scheme enforced by OSHA.[93]

---

[93] The "Background" section of the indictment described the federal OSH Act, 29 U.S.C. § 651 et seq., and the role of OSHA as the agency responsible for promulgation and enforcement of regulations under that statute. (Dkt. 711 at 4, ¶¶ 9-11.) It described Atlantic States as an "employer" under the statute and alleged that Faubert, as Human Resource Manager, had responsibility for supervising health and safety matters at the facility. (Id. ¶¶ 12-13.) It further alleged:

> 14. Defendant [ATLANTIC STATES] was required by the OSH Act and regulations promulgated thereunder (1) to furnish places of employment that were free from recognized hazards that were likely to cause death or serious physical harm to employees (29 U.S.C. § 654(a)(1)); (2) to take a powered industrial truck out of service if it was found to be in need of repair, defective, or in any way unsafe until it was restored to a safe operating condition (29 C.F.R. § 1910.178(p)(1)); and (3) to ensure that each powered industrial truck operator was competent to operate a powered industrial truck safely (29 C.F.R. § 1901.178(1)).

> 15. As an employer, defendant [ATLANTIC STATES] was required to enter each "recordable" occupational injury on an OSHA 200 log within six working days after learning of the injury. A recordable injury includes, among other things, those that result in death; one or more lost workdays; restriction of work or motion; and medical treatment other than first aid. Defendant [ATLANTIC STATES] was required to have available for inspection at all times a complete copy of the OSHA 200 log current to within 45 days.

> 16. Section 11(c) of the OSH Act prohibits an employer from discriminating or retaliating against employees who file complaints or institute proceedings against the employer or exercise any rights afforded under the OSH Act. 29 U.S.C. § 660(c)(1).

125

The government suggested at one point during oral argument on that motion to strike surplusage, but not in its brief, that it was alleging causation of the workers' injuries in this case. The AUSA stated: "And that forklift without brakes ends up, because of not having brakes, crushing an individual and killing him, we argue is at the core of this case." This Court immediately questioned that comment, and the government responded as follows:

> COURT: Just a minute. The point that you raised is one that [defense counsel] has argued. It is found partly on pages 9 and 10 of the moving brief. And it refers to the overt acts – numerous overt acts – where the physical injuries are described and related to a malfunction of some work setting or equipment, right?
>
> GOV: That's correct.
>
> COURT: And you're saying that people are not being charged with intentionally causing those injuries, in the form of an assault? It's not that type of a charge, right?
>
> GOV: Correct. Rather, they're being charged with the deception and obstruction of justice, by doing things post-conduct. When an individual got injured, as far as the mind set, the Government's argument is the defendants see an individual get injured – or in one instance, killed – and then the next part of the conspiracy and the co-conspirators, in furtherance of the conspiracy say, what do we need to do before OSHA gets here? What do we need to do to make this look like an accident?
>
> COURT: All right.
>
> GOV: It's – that is what we're arguing. So we're not – yes. They were not charged with the death. They're not charged with the person losing an eye. They're not charged with the person breaking a back or breaking a bone in the foot. But it's what they did after; the lies and the deception, subsequent to that.
>
> COURT: Okay.

(Tr. 165 at 38-39.)

---

(Id. at 5, ¶¶ 14-16.) We redacted all of those paragraphs as surplusage before the indictment was submitted to the jury. (Compare dkt. 711 at 4-5, with dkt. 754 at 1.) The jury was not instructed on the OSH Act or its regulations because there were no substantive charges or alleged conspiracy objectives under that statute. Conversely, the jury instructions did quote and explain the CAA and CWA provisions that were charged. (See dkt. 717 at 50-60.)

Another pretrial defense motion was to dismiss the OSHA-related obstruction counts (Counts 8, 9, and 10), and the corresponding conspiracy objectives, on the ground that the essential element of a "pending proceeding" by OSHA was not adequately pleaded in the indictment. (Dkt. 134 at 9-14.) At oral argument on that motion, the government made the following accurate statements concerning the theory of those charges:

> GOV: [E]ach of these incidents in [Counts] 8, 9, and 10, this was not . . . an unannounced, routine inspection, that was basically triggered by nothing. In each of these cases, the inspection was triggered or the investigation was triggered by a serious incident. And in each of those cases, OSHA came in to investigate particular injuries in those cases. In each of those cases, the efforts were made to cover up and misrepresent and change accident scenes, so that OSHA would get off the track – to thwart OSHA in pursuing its investigation further – obviously, to an end result that could have involved the more formal type of proceeding that the defense is attempting to define here. . . . The law we cite defines pending proceeding broadly. It clearly encompasses OSHA's particular efforts, in these three incidents [involving Messrs. Coxe, Owens, and Marchan], OSHA's particular efforts, in these three incidents, to investigate very serious accidents in the workplace.
>
> This whole indictment is about this group of defendants being aware of the trouble that OSHA and the EPA could cause them in their production of pipe, and their efforts to thwart those agencies in doing their job. I think it's obvious, both from the charges here and clearly, the facts that will be adduced at trial, that these defendants were aware of the workings of OSHA, about the seriousness of particular investigations, involving particular accidents at those sites.

(Tr. 173 at 78-80.) We denied that motion, finding that the obstruction element of a "pending proceeding" was adequately pleaded in those counts. (Tr. 213 at 61-62; dkt. 207, 9-9-05 Order.)

Pretrial in limine motions by defendants provided another opportunity to discuss the evidence to be adduced at trial and how it was relevant to the charged offenses. Defendants moved to exclude medical records of injured workers included in the government's proposed

exhibit list, including records on workers Lieberman and Owens, who were named in the indictment, and fatal injuries to worker Peacock, who was not so named. (Dkt. 171 at 11-12.) Again, the government's opposing brief stated that the injuries were relevant to the obstruction charges because they provided context and motive for the alleged obstruction. (Dkt. 188 at 15-17.) The defendants argued that by introducing medical records of injured workers, the government sought "to introduce these medical records to somehow place blame on Defendants for the injuries, despite the fact that they are not charged with causing the accidents," and that such would be unduly prejudicial. (Dkt. 192 at 19.) The Court denied that motion without prejudice as well, but required the government to give advance notice if, during trial, it sought to introduce evidence on any injuries not mentioned in the indictment so that a ruling could be made. (Tr. 213 at 20-28, 37-39; tr. 231 at 20-23; dkt. 665, 11-14-06 Order.)

The government again, during oral argument on the defense in limine motions, momentarily suggested that the indictment in effect charged OSHA violations, stating:

> Paragraph 39C says the object was to defraud OSHA and impede their investigations. And impede their functioning by concealing OSHA violations.

(Tr. 213 at 10 (emphasis added).)

Defense counsel immediately corrected that suggestion and the Court agreed, stating:

> FAUBERT COUNSEL:  I just want to make just one note.  I know you may know this. . . .  But, we're not defending OSHA violations here.  I mean, we're defending alleged lies to OSHA agents, albeit.

> COURT:  Right.

> FAUBERT COUNSEL:  But, if Sonny Peacock unfortunately is killed on the job and there's no allegation anybody lied about anything, then I'm not prepared to start defending everything anybody ever did that got hurt.  This is a foundry, there

are going to be a lot of injuries here.  Even if we're in the middle of the [safety statistic] percentiles.

COURT:  Yes.

(Id. at 22-24.)

Defense counsel in that in limine motion outlined some of the causation proof problems that would arise if defendants were to have to address injury causation issues, including contributory conduct by the injured worker or others.  (See dkt. 192 at 21; tr. 213 at 6-7, 37-39.) They also gave some indication of the number and variety of OSHA inspections conducted over the approximately eight-year period of the alleged conspiracy.  (Dkt. 192 at 16.)  Counsel for Atlantic States elaborated at oral argument:

> ATLANTIC STATES COUNSEL:  [T]here's numerous OSHA inspections that are done during the course of almost anything that happens.  Almost every shutdown that we have, one union will always call OSHA against another union. That's independent contractors.  OSHA always appears whenever we have shutdown because independent contractors, that's the way they compete with one another, one calls . . . OSHA on the other.  It has little or nothing to do with Atlantic States, other than the fact it's on our site.
>
> There are other times when OSHA gets called and arrives.  Or, they arrive unannounced.  But, for us to now in front of this jury argue each one of the OSHA visits and/or citations and the ultimate disposition and whether or not they impact in any way, shape, or form on this particular charge, these particular overt acts and the counts, I think is highly prejudicial to us.  [I]t's going to be a very long trial to start with.  The trial will become impossible at that point and unmanageable for us to have to defend against all those.

(Tr. 213 at 5-6.)[94]

---

[94]  The OSHA public data website lists its inspections at Atlantic States resulting in some type of OSHA action, dating back only as far as 1997.  It lists approximately twenty-one separate inspection numbers assigned by OSHA during that period, with various civil resolutions.  See www.OSHA.gov.

The defense in limine motion on that point was resolved, at least pre-trial, in the

following exchange between the Court and the prosecutor:

> GOV:  I think, as stated in my letter, I think the issue is some of the injuries that
> could come up throughout the trial could be for a purpose other than triggering an
> OSHA investigation.  It may be for an intimidation or retaliation against a witness.
> It may be having something to do with maximizing production at the plant.  So . .
> . it would have to do with the means and methods used in the conspiracy.  But at
> the same time, as stated in our letter, we are not planning to have OSHA
> investigations, people from OSHA get up and talk about injuries that are not
> alleged in the indictment. . . .
>
> We don't know where this case is going to bring us.  And we're not
> bringing forth all of these injuries, as [Atlantic States] counsel said in an earlier
> hearing.  Injuries happen there every day.  We're not planning to bring in
> hundreds of injuries.  But at the same time, it's very tough for us to try to limit
> ourself, to say only anything in the indictment and nothing else will possibly come
> out of any of our witnesses' mouths, because it's too –
>
> COURT:  I'll just have to see where it fits into the framework of relevance.
>
> GOV:  Yes.

(Tr. 231 at 20-23.)

There were other skirmishes between the parties on the topic of admitting evidence of

other injuries, or opening the door to causation issues during trial, but all of those were resolved

in the course of the trial such that no injuries except those to the six named workers (and one to

cooperating co-conspirator George Shepherd, alleged overt act number 66) were allowed into

evidence.  During none of the pretrial motion practice, or the ongoing rulings required of the

Court during the trial, did the government state or indicate that CVRA statutory crime victim

status was contemplated for any persons.

When the trial began, this Court directed sequestration of all trial witnesses, with the

exception of stated individuals such as the case agent, defendants' spouses, and prospective

expert witnesses.  (Tr. 233 at 6-7.)  This was granted on joint request of the government and defense counsel.  (Id.)  Both sides policed that sequestration order throughout the trial.

The government's opening statement to the jury described the OSHA-related aspect of the indictment as follows:

> [K]eep in mind, and this goes to the tragedy and coverup, what I call the tragedy and coverup part of the case, this case is not about assessing fault or finding cause [in] any of these incidents.  My recitation shows in several instances these workers surrendered to the pressure put on them to make [pipe] and to ignore safety systems.  And indeed, they may have contributed [in] some of these cases to their injuries.  The crime here is of the coverup.

(Tr. 234 at 101.)

The government did not assert during trial that any person had a CVRA right to be present and not to be sequestered, nor did anyone assert such a right on his or her own behalf. This is true even though the government presented all five living named injured workers as trial witnesses in this case.  See, e.g., In re Mikhel, 453 F.3d 1137, 1139-40 (9th Cir. 2006) (granting government's CVRA petition and remanding to district court for findings by clear and convincing evidence standard whether family members of murder victims were highly likely to alter their testimony as prospective witnesses, sufficient to support sequestering them from attending trial).

Closing arguments were an opportunity for the government to make an emotional appeal, which it expressed as follows:

> The word verdict has [roots] in Latin, verde, which means the truth.  You, the jury, will have the ability to speak the truth after you hear all argument summations, and you take the evidence and you deliberate.  Now, you will also have the opportunity to give your opinion and judgment based on the evidence. Now, in this case, I submit to you, speak the truth.  Speak the truth for all the

131

people who were deliberately deceived by Atlantic States and these individual defendants. Speak the truth for all the laborers, who were forced to burn and discharge oil, tires and paint, which escaped from Atlantic States and went into the environment. Speak the truth for Bobby Owens. Speak the truth for Eloy Rocca. Speak the truth for Hector Velarde. Speak the truth for Al Coxe. Thank you.

(Tr. 564 at 158.)

This elicited an immediate motion for mistrial from defendants for alleged prosecutorial misconduct. (Dkt. 575.) There, defendants argued that the government's exhortation to the jury to "speak the truth" for those injured workers was "designed solely to incite the jury to convict Defendants for causing the accidents discussed in this trial and for unfair treatment of Atlantic States workers." (Id. at 8.) They reiterated that "[t]hese issues have absolutely nothing to do with the allegations of the Indictment – post-accident efforts to obstruct OSHA." (Id.) The motion for mistrial on that ground was denied, but the government did not, in connection with that motion, suggest any CVRA crime victim issue. (Dkt. 697, 11-30-06 Order (with transcript references).)

The briefing and rulings on the post-trial Rule 29 and Rule 33 motions consumed many pages and many months, for both the parties and the Court. (See dkt. 721.) At no time during that phase of the case did the government suggest that CVRA crime victim status might enter into the case.

The briefing and oral argument on the Step One guidelines calculations came next. (See infra n.104.) There, the government contended that "the workers and their families [were] very real victims in this case. . . . Within this conspiracy, Defendants treated Atlantic States' workers as expendable fodder for their criminal enterprise." (Gov. Br. 11-30-07, submitted to chambers

re: sentencing.)  The government stated that it intended to submit victim impact statements to the Court and to the U.S. Probation Office.  Id.

The government submitted some victim impact letters, including letters from the widow of Mr. Peacock, as well as Mr. Owens and the widow of Mr. Coxe.  That submission was silent, however, as to any intention to submit those statements under the CVRA rather than under the Court's authority to consider information under 18 U.S.C. § 3661.

The government submissions to the Probation Office for preparation of the Presentence Report also have not sought or suggested a right to restitution on behalf of any person.[95]

\*          \*          \*

This chronology of events demonstrates that the government did contend that injured Atlantic States workers were "victims" of the conspiracy to obstruct OSHA in a broad sense throughout this case.  The government, however, did not mention, cite, or invoke the Crime Victims' Rights Act as being possibly applicable until the current motion was filed

## F.     FINDINGS AND CONCLUSIONS OF THE COURT

The CVRA requires that any motion seeking relief thereunder must be decided by the district court "forthwith," and "[t]he reasons for any decision denying relief . . . shall be clearly stated on the record."  18 U.S.C. § 3771(b)(1), (d)(3).  Denial of any of the relief sought is subject to a mandamus petition that must be decided by the court of appeals within 72 hours after

---

[95]  We must reject the government's contention at oral argument on this motion that the CVRA is relevant here because the Probation Office, unbidden by the Court or the government, mentioned it in its addendum response to a defense objection to a portion of the first draft of the PSR.  (Tr. 752 at 6-8.)

the petition has been filed. "If the court of appeals denies the relief sought, the reasons for the denial shall be clearly stated on the record in a written opinion." Id. § 3771(d)(3).

We have written at length, and as quickly as the topic has permitted us to do, because in our view there are substantial legal and constitutional issues raised here. Indeed, we believe that some of the issues raised in this motion highlight unresolved constitutional issues under the restitution statutes. Those issues are only intensified by the novelty of the CVRA because it draws its definition of "crime victim" from the restitution statutes. We will explain as best we can, but we see that this is a complicated and multi-faceted situation.

The government originally brought this motion seeking to compel the Court to re-set a sentencing date, at a time when the Court was actively deliberating upon serious and substantial guidelines issues that had been raised in the Step One briefing process and had so informed the parties. The government invoked the CVRA rather than Rule 32(b), which was also available for the purpose of pressing for a sentencing date. (Dkt. 744 at 5.) Defendants agreed that sentencing should be completed, as did the Court; that was never an issue. As soon as the Court rendered its tentative rulings on the Step One issues, we rescheduled the additional steps leading to firm sentencing dates for all defendants, as we had informed the parties we would do. Meanwhile, however, this motion had been filed. See supra Preliminary Statement.

Defendants responded to this motion stating that they did not oppose setting sentencing dates, and indicating their confidence and expectation that the Court was doing, and would do, what it said it would do in that regard. (Dkt. 745 at 1, 8-9.) Defendants strongly opposed, on the merits and as a procedural matter, any suggestion that the six named workers have statutory crime victim status under the CVRA in this case. (Id. at 1-8.) This contention, as we have seen,

was raised by the government for the first time in this case when it filed the present motion. Prior to that, the government had characterized <u>all</u> injured workers and their families simply as "victims," without seeking restitution or invoking the CVRA on behalf of any of them. <u>See</u> <u>supra</u> Sec. II.E.

The government then asserted, in its reply brief, that this motion also seeks to afford the six named workers, or their families or representatives, a right under the CVRA to allocute at the defendants' sentencing hearings, by providing victim impact statements in person or on paper. (Dkt. 747 at 4.) The government reiterated at oral argument that it is asserting a demand for statutory rights under the CVRA, rather than a request that the Court exercise its discretionary power to allow such statements under 18 U.S.C. § 3661. <u>See</u> <u>supra</u> Sec. II.D. We set the renewed sentencing dates on the day of oral argument on this motion, and also attended to oral argument on other sentencing-related issues. (Dkt. 751, 2-5-09 Scheduling Order.) To that extent, therefore, this motion is moot.

The issue that requires resolution in this opinion is whether the six named workers, or their representatives, have statutory crime victim status under the CVRA. We hold that, in this case, the six named workers are not statutory crime victims under the CVRA of the offenses of conviction. We recognize, however, that the Court has discretion to consider allowing them or their representatives to present information to the Court in connection with sentencing, pursuant to 18 U.S.C. § 3661. Our findings and conclusions are set forth below.

*          *          *

A person who is a "crime victim" under the CVRA has an array of enumerated rights, including the right to allocute at sentencing, either in person or, if that is not possible, through

family members or other persons appointed by the court as suitable to assume the crime victim's rights. 18 U.S.C. § 3771(a)(4), (e). A "crime victim" is defined in the CVRA as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." Id. § 3771(e). This definition is based upon the definition of "victim" in the restitution statutes, the VWPA and the MVRA. See supra Sec. I.B.

The CVRA also provides that one of the enumerated rights of a CVRA "crime victim" is "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). This provision is not considered to confer substantive rights to restitution. In re Doe, 264 Fed.Appx. at 262 n.2. Those rights are provided under the restitution statutes, chiefly the VWPA and the MVRA. The VWPA provides for a discretionary award of restitution to a statutory "victim" if the offense of conviction is within its stated offenses, unless the MVRA specifies that the offense requires mandatory restitution. See 18 U.S.C. § 3663(a); id. § 3663A(a). The relevant offenses in this case would fall under the VWPA rather than the MVRA, but the definition of "victim" under both of those restitution statutes is identical. See supra Sec. I.B.

The first conclusion that emerges from examining this statutory scheme is that if a person is determined to have statutory "crime victim" status under the CVRA, then that person is also a "victim" under the VWPA or the MVRA, if the offense of conviction is within the offenses specified in those restitution statutes. This is clear from comparing the parallel definitions of "victim" in the three statutes, as expressly intended by Congress. See supra Sec. I.B. This would also be true for any federal offense, not just those specified in the VWPA or the MVRA, if restitution is agreed to as part of a plea agreement. See 18 U.S.C. § 3663(a)(3).

A single statutory section governs the procedure for issuance and enforcement of an order of restitution, and its collateral estoppel effect in civil litigation, under both the VWPA and the MVRA. See 18 U.S.C. § 3664. In addition to its collateral estoppel effect in civil litigation, an order of restitution imposed as part of a criminal sentence cannot be discharged in bankruptcy. See Kelly v. Robinson, 479 U.S. 36, 50, 53 (1986).

The government can assert rights to restitution under the VWPA and the MVRA on behalf of alleged "victims." Id. § 3664(d)(1). The government in this case has never asserted that the six named workers, or any other persons injured at the Atlantic States facility during the relevant period, are entitled to be considered for a VWPA restitution award as part of the sentencing of any defendant. See supra Sec. II.E. Courts have, however, found it necessary under the VWPA and the MVRA to seek out potential statutory "victims," and to adjudicate their rights to restitution, if any, even if the government fails or refuses to claim restitution on their behalf. See supra Sec. I.D.

The fact that the government has not sought restitution on behalf of any asserted "crime victims" in this case is of no moment. Nor is the fact that the offenses of conviction implicated in this motion would fall under the VWPA, which makes restitution discretionary, rather than the mandatory MVRA restitution statute. It would be an abuse of discretion for a district court to simply ignore the potential for restitution without considering whether there are potential victims and whether the court should exercise its discretion to order restitution where the offenses of conviction are within the VWPA. See supra nn. 41-43 and accompanying text.

If there are CVRA "crime victims" here, they would be entitled to be at least considered for a discretionary order of restitution in the full amount of each "victim's" losses under the

VWPA.[96]  In this analysis, all co-conspirators found guilty of the offense are criminally liable to all "victims" for restitution.  The VWPA permits this award to be joint and several, or imposed in different amounts on different defendants.  Those factual issues must be determined in consideration of each defendant's current and future ability to pay.  See supra Sec. I.D.  Also, whether restitution is awarded under the VWPA or the MVRA, the court must determine the payment schedule under the statutory formula set forth in 18 U.S.C. § 3664(f)(2).  See supra Sec. I.D.

The majority of the federal circuits, including the Third Circuit, has ruled that restitution, when ordered in connection with a criminal conviction, is a criminal, rather than a civil, penalty. Leahy, 438 F.3d at 333-35.  Our Court of Appeals, in a divided en banc decision in Leahy, has also joined the majority of federal circuits in holding that a restitution order under the VWPA or the MVRA does not violate a defendant's Sixth Amendment right to trial by jury as articulated in Supreme Court precedent beginning with Apprendi v. New Jersey, 530 U.S. 466 (2000) and culminating in United States v. Booker, 543 U.S. 220 (2005).  Id. at 335-39.

Leahy was actually three criminal appeals that were combined for en banc determination of whether district courts' orders of forfeiture and restitution violated the Sixth Amendment right to trial by jury.  Id. at 330.  The underlying convictions were for bank fraud, dealing in

---

[96]  Our Court of Appeals has summed up the triggering of the VWPA and the MVRA as follows:

> [O]nce a defendant is convicted of an offense covered by the VWPA or the MVRA, a district court *must* (or in the case of the VWPA, unquestionably may) order restitution, and in order to fulfill this mandate, the court must determine the amount of loss pursuant to 18 U.S.C. § 3664(f)(1)(A).

Leahy, 438 F.3d at 337.

counterfeit money, and mail/wire fraud (two under jury verdicts; one under a guilty plea).  Id.  In

each of the cases the statutory victim status was not disputed.  The only issues before the en banc

court were the Sixth Amendment issues under the Apprendi line of cases ending in Booker,

which are all silent as to forfeiture and restitution.  Id. at 330-31.  The Leahy court concluded as

to restitution:

> In imposing restitution, a district court is . . . by no means imposing a punishment
> beyond that authorized by jury-found or admitted facts. . . .  [A] restitution order
> does not punish a defendant beyond the "statutory maximum" as that term has
> evolved in the Supreme Court's Sixth Amendment jurisprudence.  See Booker,
> 125 S.Ct. at 749 (defining "statutory maximum" as "the maximum sentence a
> judge may impose *solely on the basis of the facts reflected in the jury verdict or
> admitted by the defendant*") (citing [Blakely v. Washington, 542 U.S. 296, 303
> (2004)]) (emphasis in original) . . . . There can therefore be no Booker violation in
> the imposition of restitution under the VWPA or the MVRA.

Id. at 337.

As we have observed, it is clear that the definitions of "victim" under the CVRA, the

MVRA, and the VWPA have been aligned by Congress to identify a common core group of

persons who have powerful and enforceable rights under those statutes.  See supra Sec. I.B.

Therefore, at least where a determination of CVRA "crime victim" status carries with it an

entitlement to be considered for discretionary restitution under the VWPA or to receive

mandatory restitution under the MVRA, it appears that any Sixth Amendment limitation on the

MVRA and the VWPA is equally applicable to determinations of "crime victim" status and

commensurate rights under the CVRA.

The reason underlying the majority opinion in Leahy was hotly debated by the en banc

court, and is beyond the scope of this opinion to discuss.  However, the stated rationale in Leahy

was that the district court's fact-finding as to the amount of loss "merely give[s] definite shape to the restitution penalty born out of the conviction," so there can be no <u>Booker</u> violation in awarding restitution to each victim.  <u>Leahy</u>, 438 F.3d at 337.  The <u>Leahy</u> majority also expressed that "for purposes of sentencing under <u>Apprendi</u> and <u>Blakely</u>, whether a fact is labeled a sentencing fact or an element of the offense is of no consequence" because "the relevant 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose based solely on facts reflected in the jury verdict or admitted by the defendant."  <u>Id.</u> at 336 (citing <u>Blakely</u>, 542 U.S. at 303-04).

<u>Leahy</u> teaches that a restitution order does not create Sixth Amendment problems under <u>Booker</u> because criminal liability for restitution is based only on the "facts reflected in the jury verdict or admitted by the defendant."  <u>Id.</u>  <u>Leahy</u> dealt with whether the district court could, consistent with the Sixth Amendment right to jury trial, determine the <u>amount</u> of restitution.  <u>See</u> <u>id.</u> at 335-38.  The convictions under review in <u>Leahy</u> presented no dispute as to whether there were statutory "victims" under the VWPA and the MVRA, or how to identify those "victims" for purposes of making restitution determinations under those statutes.  <u>See</u> <u>id.</u> at 330.  But the rationale of <u>Leahy</u> appears equally applicable where a court must make findings on disputed issues of "victim" status itself.  This is necessary whether we apply the CVRA or the VWPA because a finding of CVRA "crime victim" status for the offenses of conviction here, arising as they do out of Title 18 of the United States Code, will automatically create "victim" status under the VWPA for all those so identified by this Court.

We believe that where, as here, the Court's ruling on a disputed issue of "crime victim" status under the CVRA will automatically create "victim" status for purposes of restitution under

the VWPA or the MVRA, the Court must avoid creating a Sixth Amendment <u>Booker</u> problem. The way to do that, as explained in <u>Leahy</u>, is to <u>base</u> the Court's ruling "solely on facts reflected in the jury verdict or admitted by the defendant." <u>Id.</u> at 336.

It must also be recognized, however, that the definition of "crime victim" in the CVRA, and the corresponding definitions of "victim" in the VWPA and the MVRA, take as a given that there has been a "federal offense" committed. Those definitions ask the court to make factual findings to determine whether any person was "directly and proximately harmed as a result of the commission of [the] Federal offense," and is thus a statutory crime victim with enforceable rights. <u>Compare</u> 18 U.S.C. § 3771(e), <u>with</u> <u>id.</u> § 3663(a)(2), <u>and</u> <u>id.</u> § 3663A(a)(2). As one circuit court has observed:

> The CVRA . . . does not limit the class of crime victims to those whose identity constitutes an element of the offense or who happen to be identified in the charging document. The statute, rather, instructs the district court to look at the offense itself only to determine the harmful effects the offense has on parties. Under the plain language of the statute, a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission.

<u>In re Stewart</u>, 552 F.3d at 1289.

It appears that in order for a district court to make the necessary factual findings under those statutory definitions of "crime victim," while simultaneously seeking to avoid a <u>Booker</u> Sixth Amendment violation, the court should employ a two-step analysis:

• First, the court should determine what was the offense of conviction, based solely on facts reflected in the jury verdict [or admitted by the defendant];

- Second, the court should make the factual findings to determine whether any person or persons were "directly and proximately harmed as a result of the commission of [that] Federal offense."

We will follow that approach here.

District court decisions on contested issues of statutory crime victim status have generally followed this two-prong approach, without expressly articulating it as such, drawing upon the body of appellate case law that we have summarized in Sections I.B and I.C.  See, e.g., United States v. Donaghy, 570 F.Supp.2d 411, 415, 420-23 (E.D.N.Y. 2008) (three co-conspirators pled guilty to wire fraud conspiracy and/or conspiracy to transmit wagering information in connection with insider betting recommendations on professional basketball games; basketball league was MVRA/VWPA victim); United States v. Bogart, 490 F.Supp.2d 885, 888-97, 903-07 (S.D. Ohio 2007) (five co-conspirators pled guilty to varying offenses including conspiracy to obstruct a federal grand jury, conspiracy to impede the IRS, conspiracy to commit wire fraud, mail fraud, and tax fraud, which the court found were all committed as part of a complex conspiracy to aid another co-conspirator in hiding his assets from his creditors, his ex-wife, and the U.S. government; creditors were MVRA victims entitled to restitution; ex-wife was also potential MVRA victim but evidence did not establish any losses to her directly caused by the conspiracy); United States v. Sharp, 463 F.Supp.2d 556, 558-68 (E.D. Va. 2006) (defendant pled guilty to conspiracy to distribute marijuana; former girlfriend of defendant's customer was not CVRA victim of the offense of conviction where former girlfriend contended that her abuse by the defendant's customer was at least partly attributable to the drugs defendant sold to him); United States v. Schwartz, No. 06-2, 2006 WL 1662899, at *1-*6 (D. Conn. May 25, 2006) (defendant

pled guilty to false statements to IRS for falsely telling IRS auditors that tax returns had been filed by himself and the CEO of the company for which he worked; CEO and spouse were not MVRA or VWPA victims; alternatively, court declined to determine restitution under VWPA due to complexity of determining liability issues); United States v. Bold, 412 F.Supp.2d 818, 820-28 (S.D. Ohio 2006) (defendant pled guilty to tax evasion, bank fraud, and conspiracy in connection with "mortgage flipping" scheme involving approximately 800 homes purchased and resold under inflated mortgages obtained using falsified appraisals and buyer financial statements, many of which went into foreclosure; no individuals claimed statutory victim status; nonprofit community group asserting deterioration of property values in the affected neighborhoods and surrounding communities was not MVRA or VWPA victim).

The government cites United States v. Sandhu for its reference to possible application of the CVRA to permit victim allocution at sentencing. (Dkt. 747 at 2-3.) 462 F.Supp.2d 663 (E.D. Pa. 2006), aff'd, 268 Fed.Appx. 163 (3d Cir. 2008). We find that the decisions in that case, at the district court and circuit court levels, do not support the government's arguments here. Defendant in Sandhu was a licensed commercial truck driver who pled guilty, under 18 U.S.C. § 1001, to forty-two counts of having falsified federally-required log book records recording his driving and off-duty hours (the "logbook requirement"). 462 F.Supp.2d at 664. A related federal regulation required drivers to refrain from driving more than ten consecutive hours without at least eight hours of rest (the "ten hour rule"). See id. Defendant swerved while driving his truck and crashed into a van, killing four members of a family and seriously injuring two others. Id. at 663. State vehicular manslaughter and related charges were ultimately resolved with a plea to careless driving. Id. A federal investigation revealed that during the two months leading up to

the accident date, defendant had falsified his logbook entries pertaining to the ten-hour rule forty-two times. <u>Id.</u> at 663-64. That was the federal charge to which he pled guilty. <u>Id.</u> at 664. In preparation for sentencing, the government informed the district court that it proposed to offer victim impact testimony of two relatives of the victims of the collision. <u>Id.</u> at 665-66. Defendant moved to strike and preclude such statements. <u>Id.</u> at 664. The district court, citing the CVRA, stated that "[o]nly if, after examining the parties' evidentiary submissions, [it] determines . . . that there is a nexus between the falsifications and the accident, will the family members be considered 'crime victims' for purposes of giving testimony." <u>Id.</u> at 666 n.9. It went on to discuss at length the possible impact of the logbook falsifications on its upcoming sentencing decisions under the guidelines and the sentencing statute, 18 U.S.C. § 3553(a). <u>Id.</u> at 666-75. The district court denied defendant's motion to strike the evidence and gave notice of a possible upward guideline departure or upward variance under Section 3553(a). <u>Id.</u> at 675.

Defendant appealed the sentencing decision ultimately rendered by the district court in <u>Sandhu</u>, which included an upward variance but no departure. <u>United States v. Sandhu</u>, 268 Fed.Appx. 163, 164-65 (3d Cir. 2008). The sentence was affirmed, without any citation to or discussion of the CVRA. <u>Id.</u> at 164-66. The circuit court's summary of the sentencing decision, however, indicates that the district court did not find statutory crime victim status or permit allocution of the accident victims' family members under the CVRA in that case. <u>Id.</u> at 164. It stated, "[t]he District Court declined to depart under § 5K2.1 . . . because there was insufficient evidence that Sandhu was fatigued at the time of the crash, or that he was violating the 'ten hour rule.'" <u>Id.</u> at 164-65. The circuit court noted that at the sentencing hearing, "the District Court heard from a truck driver who witnessed the crash, the agent who investigated Sandhu's logbook,

and several of Sandhu's friends and family." Id. at 164 (emphasis added).  In affirming the sentence, the panel emphasized that "the District Court explicitly stated that the upward variance reflected Sandhu's 'repeated violations over a short period of time' of 18 U.S.C. § 1001 and 49 C.F.R. § 395.8 [the logbook rule; not the ten-hour rule], not his 'causing or being involved in [the] accident.'"  Id. at 166.

The circuit court in Sandhu had no occasion to pass on any issue of statutory "crime victim" status under the CVRA, the VWPA, or the MVRA because the only CVRA issue was apparently resolved in defendant's favor at the district court level, and the restitution statutes were never invoked.  See id. at 164-66.  A further distinction between that case and the present motion is that defendant Sandhu apparently admitted in his plea that he had violated the logbook regulatory standard.  See Sandhu, 462 F.Supp.2d at 664.[97]  Here, in contrast, there was no guilty plea, and the offenses of conviction, both substantive and as conspiracy objectives, were to obstructive conduct and false statements committed after accidents occurred.  There were no charges or convictions in this case under the OSHA false records criminal statute, 29 U.S.C. § 666(g).  See supra Sec. II.C.  We decline to speculate under what circumstances a false statement

_____

[97]  Federal prosecutions for logbook violations are becoming more frequent.  The following plea was reported from this district this month:

> Holy House Shipping AB, a Swedish corporation, was sentenced today in U.S. District Court in Camden, N.J., to pay a $1 million fine, a special assessment of $400,000 in community service payments and serve three years of probation for failing to maintain an accurate oil record book in an attempt to conceal illegal discharges of oil-contaminated waste directly into the ocean from one of its ships, the Justice Department announced.

Press Release, Dep't of Justice, Shipping Line Pays $1.4 Million for Environmental Crimes (Mar. 10, 2009), available at http://www.usdoj.gov/opa/pr/2009/March/09-enrd-215.html.

conviction based on a logbook violation, or a corresponding logbook offense itself, or even a conspiracy with such objectives, could support CVRA crime victim status where a defendant does not plead guilty and the facts established by the verdict are limited to the logbook violation.

What were the offenses of conviction?

We conclude as a matter of law that the offenses of conviction relevant to this motion, based solely on facts reflected in the jury verdicts, are as follows:[98]

Count 9:  Obstruction of OSHA, in violation of 18 U.S.C. §§ 1505 and 2.[99]

The essential elements of the substantive offense are stated in the margin.[100]

---

[98]  This trial was conducted before the Third Circuit Model Criminal Jury Instructions were available.  When we state the essential elements of the offenses of conviction here, we are quoting from the jury instructions in this case.

[99]  All substantive counts in the indictment included an aiding and abetting charge under 18 U.S.C. § 2.  The jury was instructed on the essential elements of that statute.  (Dkt. 717 at 62-64.)  We will not repeat that instruction here, but we note that defendants could have been convicted of being principals under any of the substantive counts of conviction, or as aiders and abettors, and the result of this motion would not change.

[100]  In order for a defendant to be found guilty of an obstruction of justice offense under [18 U.S.C. § 1505], the government must prove beyond a reasonable doubt each of the following three elements:

First:  that there must be a proceeding pending before a department or agency of the United States;

Second:  that the defendant must be aware of the pending proceeding; and

Third:  that the defendant must have intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding.

(Dkt. 717 at 46 (jury instructions); see also id. at 47 (jury instruction on definition section for the term "corruptly," 18 U.S.C. § 1515(b)).)

The sole facts reflected in the jury verdicts on Count 9, by reference to the essential elements and the factual allegations in this Count, as well as the supporting evidence, were that between on or about March 24 and March 25, 2000, defendants Atlantic States, Prisque, Faubert, and Maury did corruptly obstruct, impede, and endeavor to obstruct and impede, a pending OSHA proceeding, by taking steps to conceal from OSHA inspectors facts regarding the forklift incident in which Mr. Coxe was fatally injured on March 24, 2000.

Count 5: Making a materially false statement to OSHA, in violation of 18 U.S.C. § 1001.

The essential elements are stated in the margin.[101]

The sole facts reflected in the jury verdict on Count 5, by reference to the essential elements and the factual allegations in this Count, as well as the supporting evidence, were that on or about March 25, 2000, defendant Atlantic States, in a matter within the jurisdiction of OSHA, knowingly and willfully made a materially false statement in a report, knowing it to contain a materially false statement that the forklift involved in the fatality the day before was

_____

[101] In order for a defendant to be found guilty of a false statement offense under [18 U.S.C. § 1001], the government must prove beyond a reasonable doubt each of the following four elements:

First:          that the defendant made a false statement or representation;

Second:     that the statement was "material;"

Third:         that the defendant acted willfully, with knowledge of the statement's falsity; and

Fourth:       that the statement was made in a matter within the jurisdiction of the executive
                   branch of the federal government.

(Dkt. 717 at 43 (jury instructions).)

inspected and found to be "in perfect operating condition," when in truth and in fact, as that defendant then well knew and believed, that forklift on March 25, 2000 (the day after the Coxe forklift fatality) had several defects, including faulty brakes.

Count 7:  Making a materially false statement to OSHA, in violation of 18 U.S.C. § 1001.

The essential elements are stated supra n.101.

The sole facts reflected in the jury verdicts on Count 7, by reference to the essential elements and the factual allegations in this Count, as well as the supporting evidence, were that on or about May 11, 2000, defendants Atlantic States and Faubert, in a matter within the jurisdiction of OSHA, knowingly and willfully made a false statement and representation, that is, Faubert stated to OSHA inspectors that the reason there was no entry on the OSHA 200 log concerning an April 27, 1999 incident was because Gabriel Marchan did not break his leg, when in truth and in fact, as Faubert then well knew and believed, Mr. Marchan sustained a fractured bone in his leg on April 27, 1999, after being struck by a forklift.

Count 10:  Obstruction of OSHA, in violation of 18 U.S.C. § 1505.

The essential elements are stated supra n.100.

The sole facts reflected in the jury verdicts on Count 10, by reference to the essential elements and the factual allegations in this Count, as well as the supporting evidence, were that on or about July 24, 2000, defendants Atlantic States and Faubert did corruptly obstruct, impede, and endeavor to obstruct and impede, a pending OSHA proceeding, by instructing Mr. Marchan to falsely inform the OSHA inspectors that his leg had not been broken when he had been struck by a forklift on April 27, 1999.

<u>Count 8:</u>  Obstruction of OSHA, in violation of 18 U.S.C. § 1505.

The essential elements are stated <u>supra</u> n.100.

The sole facts reflected in the jury verdicts on Count 8, by reference to the essential elements and the factual allegations in this Count, as well as the supporting evidence, were that in or about July 1999, defendants Atlantic States and Prisque did corruptly obstruct, impede, and endeavor to obstruct and impede, a pending OSHA proceeding by instructing "employee B" [whose name was known to the jury and who did testify at trial] to falsely inform the OSHA inspectors that the saw safety shield had not been changed since the June 25, 1999, incident in which Robert Owens sustained a fractured skull and lost an eye when a saw blade broke apart, when, in fact, a steel wire screen had been added to the shield after the incident.

<u>Count 11:</u>  Obstruction of OSHA, in violation of 18 U.S.C. § 1519.

The essential elements are stated in the margin.[102]

---

[102]  In order for a defendant to be found guilty of an obstruction of justice offense under [18 U.S.C. § 1519], the government must prove beyond a reasonable doubt each of the following five elements:

| First: | that the defendant knowingly; |
|---|---|
| Second: | altered, concealed, and covered up; |
| Third: | a tangible object; |
| Fourth: | with the intent to impede, obstruct, and influence the investigation and proper administration; |
| Fifth: | of a matter within the jurisdiction of an agency of the United States, that is, the Occupational Safety and Health Administration. |

(Dkt. 717 at 49 (jury instructions).)

The sole facts reflected in the jury verdicts on Count 11, by reference to the essential elements and the factual allegations in this Count, as well as the supporting evidence, were that in or about December, 2002, defendants Atlantic States and Prisque, did knowingly alter, conceal, and cover up a tangible object with the intent to impede, obstruct, and influence the proper administration of a matter within the administration of OSHA, by altering the condition of a cement mixer and concealing from the OSHA inspectors that they had bypassed a safety device designed to shut down the cement mixer when its doors were opened.

This count also contains the phrase, at the end of the text of Count 11: "which led to the amputation of three of an employee's fingers." (Dkt. 711 at 43.) We find that this factual allegation concerning the causation of the underlying incident involving Hector Velarde, which was the subject of the then-pending OSHA investigation, was not a fact necessary to establish this count of conviction. It is therefore surplusage for purposes of determining the sole facts reflected in the jury's verdict on this obstruction of justice count.

Count 1: Multi-object conspiracy, in violation of 18 U.S.C. § 371.

The essential elements are stated in the margin.[103] The jury's verdict under a § 371

_____

[103] There are three essential elements of the crime of conspiracy charged in Count One [18 U.S.C. § 371], which must be proven by the government beyond a reasonable doubt:

| First: | that the described conspiracy was formed and existed at or about the time alleged in the Indictment; |
|---|---|
| Second: | that the defendant knowingly and willfully became a member of the conspiracy; and |
| Third: | that at some time during the existence of the conspiracy, one of the members of the conspiracy knowingly and willfully committed an overt |

conspiracy count will generally be analyzed according to the alleged unlawful objectives of the conspiracy. Cf. Kones, 77 F.3d at 70 n.3; see supra n.16 and accompanying text. The relevant objectives here are Objective C (to defraud the United States); Objective D (to make false statements in violation of 18 U.S.C. § 1001); and Objective E (to corruptly obstruct OSHA in violation of 18 U.S.C. § 1505). (Id. at 11-12.)

The sole facts reflected in the jury verdicts, by reference to the essential elements and the factual allegations in Count 1, as well as the supporting evidence, were that beginning at an unknown time but no later than October 31, 1995, and continuing thereafter until an unknown time but no earlier than August 2003, defendants Atlantic States, Prisque, Faubert, and Maury did knowingly and willfully conspire and agree with each other to commit the following offenses against the United States:

C. To defraud the United States, that is, to hamper, hinder, impede, impair and obstruct by craft, trickery, deceit, and dishonest means, the lawful and legitimate functions of the Department of Labor and its agency, OSHA, in enforcing the federal safety and health regulations covering certain workers throughout the United States;

D. To knowingly and willfully make materially false, fictitious and fraudulent statements and representations and make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent

---

act, and that overt act or acts were committed to further some goal of the conspiracy.

(Dkt. 717 at 28-29, 48 (jury instructions); see also id. at 31-32, 48 (jury instructions on multiple-object conspiracy and Klein objective to defraud United States).)

statement, in matters with the jurisdiction of OSHA, in violation of 18 U.S.C. §

1001; and

E.     To corruptly influence, obstruct, and impede, and endeavor to influence, obstruct,

and impede, the due and proper administration of law under which a pending

proceeding was being had before OSHA, in violation of 18 U.S.C. § 1505 and its

definition section, 18 U.S.C. § 1515(b);

and that at some time during the existence of the conspiracy, one of the members of the

conspiracy knowingly and willfully committed an overt act, and that overt act or acts were

committed to further some goal of the conspiracy.

Were any persons "directly and proximately harmed as a result of the commission of [these]
Federal offense[s]"?

"The conduct underlying the offense of conviction . . . stakes out the boundaries" for

determining whether an individual has statutory crime victim status.  See Akande, 200 F.3d at

141 (interpreting CVRA's source definition of "crime victim" in the MVRA and the VWPA).

"Although victims need not be specifically named in the indictment or at trial, their harm must

still be directly and proximately caused by the criminal conduct that is established by the

prosecution."  Id.

The Third Circuit, interpreting the statutory definition of "victim" under the VWPA, a

source statute for the CVRA, where the conviction is for a scheme or conspiracy, has ruled that

"'defendant's criminal conduct in the course of the . . . conspiracy' . . . mean[s] conduct that is

both engaged in the furtherance of the . . . conspiracy . . ., and proscribed by the criminal statute

the defendant was convicted of violating."  Kones, 77 F.3d at 70 (emphasis added) (quoting 18

U.S.C. § 3663(a)(2)).  Our Court of Appeals has also interpreted the causation standard, "directly

and proximately harmed," in the corresponding definition of "victim" in the MVRA, as subject to

the following two-prong test:

> <u>First</u>:  Restitution should not be ordered in respect to a loss which would have
>
> occurred regardless of the defendant's conduct. . . .
>
> <u>Second</u>:  Even if but for causation is acceptable in theory, limitless but for
>
> causation is not.  Restitution should not lie if the conduct underlying the offense
>
> of conviction is too far removed, either factually or temporally, from the loss.

<u>Fallon</u>, 470 F.3d at 548-49 (citations omitted).  <u>See</u> <u>supra</u> Sec. I.B.

We find that the only victim "directly and proximately harmed" as a result of these

federal offenses was OSHA.  We do not make a similar finding with respect to the six named

workers, for the reasons stated below.

Each of the substantive convictions, against only particular defendants, was an

obstruction or false statement during the OSHA investigation <u>after</u> the worker in question had

been injured.  That criminal conduct cannot support a factual determination that the obstruction

or false statement "directly and proximately harmed" the worker whose injury OSHA was

investigating.  Perhaps in recognition of that impediment, the government concentrates its CVRA

argument on the conspiracy count.  <u>See</u> <u>supra</u> Sec. II.D.

The OSHA-related conspiracy convictions were against all defendants we have identified

as relevant to this motion, namely Atlantic States, Prisque, Faubert, and Maury.  If we find that

there are statutory victims of the conspiracy offense, then each of those defendants is criminally

liable to all of the statutory victims, both for the exercise of the victims' CVRA rights and for the

Court to consider restitution awards in favor of each victim under the VWPA.  See supra Sec.

I.D.  This result will occur despite the fact that only the employer, and not individual supervisory

employees, can be liable for criminal violations of the OSHA statute itself.  See supra Sec. II.C.

The main problem with the government's conspiracy count argument is that it is at once

too broad and too narrow.  The government contends that the six named workers, and only they,

have CVRA statutory crime victim status in this case.  See supra Sec. II.D.  Yet the government

itself stated at oral argument:

> [T]he government's theory of the case here is that the continuing deception of
> OSHA not only involved the coverup after the injuries, but in large measure was
> responsible for the injuries themselves.

(Tr. 752 at 27.)  See also supra n.85.

It is obvious that under that argument, all workers who sustained any significant injury

during the course of the alleged conspiracy could be considered CVRA and VWPA crime victims

in this case, and theoretically without any need for further fact-finding by the Court.  We find that

is simply too broad a factual premise to meet the statutory standard of "direct and proximate"

harm caused by the conspiracy offense of conviction.  Each of those injuries would have

occurred in a separate incident, at a different time, and under different circumstances.  The

argument is also too narrow because the government offers it to support statutory crime victim

status only for the six named workers when, on its face, it would apply potentially to all workers

injured at the Atlantic States facility during the conspiracy period.

Even assuming arguendo that the harm alleged by the government to the six named

workers could be considered as having been directly and proximately caused by the conspiracy to

154

obstruct and defraud OSHA, issues of direct and proximate causation would require additional adjudication by this Court. That leads us to the following observations:

- Until this motion, the Court has not been called upon to make any factual findings on causation of harm to any workers under the statutory crime victim statutes, the CVRA or the VWPA. None of the rulings we have made to date, during or after the trial or in preparing for sentencing, have been made under the "direct and proximate" standard of the CVRA and the VWPA. Rulings under Rule 29 and Rule 33, as well as the guidelines, are made under different legal standards. <u>See</u> <u>supra</u> Sec. I.B.[104]

- The procedural requirements under the VWPA include notice periods for both victims and defendants, starting before the initial sentencing date and progressing up to 90 days past the sentencing hearing. Those notice procedures have not been followed in this case. <u>See</u> <u>supra</u> Sec. I.D.

- Notice to potential victims would be necessary, well beyond the six named workers proposed by the government, because the Court has an affirmative obligation under the CVRA and the VWPA to locate and afford rights to persons

---

[104] This Court has prepared two post-trial opinions in this case prior to the instant opinion. The first contained our rulings on the Rule 29 and Rule 33 motions filed by defendants, and is 271 pages long. (Dkt. 721.) The second is a set of tentative Step One guideline rulings distributed only to the parties and their attorneys on December 31, 2008, which will be filed on the docket with any necessary edits and revisions at the time of sentencing. It is currently 368 pages long. Not counting the briefing on this motion and the briefing that the Court will receive on the Step Two and Step Three sentencing issues, the parties have submitted more than 1200 pages of post-trial and sentencing briefs, exclusive of exhibits. The trial transcripts total approximately 20,000 pages, and there are additional transcripts of oral argument on extensive pretrial motions. The trial record also contains many documentary exhibits.

who may qualify as statutory crime victims.  On the government's factual theory, this would likely require notice to all Atlantic States workers, and all contractors' workers, injured at the facility during the alleged conspiracy period.  <u>See</u> <u>supra</u> Secs. I.D, II.D, II.E.

- Until this motion, defendants have not been heard on factual issues of causation of harm to any workers.  <u>See</u> <u>supra</u> Sec. II.E.  They have a right under Rule 32 and the Due Process Clause to contest the government's factual assertions of harm causation leading to any determination of statutory crime victim status.  <u>See</u> <u>supra</u> Sec. I.F.

- Since these issues of causation arise in the context of an OSHA-regulated workplace, determining direct and proximate causation under the CVRA and the VWPA would raise underlying issues as to the existence and interpretation of any applicable OSHA standards, as well as factual issues of the course of events leading to each of the injuries.  Contributory conduct on the part of the injured workers, and intervening causation by other persons or events, would be relevant and not excluded under the "direct and proximate" standard.  This is a demanding standard applicable to these criminal statutes, which has no exact analogue in worker's compensation law, various state negligence laws, or collective bargaining agreements or their enforcement laws.  <u>See</u> <u>supra</u> Secs. I.B, II.C.

- Evidentiary hearings would likely be necessary as to the circumstances of each separate incident in which the government or a claimant asserts that a worker sustained injury and there is a direct and proximate causal relationship between the offenses of conviction and that injury.  <u>See</u> <u>supra</u> Secs. I.B, I.C.

156

- The complication and prolongation of the sentencing process resulting from such factual adjudication by the Court would outweigh the need to provide restitution to any victims under the balancing test of the VWPA and the MVRA. See 18 U.S.C. § 3663(a)(1)(B)(ii); id. § 3663A(c)(3). A parallel balancing provision is not found in the CVRA, but here too, due process considerations may be implicated because of the time and complexity of the effort necessary to make such factual determinations under the CVRA in the sentencing process. See supra Sec. I.F.

There are many offense statutes that readily lend themselves to fair and efficient fact-finding of potential victim status, either based on trial evidence or in limited factual determinations post-trial. See generally supra Sec. I.C. For example, even in the obstruction statutes, there are offenses that, by their terms, refer to potential victims. See, e.g., 18 U.S.C. § 1512 (tampering with a witness, victim, or an informant); id. § 1513 (retaliating against a witness, victim, or an informant). Some offense statutes may require a greater degree of fact-finding by the court to determine whether statutory crime victim status exists for various persons, but the statutes at least expressly indicate the potential for such victims to exist.[105]

---

[105] There is a much-publicized federal environmental criminal trial in progress in the United States District Court for the District of Montana, Missoula Division, United States v. W.R. Grace, et al., Cr. 05-07-M-DWM. On February 13, 2009, the district court entered an opinion and order denying companion motions by the government and asserted crime victim-witnesses (Mr. and Mrs. Parker, represented by counsel) seeking to accord the CVRA rights of thirty-four asserted crime victim-witnesses under 18 U.S.C. § 3771(a)(3), including the right to attend trial before testifying despite a sequestration order. United States v. W.R. Grace, No. 05-07, 2009 WL 368240, at *1, *9 (D. Mont. Feb. 13, 2009). On February 27, 2009, the Court of Appeals for the Ninth Circuit granted mandamus petitions filed by the government and the Parkers, holding that the district court erred in finding that the prospective crime victims did not meet the definition of "crime victim," and remanding for hearings as to whether each of the thirty-four individuals should be excluded prior to testifying. Order at 1-2, Parker v. U.S. Dist.

We recognize that under the CVRA and the restitution statutes, a reference to a particular type of victim in the elements of the offense or the charging document is not a prerequisite to establishing statutory crime victim status.[106] On the other hand, the present case illustrates the difficulty presented by a broad society-based statute, such as obstruction or false statements to government officials, when individual victims are proposed to have statutory crime victim status.

---

Court for the Dist. of Mont. (Missoula), Nos. 09-70529, 09-70533 (9th Cir. Feb. 27, 2009). On March 2, 2009, the district court filed a Notice of Compliance on the court of appeals docket, stating that the government advised on remand that only the Parkers expressed any interest in being present at trial prior to testifying, and even they had withdrawn their request. Notice of Compliance at 2-5, Parker v. U.S. Dist. Court for the Dist. of Mont. (Missoula), No. 09-70529 (9th Cir. Mar. 2, 2009). The district court also described how it had exercised its discretion under Federal Rule of Evidence 611(a) to afford the Parkers their CVRA rights in that circumstance. Id. at 4-5.

The counts of the indictment that were invoked in support of CVRA statutory crime victim status in the W.R. Grace case were Counts I, II, III, and IV of the Superseding Indictment. W.R. Grace, 2009 WL 368240, at *3. Counts II, III, and IV allege CAA violations under 42 U.S.C. § 7413(c)(5)(A). Superseding Indictment at 44-45, United States v. W.R. Grace, No. 05-07 (D. Mont. June 26, 2006). The corresponding Count I conspiracy objective cites the same statutory section. Id. at 15. That provision of the CAA states that "[a]ny person who knowingly releases into the ambient air any hazardous air pollutant . . ., and who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury [shall be guilty of this offense]." 42 U.S.C. § 7413(c)(5)(A) ("knowing endangerment" offense). There are other counts in that Superseding Indictment that charge obstruction of the EPA in violation of 18 U.S.C. § 1505, with a corresponding Klein-type "defraud" EPA and OSHA (called NIOSH) objective alleged in the Count 1 conspiracy. Superseding Indictment, supra, at 15-16, 46-49. We find it significant, however, that none of the obstruction charges were mentioned as supporting the asserted CVRA crime victim status in the W.R. Grace case. W.R. Grace, 2009 WL 368240, at *3-*8.

[106] See, e.g., cases summarized supra Sec. I.C, including In re Stewart, 552 F.3d at 1286-89 (mortgage borrowers were CVRA victims of bank fraud conspiracy); Gee, 432 F.3d at 714-15 (local entity administering federal welfare funds was MVRA victim of conspiracy to defraud United States through bribery scheme); Hoover, 175 F.3d at 567, 569 (university was MVRA victim of false statement offense in federal student loan program); Haggard, 41 F.3d at 1323-24, 1329 (mother of long-missing child was VWPA victim of false statement hoax directed at FBI); and Hand, 863 F.2d at 1102-05 (federal law enforcement agencies were VWPA victims of juror's contempt of court that caused convictions obtained at trial to be vacated).

One of the chief salutary purposes of the crime victims' rights statutes, such as the CVRA and the restitution statutes, is to provide victims with dignity and respect in the criminal justice process. See supra Sec. I.A. That purpose is defeated if causation allegations are so attenuated in relation to the offense of conviction that the alleged victims are effectively turned into litigants, defending against contentions that intervening forces or their own actions contributed to their harm. See supra Sec. II.E.

*  *  *

This Court finds that the harm to the six named workers alleged by the government to have been "directly and proximately" caused by the offenses of conviction is too factually attenuated, in relation to the offenses of conviction, for the Court to make a finding of CVRA or VWPA statutory crime victim status in this case. The conduct that allegedly harmed one or more of the six named workers may have been in violation of OSHA workplace standards (standards applicable to the employer only), and that appears to be the actual basis of the government's argument in this motion. See text accompanying supra n.88. Such conduct, however, was not conduct proscribed by the obstruction and false statement substantive offenses and conspiracy objectives of which each of these defendants was convicted, and we perceive no "direct and proximate" causal link between those offenses of conviction and the injuries sustained by the six named workers. See Kones, 77 F.3d at 71 (the conduct that allegedly harmed claimant was not conduct proscribed by the mail fraud offense of conviction, so claimant was not a "victim" under the VWPA). In so ruling, we do not preclude the possibility that in a rare factual setting, an obstruction or false statement offense involving OSHA could be found to have the requisite

causal nexus to an injury in the workplace.[107]

Alternatively, we find that the record is not sufficiently developed on issues of "direct and proximate" causation linked to the offenses of conviction under the CVRA and VWPA standards, and that defendants have statutory and constitutional rights that would, at a minimum, require further evidentiary adjudication. We further find and conclude that such evidentiary adjudication would unreasonably complicate and prolong the remaining proceedings in this criminal prosecution. See id. ("As the district court aptly observed, it could not grant [claimant's statutory victim request under the VWPA] without fully litigating a tangentially related medical malpractice case as a part of the sentencing process."). We also have grave doubts that such a proceeding would produce a result consistent with the limitations on statutory crime victim status inherent in the Sixth Amendment right to jury trial as articulated in Booker. See Leahy, 438 F.3d at 336-37.

For these reasons, insofar as the government seeks to have the Court afford CVRA allocution rights to the six named workers or their representatives in the sentencing of defendants Atlantic States, John Prisque, Scott Faubert, and Jeffrey Maury, that relief requested under the CVRA is denied. The Court does recognize its discretionary authority under 18 U.S.C. § 3661 to receive information from indirect victims or other persons affected by acts and events depicted in

---

[107] A direct and proximate causal link between obstruction of OSHA and a personal injury might be found, for example, in a case where OSHA made an unannounced inspection and directed the employer to have someone demonstrate a piece of machinery, such as an overhead crane; and the employer, knowing the equipment was in an unsafe condition, nonetheless ordered a worker to make the demonstration to OSHA; and while that was in progress the equipment failed and injured the operator, the OSHA inspector, or others in the vicinity.

the trial evidence.  See supra Sec. I.E.  We will determine separately how that authority will be exercised in this case.

An appropriate Order and Notice accompanies this opinion.


   s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Dated:  March 23, 2009